UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PENTHOL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:21-CV-416 |
| | § | |
| VERTEX ENERGY OPERATING, LLC, | § | |
| | § | |
| *Defendant.* | § | |

## ORIGINAL COMPLAINT

Plaintiff Penthol LLC ("Penthol") files this Original Complaint against Defendant Vertex Energy Operating, LLC ("Vertex") for violations of the Sherman Act, breach of contract, business disparagement, and misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA").

## I.     Introduction

1.     This case presents two types of claims: (1) a Sherman Act claim over which this Court has exclusive jurisdiction, and (2) claims for breach of contract, business disparagement, and misappropriation of trade secrets that did not arise until Penthol and Vertex mutually agreed to terminate ███████████████████████████████████████ on January 27, 2021.

### Sherman Act Claim

2.     Vertex has stifled competition in the marketing and sale of Group III base oil in the United States. Group III base oil is used to make high-performance synthetic engine oils for passenger vehicles, industrial lubricants, food grade white oils, process oils, and high-performance, heavy-duty engine oils. It is very expensive and time-consuming to become a qualified and approved manufacturer capable of selling Group III base oil in the United States. To

1

do so, one must own an oil refinery, or have access to its refined products, and possess the significant time, money, and expertise needed to obtain the required regulatory and other approvals.

3.    █████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████    When the Parties[1] entered into ████████████  Vertex did not manufacture or sell any base-oil product that competed directly or indirectly with the Product. Indeed, that was a key consideration for Penthol, which wanted an *independent* sales representative without debilitating conflicts of interest that would prevent the representative from using good business practices and commercially reasonable efforts to maximize Product sales in North America.

4.    After it entered into ██████████  however, Vertex became a direct competitor of Penthol and the Product.  But rather than compete on the merits, Vertex used ████████████
████████████████████████████████  as an anticompetitive sword to stifle competition in the market for Group III base oil. Vertex has violated the Sherman Act, and Penthol is entitled to actual and treble damages, attorneys' fees and costs, and declaratory and injunctive relief.

<u>Post-Termination Claims</u>

5.    The Parties mutually agreed to terminate ██████████  on January 27, 2021. Termination triggered certain obligations ████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████  Unfortunately, Vertex has

---

[1] Capitalized terms not defined herein shall have the meaning given to them in ██
████████.

refused to comply with its obligations ████████ despite repeated requests by Penthol. Vertex has therefore materially breached ██████ and damaged Penthol by refusing to cooperate.

6.      Instead of ensuring an orderly post-termination transition of work from Vertex to Penthol, Vertex has engaged in a "scorched earth" strategy of disparaging Penthol to Customers and others by falsely stating that Penthol terminated ████████. In fact, Vertex agreed with Penthol that ██████████ terminated on January 27, 2021. Vertex falsely attributed ██ ██████████ termination to Penthol for the purpose of harming Penthol and its business, economic interests, and relationships with Customers, suppliers, and others. Now that Vertex and Penthol both sell Group III base oil, Vertex wants to remove Penthol as an competitor and ensure that the termination of ████████ is as disruptive as possible to Customers, suppliers, and others to induce them not to do business with Penthol.

7.      Finally, now that ██████████ is terminated, Vertex has no right to access or use Penthol's confidential and trade secret information. But Vertex is continuing to access and use Penthol's trade secrets to further Vertex's sale of its own Group III base oil. Vertex's misappropriation of Penthol's trade secrets is illegal under both the DTSA and the TUTSA.

8.      As explained in more detail below, Vertex's post-termination breaches of contract, business disparagement, and misappropriation of trade secrets entitle Penthol to actual and exemplary damages, attorneys' fees and costs, and declaratory and injunctive relief.

## II.      Parties

9.      Plaintiff Penthol is a limited liability company organized and existing under the laws of Texas with its principal place of business in Texas. Penthol's sole member and 100% owner is Final Energy B.V., a Netherlands partnership. The sole partner and 100% owner of Final

Energy B.V. is Zeynep Cizmeci, a Turkish citizen residing in the United Kingdom who is neither lawfully admitted for permanent residence in the United States nor domiciled in any of the United States. Accordingly, for purposes of diversity jurisdiction, Penthol is a citizen or subject of a foreign state. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) (holding that, "like limited partnerships and other unincorporated associations or entities, the citizenship of a LLC is determined by the citizenship of all of its members").

10.     Vertex is a limited liability company organized and existing under the laws of Texas with its principal place of business in Texas. Vertex Energy, Inc. (1) is the sole member and 100% owner of Vertex, and (2) is incorporated in Nevada and had its principal place of business in Texas. Accordingly, for purposes of diversity jurisdiction, Vertex is a citizen of Nevada and Texas. *Harvey*, 542 F.3d at 1080.

### III.     Jurisdiction and Venue

11.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because Penthol's claims under the Sherman Act and the DTSA arise under federal law. Indeed, this Court has exclusive jurisdiction over Penthol's Sherman Act claim. *Miller v. Granados*, 529 F.2d 393, 395 (5th Cir. 1976).

12.     This Court also has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive or interest and costs, and is between citizens of a state and a citizen or subject of a foreign state.

13.     To the extent necessary, the Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367 since those claims form part of the same case or controversy and derive from a common nucleus of operative facts.

14.     This Court has personal jurisdiction over Penthol and Vertex because they each conduct substantial business in Texas. Additionally, a substantial part of the events or omissions giving rise to Penthol's claims occurred in Texas. ████████████████████████████ ██████████████████████████

15.     Venue is proper in the Southern District of Texas pursuant to 29 U.S.C. § 1391 because Vertex resides in this judicial district; a substantial part of the events or omissions giving rise to Penthol's claims occurred in this judicial district; and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this judicial district. Additionally, ████████████████ venue in the Southern District of Texas.

## IV.     Interstate Commerce for the Sherman Act

16.     Vertex's conduct, as described below, was within the flow of and substantially affected interstate commerce under the Sherman Act.

17.     During the relevant time period for the Sherman Act, Vertex ████████████ ████████████ acted as Penthol's independent sales representative in North America, which includes the United States. Vertex engaged in conduct, made communications, and received payments ████████████ that were within the flow of and substantially affected interstate commerce.

18.     Additionally, during the relevant time period for the Sherman Act, Vertex engaged in conduct, made communications, and received payments related to sales of Vertex's own products that were within the flow of and substantially affected interstate commerce. Vertex received revenues and purchased products and feedstock from sources in multiple states. Vertex also sold its own products to customers who then sold their own products in interstate commerce.

## V.      Facts

**A.      Penthol is the Product's exclusive North American distributor.**

19.      Penthol is a global distributor of high-quality petrochemicals and petroleum based products. Since 2016, Penthol has distributed the Product manufactured by Abu Dhabi National Oil Company ("ADNOC") in the North American market.

20.      Group III base oil is a type of base stock derived from petroleum crude oil that has undergone a rigorous refining process, resulting in a purer, high-quality base oil that has greater than 90 percent saturates, less than .03 percent sulfur, and a viscosity index greater than 120. Group III base oil offers improved performance to other base oil groups and is used in a broad spectrum of applications that require efficiency and high performance, like engine oils, driveline fluids, and other automotive, hydraulic, marine, and industrial lubricants.

21.      Very little Group III base oil is produced in the United States. Instead, Group III base oil is primarily imported into the United States from other countries.

22.      In 2016, Penthol began strategizing how it would introduce and distribute the Product in the United States. Penthol quickly realized that to compete in the North American market, it would need to either: (1) launch an office in the United States and hire full-time employees to build out its operations there; or (2) work with a company operating in the base-oil market with an existing infrastructure to assist Penthol with marketing, sales, and logistics.

23.      Penthol worked with a consultant to develop a strategic plan and to introduce Penthol to customers to whom it could sell the Product in North America. Since Penthol did not have a long-term supply contract in place during 2016, it wanted to minimize costs and did not want to hire many employees. Eventually, Vertex was identified and vetted as a potential company that Penthol could hire as a sales representative to outsource certain aspects of the Product's marketing, sales, and logistical functions in North America.

24.     Vertex is a refiner and marketer of alternative feedstocks—in this case, used motor oil. Vertex collects used motor oil from auto shops that perform oil changes or other businesses that need to dispose of their old lubricants and oils and re-refines the used motor oil into other products, like recycled base oils.

25.     ███████████████████████ Penthol believed that Vertex would be a good North American sales representative for the Product. As a manufacturer of recycled base oil, Vertex had some knowledge about the North American base oil market. But Vertex was not manufacturing and selling base-oil products that competed directly or indirectly with the Product ████████████████████████ This was an important consideration for Penthol ████████████████████ because Penthol did not want to do business with a sales representative that had a conflict of interest and lacked sufficient incentives to market, sell, and provide logistical support for the Product, as compared to the representative's competing base-oil products.

**B.     Penthol engaged Vertex as an independent sales representative.**

26.     Following negotiations, Penthol and Vertex ████████████████████ ████████████████████████ Penthol appointed Vertex to be an independent sales representative for Penthol and to solicit orders for the Product in North America. Through its position as Penthol's independent sales representative, Vertex obtained access to Penthol's confidential information and trade secrets relating to Customers and the Product, including (but not limited to) price, cost, and other financial information; logistical and transportation information; sales and marketing information and plans; Customer lists, Purchase Contracts, files, and other information; and business plans.

**C.**     **Vertex violated federal antitrust law.**

27.     As noted above, Vertex and Penthol were not direct competitors when they ██████ ████████████ but that changed later and Vertex began manufacturing and selling Group III base oil.

28.     Once Vertex entered the Primary Market and the Sub-Market (as those terms are defined below), ███████████ became an unlawful restraint on trade and a per se violation of the Sherman Act because it was a █████████████████████████████████████ ██████████████████

29.     In  particular, █████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ Although █████████████████████ was lawful when ████████████████████████████████████████████ ██████████████████████ it became unlawful once Vertex became a direct, horizontal competitor of Penthol and the Product.

30.     Vertex has used ██████████████████████████████ to exclude Penthol, a maverick competitor focused on making Group III base oil more affordable, from both the Primary Market and the Sub-Market. By doing so, Vertex has ensured that its own entry into those markets has no impact. Accordingly, Vertex's conduct has turned what should have been an event that increased competition into a non-event.

31.     Although  Vertex  and  Penthol  mutually  agreed  to  terminate ███████████ on January 27, 2021, Vertex has not indicated whether it agrees that ████████████████████ terminated at that time too. The ██████████████████ substantially reduces competition and results in consumers paying higher prices for Group III base oil and having less choice when

it comes to suppliers of those products, because Penthol is effectively being removed as a competitor in the market for Group III base oil in North America.

<u>Market Definition</u>

32.     Defining a relevant market is unnecessary when ██████████████████ amounts to a per se violation of the Sherman Act, which is the situation here since Vertex became a horizontal competitor. Nevertheless, if a defined market is required here, the relevant market is that for Group III base oil sold in the United States of America ("Primary Market").

33.     The primary product market is that for Group III base oil. There is extremely low cross-elasticity of demand between Group III base oil and other base oils. In contrast, there is high cross-elasticity of demand between Group III base oil like Penthol's Product and Vertex's competing product, VTX-6, which meets the specifications to be a Group III base oil.

34.     A small but significant price increase in the price of Group III base oil will not cause customers to switch to other base oils. The choice of base oil is largely determined by product function and the needs of each customer, not on the relative cost of the product. Other base oils cannot be used for the same functions or purposes as Group III base oil, which are of higher quality.

35.     There is further differentiation in the product market arising from the nature of the customer at issue, which gives rise to one or more product submarkets. Some customers purchase large volumes of Group III base oil ("Large Purchasers"). Others are independent lubricant companies that purchase smaller volumes of Group III base oil ("Small Purchasers").

36.     Small Purchasers do not have the same buying opportunities as Large Purchasers who are able to use long-term contracts to secure significant supply of Group III base oil. Due to their size and needs, Small Purchasers have fewer options when purchasing Group III base oil.

They therefore face different cross-elasticity of demand than Large Purchasers and can constitute a product submarket.

37.     Put simply, sellers are able to impose price differences on Small Purchasers for the same or similar Group III base oil. Although Vertex and Penthol compete in the Primary Market, they compete most acutely when it comes to sales of Group III base oil to Small Purchasers in the United States ("Sub-Market"). As noted above, Penthol is a maverick supplier who has made Group III base oil more affordable. Vertex wants to eliminate Penthol as a competitor and to decrease competition in the Sub-Market.

38.     Barriers to entry exist in the Primary Market and Sub-Market making entry difficult, costly, unlikely, and untimely. Building or acquiring the infrastructure and technology necessary to process and sell Group III base oil is expensive and time-consuming. It requires a license for necessary technology and construction, ownership, or control of a refinery to process crude oil into Group III base oil and the related infrastructure required to sell, transport, and deliver them to customers, including tanker ships, storage tanks, and railcars, barges, or trucks.

39.     Regulatory or other approvals create additional barriers to entry in the Primary Market and Sub-Market. Refineries and the related infrastructure required to manufacture, sell, transport, and deliver Group III base oil to customers are subject to myriad environmental, health, safety, and other regulations at both the federal and state level in the United States. Complying with all applicable regulations is expensive and burdensome, thereby discouraging entry into the Primary Market and Sub-Market.

40.     In addition to regulatory approvals and compliance, entry into the Primary Market requires approval from other organizations, like the American Petroleum Institute, or from original equipment manufacturers, like General Motors and Ford. It is time-consuming and expensive to

obtain these approvals, and it requires significant knowledge and experience to ensure that Group III base oil meet required specifications before they may be sold to customers in the Primary Market. Similar regulatory approvals and compliance issues apply to the Sub-Market.

41.     The relevant geographic market is no larger than the United States. Group III base oil is sold throughout the United States. The sellers of Group III base oil in the United States would have the power, if acting collectively, to increase prices above competitive levels. Further, as explained above, there are high technical and legal barriers to entry into the United States, including the need to comply with federal and state laws and to obtain various regulatory and other approvals. Additionally, entrants must establish a distribution, logistics, and sales network in the United States. Customers of Group III base oil in the United States cannot easily substitute to other sellers outside the United States.

42.     The Primary Market is highly concentrated. Approximately one million tons of Group III base oil are sold annually in the United States. The largest seller accounts for approximately 450,000 tons; the next two sellers (one of which is Penthol) account for approximately 200,000 tons each; and another half dozen or so sellers account for the remaining balance. Based on these market shares, the Herfindahl–Hirschman Index ("HHI") for the Primary Market exceeds 2,800.[2] The Department of Justice and the Federal Trade Commission consider any market with a HHI in excess of 2,500 to be highly concentrated. The Sub-Market is even more highly concentrated because some large sellers are not interested in selling to Small Purchasers.

---

[2] HHI is a commonly accepted measure of market concentration and is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).

43.     Vertex has market power in the Sub-Market. As explained above, Vertex and Penthol compete in the Sub-Market. Vertex has a significant share of the Sub-Market and will continue to have one unless ███████████████████████ is terminated as of January 27, 2021. Therefore, Vertex has and exercises market power in the Sub-Market, which causes prices for Group III base oil to rise and reduces consumer choice and competition. The Sub-Market should be subjected to open and robust competition, free from any anticompetitive restraints.

Anticompetitive Effects

44.     Vertex acted with the purpose and effect of unreasonably restraining and injuring competition in the Primary Market and the Sub-Market. But for Vertex's conduct described herein: (1) Vertex's market power in the Primary Market and the Sub-Market would be reduced; (2) there would be increased competition in those markets; (3) prices for Group III base oil would be lower in those markets; and (4) the quality and quantity of Group III base oil and related services offered for sale in those markets would be higher. Accordingly, Vertex's conduct has resulted in higher prices, less competition, and lower quality and quantity of Group III base oil in the Primary Market and the Sub-Market.

Antitrust Impact

45.     Because of the anticompetitive course of conduct described herein, competition in the Primary Market and the Sub-Market has been unreasonably restrained, and Penthol has been substantially limited in its ability to effectively compete in those markets. Vertex's conduct has harmed Penthol by foreclosing it from the Primary Market and the Sub-Market, which has caused Penthol to lose sales, revenues, and profits, and thereby suffer harm to its business or property. Penthol will continue to be harmed unless ████████████████████████ is found to be terminated on January 27, 2021.

46.     Penthol's injuries are a direct and foreseeable result of Vertex's anticompetitive course of conduct, as described herein. Further, Vertex's actions have deprived Penthol of the benefits of open competition and represent precisely the type of conduct the antitrust laws were designed to prohibit.

**D.     Vertex breached its post-termination obligations** ██████████████.

47.     On December 18, 2020, Penthol sent a letter to Vertex providing ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Because Vertex received the ████ letter on December 23, 2020, the ██████████████ period did not expire until early February 2021.

48.     On January 19, 2021, Vertex responded to Penthol's letter and disputed both the accuracy of the facts in Penthol's letter and the occurrence of ████████████████████ Vertex's letter closed by asserting that ██████████████████████████████ ██████████████.

49.     Before Penthol could respond to Vertex's January 19 letter, Vertex sent a new letter on January 27, 2021. Although ████████████████████ period had not yet expired, Vertex's January 27 letter notified Penthol that "Vertex considers ██████████ terminated" and invoked ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ By its January 27 letter, Vertex elected to terminate ████████████████████████████████████████ ████████████████████



50.     On January 29, 2021, Penthol responded to Vertex and confirmed Penthol's agreement that ███████████ was terminated ██████████████ on January 27, 2021. Penthol also explained how Vertex breached its obligations ███████████████████ Instead of acting in ████████████████████████████ Vertex had (among other things) unilaterally notified Customers that Vertex was no longer an independent sales representative of the Product and removed Penthol's access to important Customer information. Vertex's conduct made it difficult, if not impossible, for Penthol to ensure that Customers' Purchase Contracts were satisfied in a timely manner.

51.     Penthol's January 29 letter also addressed Vertex's breaches of ███████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████

52.     Vertex breached its obligations ████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████ Vertex improperly conditioned its cooperation on the prior receipt of all

amounts alleged owed by Penthol: "Should Penthol pay these amounts by this [January 29]

deadline, Vertex will entertain reasonable requests to provide its services and expertise to process

an orderly transition of work."

53.     When Vertex failed to timely respond to Penthol's January 29 letter, Penthol sent

another letter on February 4, 2021, listing the following specific actions that Vertex must take by

February 8 to comply with ▮▮▮▮▮▮▮▮▮▮▮▮▮:

(a)     provide Penthol with a list of all actual or prospective Customers for the
        Product that includes, at a minimum, (i) all contact information (*i.e.*, names,
        telephone numbers, email addresses, etc.) for each actual or prospective
        Customer, and (ii) a complete list of all persons, and their respective email
        addresses, who must receive shipping documents (*e.g.*, bills of lading or
        invoices) for each actual or prospective Customer;

(b)     provide Penthol with a list of all actual or prospective Customers that Vertex
        has contacted about the termination of ▮▮▮▮▮▮▮▮, along with copies of
        all related communications;

(c)     in all future communications between Vertex and any actual or prospective
        Customer regarding the Product or ▮▮▮▮▮▮▮▮ (or its termination),
        advise them (i) that ▮▮▮▮▮▮▮ has been mutually terminated by the
        parties, (ii) that Penthol is taking over all services previously performed by
        Vertex, and (iii) that all future communications should be directed to
        Penthol's Chief Executive Officer, Harji Gill, at (317) 832-3020 or
        harjigill@pentholusa.com;

(d)     provide Penthol with access to all data related to sales activities ▮▮▮▮
        ▮▮▮▮▮▮ by giving Penthol access to the shared drive that was in place
        before ▮▮▮▮▮▮ termination;

(e)     provide Penthol with copies of all policies, procedures, or similar
        documents used by Vertex to perform services ▮▮▮▮▮▮▮▮; and

(f)     cooperate with Penthol to prepare and issue a joint press release or
        announcement notifying Customers about ▮▮▮▮▮▮ termination to
        help facilitate an orderly and commercially reasonable transition of work
        from Vertex to Penthol.

Vertex's failure to comply with all of these requests constitutes violations of ▮▮▮▮▮▮▮

▮▮▮▮▮.

54.     Indeed, rather than cooperate with Penthol in an orderly and commercially reasonable manner, Vertex has intentionally cancelled meetings with Penthol; denied Penthol access to Customer and other information related to ███████; misrepresented to Customers and others the reason for ██████████ termination; failed to process and finalize Purchase Contracts; failed to process Customer orders and issue Customer invoices for the Product; failed to make shipments of the Product; and forced Penthol to make costly alternate arrangements to process orders and ship the Product. Vertex's post-termination conduct has thus damaged Penthol and will continue to do so in the future.

**E.      Vertex disparaged Penthol's business and economic interests.**

55.     As explained above, the Parties mutually agreed to terminate ██████████ on January 27, 2021. Contrary to the Parties' mutually agreed termination, however, Vertex has unilaterally contacted Customers and others, including ADNOC, to disparage Penthol and its economic interests, including by (among other things) falsely telling them that Penthol terminated ██████████, that Penthol is not a reliable supplier or distributor of the Product, and that Penthol will not be able to sell the Product to them anymore.

56.     Vertex disseminated its false communications to Customers and others via Zoom and otherwise on January 28, 2021, and thereafter. Vertex made its false statements to harm Penthol and its reputation and economic interests. As explained above, Vertex is now a competitor of Penthol and the Product, and Vertex wants to sell its Group III base oil to the Customers, thereby displacing Penthol as the Customers' supplier. Vertex would also like to displace Penthol as the distributor of the Product in North America. Indeed, Vertex knew that its false statements would likely induce Customers and others not to do business with Penthol. Thus, Vertex's false statements about Penthol and the termination of ██████████ were motivated by actual malice and were published to the Customers and others with actual malice.

57.     Vertex's malice is reflected through, among other things, its refusal to cooperate with Penthol in an orderly transition of work and Customers from Vertex to Penthol. Vertex has tried to make the transition as difficult and disruptive as possible to harm Penthol and its reputation with Customers and others. By portraying Penthol in a negative light, Vertex intends to increase its sales of Group III base oil to the Customers and enhance its reputation as a reliable supplier of Group III base oil.

**F.     Vertex misappropriated Penthol's trade secrets.**

58.     As explained above, Vertex obtained access to Penthol's confidential information and trade secrets through Vertex's position as Penthol's independent sales representative for North America. The confidential information and trade secrets relating to Customers and the Product to which Vertex was given access include, but are not limited to, price, cost, and other financial information; logistical and transportation information; sales and marketing information and plans; Customer lists, Purchase Contracts, files, and other information; and business plans.

59.     Although Vertex was entitled to access Penthol's confidential information and trade secrets related to the Product and the Customers while Vertex was Penthol's independent sales representative, Vertex has no right to that information and those trade secrets now that ███ ███████ is terminated. Nevertheless, Vertex is still using and disclosing Penthol's confidential information and trade secrets improperly for Vertex's benefit in the sales of its own Group III base oil.

60.     As explained above, Vertex is contacting Customers and others and falsely stating that Penthol terminated ████████. Vertex is also telling Customers that it wants to sell its own Group III Product to them and to displace Penthol as the Customers' supplier. By virtue of its improper access to Penthol's confidential information and trade secrets, which Vertex is using for

its own purposes to sell its own Group III base oil, Vertex is misappropriating Penthol's trade secrets.

## VI.    Causes of Action

**A.    First Claim for Relief – Sherman Action, Section 1**

61.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

62.    As explained above, ███████████████████████████████ ████████████████████████ since Vertex became a direct competitor of Penthol and the Product, and since then has reflected a horizontal agreement among competitors that is per se unlawful.

63.    In the alternative, ████████████ and Vertex's conduct are unlawful under the rule of reason. As explained above, ███████████████████████████ have created anticompetitive effects in the Primary Market and the Sub-Market.

64.    Vertex's conduct has substantially and adversely affected interstate commerce.

65.    Vertex enhanced and abused its market power in the Primary Market and the Sub-Market through the exclusionary and anticompetitive devices described above, including by excluding Penthol from the Primary Market and the Sub-Market. Vertex was trying to eliminate a maverick competitor from the market and thereby harm competition in the Primary Market and the Sub-Market.

66.    Vertex's conduct tended to impair the opportunities of rivals—like Penthol—and did not further competition on the merits or did so in an unnecessarily restrictive way.

67.    Because of Vertex's conduct, prices have been higher and there are few alternatives for participants in the Primary Market and the Sub-Market, thereby causing injury to competition,

consumers, and Penthol. These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Vertex's conduct unlawful.

68.     Because of Vertex's anticompetitive conduct, Penthol seeks all remedies to which it may be entitled, including actual damages, treble damages, attorneys' fees and costs, a declaratory judgment that ███████████████████ is invalid and was terminated on January 27, 2021, and an injunction prohibiting enforcement of ███████████████ .

**B.     Second Claim for Relief – Post-Termination Breach of Contract**

69.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

70.     Penthol has performed all of its obligations ███████████ and all conditions precedent to Vertex's required performance ███████████ have been performed, will be performed, or have been waived.

71.     Following ███████ termination, Vertex has materially breached ███████ by failing to ████████████████████████ ████████████████████ .

72.     Vertex has further materially breached ████████████ post-termination by demanding immediate payment of funds without allowing Penthol, ███████ ████████████████████████ ████████████████████████ ███████ .

73.     Vertex has also materially breached ████████████ post-termination by demanding immediate payment of funds without offering to ███████████ ████████████████████████ .

74.     Penthol has incurred damages because of Vertex's material breaches.

75.     Penthol therefore seeks all remedies to which it may be entitled, including actual damages, consequential damages, declaratory and injunctive relief, and attorneys' fees and costs.

**C.      Third Claim for Relief – Business Disparagement**

76.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

77.     Vertex has made and published defamatory statements about Penthol and its business and economic interests. Vertex's statements are false. When Vertex made and published its statements, it was motivated by actual malice, and it made and published the statements with actual malice. Vertex's statements are not privileged.

78.     Penthol has been injured and suffered special damages as a direct and proximate result of Vertex's conduct. Penthol therefore seeks adequate compensation for the damages inflicted by Vertex.

**D.      Fourth Claim for Relief – Misappropriation of Trade Secrets Under the DTSA**

79.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

80.     The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

81.     Penthol owns trade secrets relating to Customers and the Product consisting of, among other things: price, cost, and other financial information; logistical and transportation information; sales and marketing information and plans; Customer lists, Purchase Contracts, files,

and other information; and business plans. These materials are trade secrets under the DTSA and are related to the Product, which is used in interstate commerce.

82.     The materials are of independent economic value, actual and potential, for not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value for the disclosure or use of the information because this information enables Penthol to create and develop business strategies that give it a competitive edge in the industry. This information in the hands of a competitor who could use it for its own business would put Penthol at an enormous disadvantage.

83.     Penthol takes significant measures to maintain the secrecy of its trade secrets by, among other things: limiting access to trade secrets and confidential information only to that which is necessary for an employee to perform his or her duties; requiring employees to sign confidentiality agreements; and requiring passwords for accessing the information.

84.     While performing services for Penthol ███████████ Vertex obtained access to Penthol's trade secrets relating to Customers and the Product, including price, cost, and other financial information; logistical and transportation information; sales and marketing information and plans; Customer lists, Purchase Contracts, files, and other information; and business plans. Now that Vertex is no longer Penthol's independent sales representative ██████ ██████ Vertex was obligated to immediately cease using Penthol's trade secrets and to return them to Penthol. Instead, Vertex has misappropriated Penthol's trade secrets by (among other things) using, copying, and sharing them in marketing plans, customer lists, pricing, and business development activities for Vertex's Group III base oil.

85.     Penthol has been harmed as a direct and proximate result of Vertex's conduct. Penthol has suffered and is continuing to suffer actual losses caused by the misappropriation of its

trade secrets, including loss of profits, goodwill, competitive advantage, and business opportunities, and Penthol is entitled to recover damages for these losses. Penthol's damages include, but are not limited to, actual loss and the value of the trade secrets. Penthol is also entitled to recover damages for unjust enrichment caused by the misappropriation of its trade secrets.

86.     Vertex's misappropriation was done willfully and maliciously, and Penthol seeks exemplary damages from Vertex.

87.     As a result of Vertex's willful and malicious violation of the DTSA, Penthol has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work. Penthol seeks to recover such attorney's fees and costs under the DTSA pursuant to 18 U.S.C. § 1836(b)(3)(D).

88.     Penthol is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential information and trade secrets by (1) enjoining Vertex from using or disclosing Penthol's trade secret and confidential information; and (2) requiring Vertex's to return to Penthol any and all copies of Penthol's trade secret and confidential information.

**E.     Fifth Claim for Relief – Misappropriation of Trade Secrets Under the TUTSA**

89.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

90.     The actions described above also constitute misappropriation of trade secrets under the TUTSA, codified at Chapter 134A of the Texas Civil Practices and Remedies Code.

91.     Penthol has been harmed as a direct and proximate result of Vertex's violations.

92.     Accordingly, Penthol seeks relief under the TUTSA and exemplary damages for the willful and malicious misappropriation of its trade secrets.

93.     As a result of Vertex's willful and malicious violations of the TUTSA, Penthol has been forced to retain counsel to enforce its rights and agreed to pay counsel a reasonable fee for

necessary work. Penthol seeks to recover such attorneys' fees and costs under the TUTSA pursuant to section 134A.005 of the Texas Civil Practice and Remedies Code.

### VII.    Declaratory and Injunctive Relief

94.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

95.    Penthol seeks a declaration that  is invalid, unenforceable, and was terminated on January 27, 2021. Alternatively, if ████████████ ████ is not invalid, unenforceable, and terminated, Penthol seeks a declaration that compliance with that █████ is excused because of Vertex's post-termination breaches of ██ ████████. Penthol further seeks an injunction prohibiting enforcement of the ███ ████████████████. 

96.    Penthol further seeks a declaration that Vertex has materially breached ██████  For the reasons given above, Vertex has refused to cooperate with Penthol and has acted ██████████ ████████████████████.

97.    Penthol further seeks an injunction (1) prohibiting Vertex from using or disclosing Penthol's trade secret and confidential information; and (2) requiring Vertex's to return to Penthol any and all copies of Penthol's trade secret and confidential information.

### VIII.   Attorneys' Fees and Costs

98.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

99.    Due to the Vertex's conduct, Penthol has been forced to engage the law firms of Thompson & Knight LLP and Morgan, Lewis & Bockius LLP to prosecute this action and to

protect its rights.   Accordingly, Penthol is entitled to recover its reasonable and necessary attorneys' fees and costs pursuant to the Sherman Act, the DTSA, the TUTSA, Chapter 38 of the Texas Civil Practice and Remedies Code, and any other applicable law.

## IX.   Prayer

Defendant Penthol LLC respectfully prays that the Court: (a) render judgment in favor of Penthol on its claims; (b) enter declarations (i) that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is invalid, unenforceable, and was terminated on January 27, 2021, or alternatively, that compliance with that ▮▮▮▮▮▮ is excused due to Vertex's material post-termination breaches of contract, and (ii) that Vertex has materially breached ▮▮▮▮▮▮▮▮▮▮▮; (c) issue an injunction (i) that prohibits enforcement of ▮▮▮▮▮▮▮▮▮▮▮, assuming that it was not already terminated on January 27, 2021, (ii) that prohibits Vertex from using or disclosing Penthol's trade secret and confidential information, and (iii) that requires Vertex's to return to Penthol any and all copies of Penthol's trade secret and confidential information; (d) award Penthol actual, treble, consequential, and exemplary damages, attorneys' fees, and costs of court; and (e) grant Penthol all other and further relief, at law and in equity, to which it may be justly entitled.

Respectfully submitted,

**THOMPSON & KNIGHT LLP**

By:    _/s/ William M. Katz, Jr._
         *Attorney-in-Charge*
         William M. Katz, Jr.
         Texas Bar No. 00791003
         S.D. Tex. Bar No. 21581
         William.Katz@tklaw.com

         One Arts Plaza
         1722 Routh Street, Suite 1500
         Dallas, TX 75201
         214-969-1700 (Telephone)
         214-969-1751 (Facsimile)

**ATTORNEYS FOR DEFENDANT
PENTHOL LLC**

*Of Counsel*

**THOMPSON & KNIGHT LLP**

J. Michael Bell
Texas Bar No. 02079200
S.D. Tex. Bar No. 5574
michael.bell@tklaw.com

Caitlin E. Gernert
Texas Bar No. 24093140
S.D. Tex. Bar. No. 3306023
caitlin.gernert@tklaw.com

Dina W. McKenney
State Bar No. 24092809
S.D. Tex. Bar. No. 3501700
Dina.McKenney@tklaw.com

811 Main Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

**MORGAN, LEWIS & BOCKIUS LLP**

Winstol D. Carter, Jr.
Texas State Bar No. 03932950

S.D. Tex. Bar No. 2934
winn.carter@morganlewis.com

William R. Peterson
Texas State Bar No. 24065901
S.D. Tex. Bar No. 1035932
william.peterson@morganlewis.com

Lewis A. Smith
Texas State Bar No. 24088439
S.D. Tex. Bar No. 2292401
lewis.smith@morganlewis.com

Heidi Rasmussen
Texas State Bar No. 24090345
S.D. Tex. Bar. No. 3027157
heidi.rasmussen@morganlewis.com

1000 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001