UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PENTHOL LLC, | § | |
| *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO. 4:21-CV-416 |
| VERTEX ENERGY OPERATING, LLC, | § § § | |
| *Defendant*, | § § | |

**PENTHOL LLC'S CLOSING BRIEF**

Pursuant to the Court's instruction (11/6/23 Tr. 64:5–12), Penthol LLC submits this brief to address Vertex's closing argument. Vertex argued that "[t]his is a case about the real world versus pretend." 11/6/23 Tr. 35:21–22. Penthol agrees. The reality is that the evidence presented at trial proves that Vertex (1) breached the Sales Representative and Marketing Agreement ("SRMA"); (2) misappropriated Penthol's trade secrets for Vertex's own benefit; and (3) wrongfully terminated the contract or mutually agreed to terminate it with Penthol. The Court should find in Penthol's favor on all issues for at least the reasons summarized below.

**A.      Vertex breached Section 3.4(c) of the SRMA.**

Vertex's arguments challenging Penthol's claim that Vertex breached Section 3.4(c) of the SRMA all fail.[1] *First*, Vertex pretends that the prohibited conduct in Section 3.4(c) is limited only to actual sales. *See, e.g.*, 11/6/23 Tr. 37:13–38:4, 41:16–17. But this argument contradicts the SRMA's plain language, which provides that Vertex cannot "sell, ***market, advertise, promote,***

---

[1] Vertex has in fact breached multiple sections of the SRMA. Because Vertex's argument at closing about the SRMA focused on Section 3.4(c), Penthol limits its discussion of its breach-of-contract claims to Section 3.4(c). Penthol should also prevail on its claims that Vertex breached other SRMA sections for the reasons set forth in Penthol's Proposed Findings of Fact and Conclusions of Law.

*solicit the same of or offer to sell* any product that competes with Product procured or sourced by Penthol … ." PTX004 § 3.4(c) (emphasis added).  Section 3.4(c)'s language is broad and extends to conduct beyond just selling a competing product.  Recognizing Section 3.4(c)'s importance, the parties used the phrase, "Notwithstanding anything to the contrary in this Agreement," to show that it was more important than any of the SRMA's other provisions.  *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing cases).  In short, Vertex wrongly argues that Section 3.4(c) is limited to only actual sales of a competing product, even though Vertex's witnesses admitted that Section 3.4(c) was broader than just actual sales.  10/31/23 (AM) Tr. 71:13-15, 71:22-72:3.  Thus, from a liability standpoint, it is clear that Vertex breached the SRMA.

*Second*, Vertex pretends that the Group III VTX-6 it admittedly sold did not compete with the SRMA's Product.  11/6/23 Tr. 39:15–41:7.  As shown at trial, however, the SRMA defined the "Product" as a "Group III Base Oil meeting the specifications set forth in Exhibit 'A.'"  PTX004 at 6.  Penthol's President, Faruk Erkoc, negotiated the SRMA and confirmed that Penthol intended and understood that Section 3.4(c) required Vertex to stay in the Group II lane with its own VTX-6 product and not cross over into the Group III lane.  *See* 10/31/23 (PM) Tr. 18:16-20.

Vertex's witnesses also admitted that once a base oil "crosses the 120 [viscosity index ("VI")], 0.03 percent sulfur and > 90% saturates threshold, it is categorized as 'all the same.'"  PTX112 at 1; 11/1/23 (AM) Tr. 66:12-67:13; 11/2/23 (AM) Tr. 144:15-21.  In other words, Group III base oil is Group III base oil, as confirmed by the American Petroleum Institute's base oil grading specifications and interchange rules.  11/1/23 (AM) Tr. 72:6-9, 72:16-73:6; 10/30/23 (AM) Tr. 114:22-115:23; 11/2/23 (AM) Tr. 138:4-19, 139:4-140:9, 141:17-142:2.  This means that for each gallon of Group III VTX-6 a customer received, it could forego purchasing a gallon of the

Product. Contrary to Vertex's arguments, Section 3.4(c)'s prohibition on competition with the Product "procured and sourced by Penthol" unambiguously means the Product defined in Exhibit A to the SRMA—i.e., a Group III base oil. PTX004 at § 3.4(c), Ex. A.

Further, the API does not have specifications for CCS (cold crank simulator) or NOACK volatility. 10/30/23 (AM) Tr. 120:9-12; 11/1/23 (AM) Tr. 57:23-58:5; 11/1/23 (PM) Tr at 58:14-16; 11/2/23 (AM) Tr. 141:3-15. Thus, the evidence established that, in reality, Vertex breached Section 3.4(c) by selling, marketing, advertising, promoting, soliciting the sale of, and offering to sell hundreds of thousands of gallons of Group III VTX-6 with a VI of 120 or above. 10/30/23 (AM) Tr. 118:9-24; *see e.g.*, PTX148; DX066 at 6; PTX013 at 6, 11. Indeed, by the time the SRMA terminated in January 2021, almost 20% of all VTX-6 sold by Vertex was Group III base oil in violation of the SRMA. 10/30/23 (AM) Tr. 119:23-120:1. And Vertex marketed and promoted its ability to produce and sell more Group III base oil through its presentations to numerous potential investors, including Tensile, which invested over $7 million in the Heartland Refinery where Vertex produced and sold its Group III VTX-6 base oil. 10/30/23 (PM) Tr. 141:15-23; *see e.g.*, PTX005; PTX013; PTX148.

*Third*, Vertex incorrectly argues that Penthol has "pretend" damages for its claim that Vertex breached Section 3.4(c). *E.g.*, 11/6/23 Tr. 35:24. Not so. The parties' bargain reflected in the SRMA prevented Vertex from competing with the Product. Because Vertex breached Section 3.4(c) by selling Group III VTX-6, Penthol did not receive the benefit of that bargain. Accordingly, Penthol should be restored to the same position it would have been absent Vertex's breach—i.e., if Vertex had never sold Group III VTX-6. *See Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 888–89 (Tex. App.—Dallas 2004, pet. denied) (discussing benefit-of-the-bargain damages); *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279

(Tex. 1994) (finding that lost profits were the proper measure for benefit of the bargain damages because they were "the natural and probable consequences" of the breach). To restore Penthol to that position, Penthol should receive the profits that it lost from Vertex selling Group III VTX-6, rather than the Product, in violation of Section 3.4(c).

*Fourth*, the Court should reject Vertex's argument that Penthol's damages calculation is not sufficiently specific because certificates of analysis ("COAs") "are not reflective of gallons" sold. 11/6/23 Tr. 42:12. As explained below, the evidence established the potential range of gallons sold by Vertex in each shipment of Group III VTX-6, and the profits from those sales should have been realized by Penthol rather than Vertex. Accordingly, the profits that Penthol would have received if Vertex had sold the Product instead of Group III VTX-6 should be awarded to Penthol as damages. This is especially true because Section 3.4(c) is a non-compete provision that does not require mathematical precision for damages:

> The courts have recognized the problem of ascertaining damages in cases involving the breach of non-competition contracts. Because of the very nature of these cases, ***it is seldom possible to establish with complete mathematical accuracy the damages resulting to plaintiff***. While courts do not permit an award of damages based upon mere speculation or conjecture, they do not go so far as to require that there be a mathematical exactness of the amount of damages.

*Arabesque Studios, Inc. v. Acad. of Fine Arts, Intern., Inc.*, 529 S.W.2d 564, 569 (Tex. App.—Dallas 1975, no writ) (emphasis added) (citing cases). In this case, all that is required is that "the evidence … provide ***a basis for reasonable inference***." *Thomas*, 174 F.3d at 648. Penthol has more than met this threshold for the damages caused by Vertex's breach of Section 3.4(c).

Ms. Snedegar testified that each COA reflects a full truck or a full railcar of VTX-6. 11/1/23 (PM) Tr. 47:5-10. She then confirmed that the smallest number of gallons in a full truck or a full railcar would be 5,200 gallons. *Id.* Tr. 46:8–23. Accordingly, if each COA reflecting a

sale of Group III VTX-6 was for only 5,200 gallons, Penthol's damages would be at least $109,980 using the following formula. Multiply the minimum number of gallons (5,200) by the number of COAs reflecting Group III VTX-6 from January 2019 to January 27, 2021 (141) to get 733,200 gallons of Group III VTX-6. *See* 10/30/23 (AM) Tr. 118:17-22. Then multiply those 733,200 gallons by Penthol's per-gallon profit margin of $0.15 to get damages of at least $109,980. *See* 10/31/23 (PM) Tr. 123:21-124:25). At a minimum, Penthol is entitled to these damages from Vertex.

B.   **Vertex misappropriated Penthol's trade secrets for Vertex's own benefit.**

Vertex cannot avoid liability on Penthol's claim for misappropriation of trade secrets for several reasons. *First*, the lack of a nondisclosure agreement between Penthol and Vertex is not a real reason to bar Penthol's recovery. 11/6/21 Tr. 49:24-50:1. "Texas law makes it clear that an express confidentiality agreement is not required for liability in a trade secret misappropriation case … ." *Bianco v. Globus Med., Inc.*, No. 2:12-CV-00147-WCB, 2014 WL 5462388, at *10-11 (E.D. Tex. Oct. 27, 2014), *aff'd*, 618 Fed. Appx. 1032 (Fed. Cir. 2015); *see Zinco-Sherman, Inc. v. Adept Food Sols., Inc.*, No. CIV. A. H-06-1081, 2006 WL 1061917, at *2 (S.D. Tex. Apr. 21, 2006) ("Although the parties did not execute a written confidentiality or noncompete agreement, Texas law does not require a formal written confidentiality agreement to establish a confidential or fiduciary relationship."); *Hyde Corp. v. Huffines*, 158 Tex. 566, 576, 314 S.W.2d 763, 770 (1958) ("In the area of confidential relationships between partners, employers and employees, licensors and licensees, and the like, the injured party is not required to rely upon an express agreement to hold the trade secret in confidence.").

Section 4.8 of the SRMA confirmed that Vertex was Penthol's "exclusive agent for marketing and sale of the Product in the Territory," and as the Restatement of Agency makes clear:

> Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another … .

Restatement (First) of Agency § 395 (1933). That is the exact situation here. Having obtained Penthol's confidential information because of the SRMA, Vertex could not use it without Penthol's permission, regardless of whether there was a nondisclosure agreement in place.

*Second*, the trade secrets at issue belong to Penthol, not Vertex. *See e.g.*, 10/30/23 (PM) Tr. 52:14–20 (H. Erkoc testifying that the price sold to the customer is Penthol's most important trade secret); *id*. 53:3–9 (H. Erkoc testifying about the different between posted prices and actual prices); *id.* 77:8–19 (H. Erkoc testifying that Penthol created the prices and Vertex would record them in the workbook). To the extent Vertex had any role in generating or developing those prices, it did so at Penthol's direction as Penthol's agent, which renders the prices Penthol's property. 13 Dorsaneo, Texas Litigation Guide § 200B.04 ("If an employee is hired or employed specifically to invent, develop, or devise improvements for the employer, any inventions and work product resulting from the employee's work in the scope of employment belongs to the employer." (citing cases)). Finally, even if the Court determines that the trade secrets at issue were jointly owned or developed by Penthol and Vertex, Penthol still can sue Vertex for misappropriation: "[A] joint owner can bring a claim for trade secret misappropriation against the other owner." *StrikePoint Trading, LLC v. Sabolyk*, 2008 WL 11334084, at *6 (C.D. Cal. Dec. 22, 2008); *see Curtiembre Becas, S.A. v. Arpel Leather Corp.*, No. 1:05CV622, 2007 WL 9751828, at *8 (M.D.N.C. May 2, 2007) ("[C]ourts that have addressed [the issue] have held that a joint owner of a trade secret is protected from unlawful disclosure by the other owners of the trade secret, absent some clear waiver of that protection." (citing cases)).

*Third*, the reality of the evidence shows that Vertex used Penthol's trade secrets for Vertex's own benefit. Vertex did so by using actual Product prices to create models for the sale of Group III base oil by Vertex. *See* PTX112 ("Using real raw data from July 2019 ADNOC GR III selling price …"). Vertex used those models to persuade Tensile to invest over $20 million in Vertex and did not get Penthol's permission to use the actual price information for the Product. 11/1/23 (AM) Tr. 84:15–85:7; 11/2/23 (AM) Tr. 18:11-14; PTX112 at 1. Vertex also used Penthol's trade secrets after the SRMA terminated by sharing Product prices with Valvoline without Penthol's permission. DX098 at 1.

*Fourth*, Penthol is entitled to disgorgement due to Vertex's misappropriation. Disgorgement "is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). "A defendant who misappropriates a trade secret … faces the risk of a judgment requiring disgorgement of up to all the profits gained as a result of that misappropriation." *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 938 (E.D. Tex. 2014); see 18 U.S.C. § 1836(b)(3)(B). Mathematical precision is not required for Penthol's damages, which are measured from either September 2017 or July 2019 through the end of the SRMA in January 2021 using the formula below. The evidence showed that Vertex's "black oil" gross profit margin (which included VTX-6 sales) was 18.5%, and thus a net profit margin of 7.5% is reasonable. 11/2/23 (AM) Tr. 8:2-16, 8:24-9:20; PTX012 at 8.

$$\left( \frac{\text{GIII VTX-6 COAs}}{\text{Total VTX-6 COAs}} \times \text{Total VTX-6 Revenues} \right) \times \text{Vertex Profit Margin} = \text{Damages}$$

PTX170, DX148     PTX190

$$\left( \frac{134}{1000} \times \$42{,}310{,}211 \right) \times 7.5\% = \$425{,}217$$

*July 18, 2019 to January 27, 2021*

Accordingly, the Court should rule in Penthol's favor and award damages for misappropriation.

C. **Vertex terminated the SRMA or agreed to mutually terminate it with Penthol.**

Finally, Vertex pretends that Penthol wrongfully terminated the SRMA. *First*, Vertex is incorrect that, once Penthol sent its December 18, 2020 notice of default, termination was automatic if Vertex did not cure its breach within 30 Business Days. 11/6/23 Tr. 47:22–48:11. Section 7.1 sets forth the various ways the SRMA "is ***subject to*** termination." PTX004 § 7.1 (emphasis added). This language does not make termination automatic. "Subject to' … implies a contingency." *Titan Tire Corp. of Bryan v. Local 890l, United Steelworkers of Am.*, 673 F. Supp. 2d 582, 586 (N.D. Ohio 2009), *aff'd sub nom*, 656 F.3d 368 (6th Cir. 2011). "Subject to termination" means that termination "is an option … but it is not automatic." *Id.*

Section 7.1(b) confirms that termination was not automatic with the transmission of a default notice like Penthol's December 18, 2020 letter:

> Either Party shall have the ***right to terminate*** this Agreement upon … the failure of a Party to perform any material covenant or obligation set forth in this Agreement if such failure is not remedied within thirty (30) Business Days after receipt of a Notice specifically describing the nature of the default; provided, however, that in the event the alleged default is

**PENTHOL LLC'S CLOSING BRIEF – PAGE 8**

> cured within such thirty (30) day period, this Agreement shall remain in full force and effect and not be terminated as a result of such default.

PTX0004 § 7.1(b). Under this language, Penthol had only a "right to terminate" that was not exercisable until at least February 4, 2021, the first day following the expiration of 30 Business Days after sending its December 18, 2020 default notice. Penthol's option to terminate could be eliminated based on the "provided" language relied on by Vertex—i.e., if the alleged default was cured within 30 Business Days, Penthol's option to terminate was no longer exercisable and the SRMA would "remain in full force and effect." Even Vertex's January 19, 2023 letter recognized that Penthol had only an option to terminate after sending its December 18, 2020 letter, because Vertex conceded that Penthol had to take additional steps to "follow through on its threat to terminate." PTX067 at 2. In sum, Penthol had only an option to terminate after sending its December 18, 2020 letter; that letter neither terminated the SRMA nor required its termination.

*Second*, the evidence shows that the SRMA did not terminate when Penthol sent its December 18, 2020 letter. To the contrary, the parties continued to perform under the SRMA until late January 2021. 11/1/23 (PM) Tr. 33:15-17; *see* DX097 at 2. Penthol also paid commissions to Vertex on December 23, 2020, and the morning of January 27, 2021. PTX188 at 1; PTX191 at 2. It was only later on January 27, 2021 that **Vertex** terminated the SRMA by sending an email with the subject line: "Sales Representative and Marketing Agreement **Termination**." PTX233 at 1 (emphasis added). That email transmitted Vertex's January 27, 2021 letter stating that "Vertex considers the Agreement terminated." PTX045 at 1.

*Third*, Vertex's closing ignores that, when Vertex sent its January 27, 2021 letter, Penthol's option to terminate under Section 7.1(b) was not exercisable until at least February 4, 2021. But before then, on January 28, 2021, Vertex was already telling customers like Lube-Tech that the SRMA terminated as of January 27, 2021. DX 97 at 2. Then, just days after terminating the

SRMA on January 27, 2021, Vertex contacted ADNOC in an attempt to squeeze Penthol out and become ADNOC's North American distributor for the Product. PTX094 at 1-2.

For these reasons, the evidence does not support Vertex's "pretend" argument that Penthol terminated the SRMA by sending its December 18, 2020 letter. The SRMA terminated (1) when Vertex sent it January 27, 2021 letter, began telling Product customers like Lube-Tech that the SRMA was over, cancelled the weekly Vertex-Penthol customer meetings, and cut off Penthol's access to the shared drive, or (2) when Penthol sent its January 29, 2021 letter to Vertex confirming the parties' mutual agreement to terminate the SRMA as of January 27, 2021, pursuant to Section 7.1(d) of the SRMA.

* * * * * * * * * * * * * * * * * * * *

For these reasons, and the set forth in Penthol's Proposed Amended Findings of Fact and Conclusions of Law, the Court should find in Penthol's favor on its claims against Vertex and on Vertex's counterclaims against Penthol.

Date: November 22, 2023                                    Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By:    */s/ William M. Katz, Jr.*
William M. Katz, Jr.
Attorney-in-Charge
Texas Bar No. 00791003
S.D. Tex. Bar No. 21581
William.Katz@hklaw.com

Dina W. McKenney
Texas Bar No. 24092809
S.D. Tex. Bar No. 3501700
Dina.McKenney@hklaw.com

Jordan T. Koenig
Texas Bar No. 24121702
S.D. Tex. Bar No. 24121702
Jordan.Koenig@hklaw.com

One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
214-969-1700 (Telephone)
214-969-1751 (Facsimile)

J. Michael Bell
Texas Bar No. 02079200
S.D. Tex. Bar No. 5574
michael.bell@hklaw.com

811 Main Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

**MORGAN, LEWIS & BOCKIUS LLP**

David J. Levy
Texas State Bar No. 12264850
S.D. Tex. Bar No. 13725
david.levy@morganlewis.com

William R. Peterson
Texas State Bar No. 24065901
S.D. Tex. Bar. No. 1035932
william.peterson@morganlewis.com

**PENTHOL LLC'S CLOSING BRIEF – PAGE 11**

                                                                   Heidi Rasmussen
                                                                  Texas State Bar No. 24090345
                                                                  S.D. Tex. Bar. No. 3027157
                                                                  heidi.rasmussen@morganlewis.com

                                                                  1000 Louisiana Street, Suite 4000
                                                                  Houston, Texas 77002
                                                                  Telephone: (713) 890-5000
                                                                  Facsimile: (713) 890-5001

                                                          **ATTORNEYS FOR PENTHOL LLC**

## CERTIFICATE OF SERVICE

      I certify that a true and correct copy of the foregoing instrument has been served on all parties of record on November 22, 2023.

                                                          */s/ Jordan T. Koenig*
                                                           Jordan T. Koenig