**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| PENTHOL LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:21-CV-416 |
| | § | |
| VERTEX ENERGY OPERATING, LLC, | § | |
| | § | |
| *Defendant.* | § | |

**PENTHOL LLC'S PROPOSED AMENDED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Penthol LLC submits the following amended proposed findings of fact and conclusions of law.[1]  To the extent that the Court deems any of the proposed findings of fact to be conclusions of law or mixed findings of fact and conclusions of law, Penthol LLC submits them as such.  And to the extent that the Court deems any of the proposed conclusions of law to be findings of fact or mixed findings of fact and conclusions of law, Penthol LLC submits them as such.

**I.       Findings of Fact**

1.       Penthol LLC is a limited liability company organized and existing under the laws of Texas with its principal place of business in Texas.  Penthol LLC's sole member and 100% owner is Final Energy B.V., a Netherlands partnership.  The sole partner and 100% owner of Final Energy B.V. is Zeynep Cizmeci, a Turkish and British citizen residing in the United Kingdom who is neither lawfully admitted for permanent residence in the United States nor domiciled in any of the United States.

---

[1] The Court previously dismissed Penthol LLC's Sherman Act Claim [Dkt. No. 41] and claims for business disparagement, tortious interference, and fraud [Dkt. No. 176].  Accordingly, Penthol LLC has omitted discussion of those claims, but reserves all appellate rights regarding the claims.

2.      Vertex Energy Operating, LLC ("Vertex") is a limited liability company organized and existing under the laws of Texas with its principal place of business in Texas.  Vertex Energy, Inc. (1) is the sole member and 100% owner of Vertex, and (2) is incorporated in Nevada and has its principal place of business in Texas.

3.      In June 2016, Penthol LLC and Vertex Refining OH, LLC ("Vertex Ohio"), Vertex's predecessor in interest, entered into the Sales Representative and Marketing Agreement ("SRMA"),[2] under which Vertex Ohio served as Penthol LLC's independent sales representative in North America for Group III base oil meeting the specifications in the SRMA (the "Product").[3]

**A.      Penthol LLC is the Product's exclusive distributor in North America.**

4.      Since its formation in 2016, Penthol LLC has acted as the North American distributor of the base oil Product manufactured by the Abu Dhabi National Oil Company ("ADNOC").[4]  Supplying the Product in the United States required great financial investment and financial risk for Penthol LLC.[5]

5.      Base oils are used in a broad spectrum of applications, like engine oils, driveline fluids, and other automotive, hydraulic, marine, and industrial lubricants.[6]  Group III base oil is a type of base stock derived from petroleum crude oil that has greater than 90 percent saturates, less than .03 percent sulfur, and a viscosity index or "VI" greater than or equal to 120.[7]

---

[2] PTX004, SRMA at 1.

[3] PTX004, SRMA at 6, definition of "Product," 22, Exhibit A.

[4] Day 2 (PM) Trans., F. Erkoc Test. at 9:17-20.

[5] Day 2 (PM) Trans., F. Erkoc Test. at 5:5-22, 17:3-7.

[6] Day 1 (AM) Trans., H. Henderson Test. at 83:9-20, 84:1-10.

[7] PTX138, API 1509, Appendix E at 1-2.

**Penthol LLC's Proposed Amended Findings of Fact and Conclusions of Law – Page 2**

**B.     Penthol LLC engaged Vertex as an independent sales representative.**

6.      In 2016, before Penthol LLC was formed, an affiliate of Penthol LLC, Penthol C.V., analyzed how it would introduce and distribute the Product in North America.  Eventually, Vertex was identified and vetted as a potential sales representative to outsource certain aspects of the Product's marketing, sales, and logistical functions in North America.[8]  At the time, Vertex was a refiner and marketer of alternative feedstocks—in this case, used motor oil ("UMO").[9]  Vertex collected UMO from auto shops and other businesses that needed to dispose of lubricants and oils and re-refined or recycled them into new products, like base oils.[10]

7.      Entering into the SRMA benefited Vertex by, among other things, allowing Vertex to build relationships with customers that were not previously purchasing VTX-6 and by allowing Vertex to offer its current VTX-6 customers a Group III base oil.[11]  As a manufacturer of recycled base oil, Vertex had some knowledge about the North American base-oil market.[12]  But when the parties entered into the SRMA, Vertex was not producing, marketing, promoting, and/or selling Group III base oil that competed with the Product.[13]  This was an important consideration for Penthol LLC when entering into the SRMA because Penthol LLC did not want a sales representative that lacked sufficient incentives to promote, market, sell, and provide logistical support for the Product.[14]

---

[8] Day 1 (PM) Trans., H. Erkoc Test. at 41:6-42:12.

[9] Day 1 (PM) Trans., B. Cowart Test. at 130:19-20.

[10] Day 3 (AM) Trans., E. Snedegar Test. at 55:13-19.

[11] Day 1 (PM) Trans., B. Cowart Test. at 129:5-17.

[12] PTX140, Vertex Environmental Operations.

[13] Day 1 (PM) Trans., B. Cowart Test. at 121:19-25, 122:20-123:1.

[14] Day 2 (PM) Trans., F. Erkoc Test. at 18:16-20; Day 1 (PM) Trans., H. Erkoc Test. at 41:18-42:10.

**C.**     **The SRMA set forth clear terms for the parties' business arrangement.**

8.     The SRMA made Vertex the independent sales representative and exclusive agent of Penthol LLC for the Product in North America.[15]   As such, Vertex had to provide certain marketing, sales, and logistical-support functions.[16]   Among these, Vertex had to use commercially reasonable efforts to maximize the Product's sales volume.[17]   Vertex was also required to coordinate, arrange, and procure logistics, including the proper return and cleaning of railcars.[18]

9.     For its work, Vertex received a commission and (if earned) a performance-incentive payment.[19]   Commissions were not payable to Vertex until "Penthol actually receive[d] unconditional payment from a Customer under the corresponding Purchase Contract or spot sale transaction."[20]   Vertex received all commissions owed for Product sales that occurred prior to termination of the SRMA.[21]   With respect to the performance incentive, Vertex hired and paid PW Associates, PLLC ("PWA") to perform the calculations for the performance incentive during the SRMA's term.[22]   PWA worked with both Vertex and Penthol LLC to refine the methodology for calculating the performance incentive payments owed, if any.[23]

---

[15] PTX004, SRMA at 7 §§ 3.1(a), 4.8; Day 1 (PM) Trans., H. Erkoc Test. at 40:9-12.

[16] PTX004, SRMA at 8-9 § 3.3; Day 1 (PM) Trans., H. Erkoc Test. at 41:6-42:12.

[17] PTX004, SRMA at 8 § 3.3(a).

[18] PTX004, SRMA at 10-11 § 4.2.

[19] PTX004, SRMA at 13-14 § 5.2, 6, definition of Net Sales Proceeds.

[20] PTX004, SRMA at 14 § 5.2(b).

[21] PTX188, Email re Penthol payments at 1; PTX191, Penthol LLC's payments to Vertex.

[22] PTX126, PWA Engagement Letter; Day 1 (PM) Trans., H. Erkoc Test. at 49:13-50:6; Day 4 (PM) Trans., S. Enriquez Test. at 83:6-14.

[23] Day 4 (AM) Trans., C. Carlson Test. at 22:15-25, 27:1-14; PTX127, Email re Incentive Calculation.

10.     By its terms, the SRMA did ***not*** create a joint venture, partnership, or other joint enterprise between the Parties.[24]  Vertex was always an independent contractor.[25]  Vertex did not sell any Product under the SRMA and had "no authority to … enter into a Purchase Contract on behalf of Penthol LLC or to otherwise bind Penthol LLC to sell or deliver the Product to a Customer."[26]  All Product sales were made by Penthol LLC.[27]

11.     Additionally, the SRMA barred Vertex from directly or indirectly engaging in certain prohibited activities (collectively, the "Prohibited Acts"), including (1) making representations on Penthol LLC's behalf; (2) engaging in unfair, anti-competitive, misleading or deceptive practices respecting the Product; and (3) selling, marketing, advertising, promoting, soliciting the sale of, or offering to sell any product that competes with the Product.  Section 3.4(c) barred Vertex from selling, marketing, advertising, promoting, soliciting the sale of, or offering to sell any Group III base oil besides the Product; if Vertex were to do so, it would be improperly competing with the Product procured or sourced by Penthol.[28]

**D.     Vertex fundamentally misinterprets the SRMA.**

12.     After executing the SRMA, and despite the SRMA's clear language, Vertex began misrepresenting its relationship with Penthol LLC to existing and prospective customers by, among other things, issuing press releases, advertisements, and spec sheets incorrectly describing the parties' relationship as a joint venture.  Vertex wrongly claimed that the parties were to "jointly market this business" using "the VertexPenthol brand."  Vertex also issued press releases falsely

---

[24] Capitalized terms not defined herein shall have the meaning given to them in the SRMA.  PTX004, SRMA at 8 § 3.2(b).

[25] PTX004, SRMA at 7 §§ 3.1, 3.2.

[26] PTX004, SRMA at 11 § 4.4.

[27] *See e.g.*, PTX141, Pennstar Contract at 10; PTX142 Plouton Contract at 7; PTX143 Pinnacle Oil Contract at 9.

[28] Day 2 (PM) Trans., F. Erkoc Test. at 18:16-20; Day 1 (PM) Trans., H. Erkoc Test. at 41:18-42:10.

representing that it had "partnered" with Penthol LLC to distribute and sell the Product under "the Vertex-Penthol" name and that the parties had entered into a "joint venture."[29]   Vertex also advertised that a "partnership between Vertex and Penthol LLC—two trusted base oil suppliers with a combined 30 years in the business—means we can deliver impeccable service and unparalleled value to our customers."[30]   A specification sheet or "spec sheet" linked to Vertex's website further represented that the "partnership between these two trusted base oil suppliers means a continued commitment to superior service."[31]

13.   A February 2018 email sent by Vertex's CEO and Chairman of the Board—Benjamin Cowart—shows how Vertex misconstrued its role under the SRMA.   In that email, Cowart claimed that the Parties were to "jointly market this business to the US together under the VertexPenthol brand" and complained that Penthol LLC erroneously believed it "was the US distributor to the US market and not VertexPenthol."[32]   Vertex demanded—in contravention of the SRMA—that Penthol LLC "immediately include the VertexPenthol brand as part of [Penthol LLC's] communications related to the Technical, sales and marketing, and distribution of the ADNOC base oil."[33]   Vertex also wanted to enter into a contract with ADNOC.[34]   Before the SRMA, Vertex had no relationship whatsoever with ADNOC.[35]

---

[29] PTX009, August 9, 2016 Press Release; PTX144, August 11, 2016 Press Release; PTX010, May 22, 2017 Press Release.

[30] PTX145, Vertex ADBase Website.

[31] PTX146, Vertex ADBase Marketing Materials.

[32] PTX147, Email re London Meeting Follow Up at 2.

[33] PTX147, Email re London Meeting Follow Up at 3.

[34] PTX094, Email re ADBase GIII Base Oil for North America at 1-2; Day 1 (PM) Trans., B. Cowart Test. at 176:12-25.

[35] Day 1 (PM) Trans., B. Cowart Test. at 125:24-126:7.

14.     Faruk Erkoc—Penthol LLC's President—responded to correct Cowart's clear misunderstanding.   Relying on the SRMA, Mr. Erkoc explained that "Penthol is the vendor. Vertex is the sales representative"—nothing more.[36]  After this exchange, Mr. Faruk Erkoc and Mr. Cowart largely stopped communicating and the relationship between Penthol and Vertex soured.[37]

**E.     Vertex breached its affirmative obligations under the SRMA.**

15.     Vertex did not devote sufficient resources to allow Penthol LLC to sell the Product for its more profitable uses.[38]  Penthol LLC could have obtained additional Product volume from ADNOC to sell into these new industries, if Vertex had complied with Section 3.3(a).[39]  The United States was the best and highest-price market for ADNOC and the Product.[40]

16.     Vertex also failed to meet its obligations under Section 4.2 of the SRMA by failing to have railcars properly cleaned before returning them and by failing to negotiate a waiver of the cleaning fee.  As a result of this, Penthol had to hire and pay a consultant to re-negotiate the cleaning fee and to have the rail car company agree to waive the cleaning fee.[41]

17.     VTX 6 is sometimes a Group II base oil and sometimes a Group III base oil ("Group III VTX-6"), depending entirely on the viscosity index of the batch at issue.[42]  Although Vertex received commissions for sales of the Product under the SRMA—and possibly performance

---

[36] PTX147, Email re London Meeting Follow Up at 1.

[37] Day 2 (PM) Trans., F. Erkoc Test. at 23:20-24:4.

[38] PTX232, Email re Additional Employee; Day 2 (AM) Trans., F. Erkoc Test. at 24:10-25:22; Day 3 (PM) Trans., E. Snedegar Test. at 11:11-13.

[39] Day 1 (PM) Trans., H. Erkoc Test. at 51:14-17; Day 2 (PM) Trans., F. Erkoc Test. at 27:4-14.

[40] Day 2 (PM) Trans., F. Erkoc Test. at 27:4-14.

[41] PTX229, Integrity Rail Partners Invoice.

[42] Day 1 (PM) Trans., B. Cowart Test. at 135:5-10, 135:25-136:4; Day 3 (PM) Trans., E. Snedegar Test. at 56:22-25; *see e.g.*, PTX152, Group III VTX-6 Certificates of Analysis; DX148, VTX-6 Certificates of Analysis at 1-5.

incentive payments, if earned—Vertex was financially incentivized to sell VTX-6 instead of the Product, because Vertex received 100% of the revenues and 100% of the profits from all VTX-6 sales, including Group III VTX-6 sales.[43]

**F.      Vertex breached the SRMA by competing with Penthol and the Product.**

18.     Vertex competed with the Product in violation of SRMA Section 3.4(c), which prohibited Vertex from directly or indirectly selling, marketing, advertising, promoting, soliciting the sale of, or offering to sell any product that competes with the Product.[44]  The SRMA defined the Product as a Group III base oil procured or sourced by Penthol that meets the specifications in Exhibit A to the SRMA.[45]

19.     Under the grading system and specifications issued by the American Petroleum Institute ("API"), the Product was a Group III base oil because it had a viscosity index of 120 or greater, greater than 90 percent saturates, and less than .03 percent sulfur.[46]  The API's grading system does not have a maximum viscosity index for Group III base oils, so a base oil with a viscosity index of 135 or higher is still a Group III base oil.[47]  The API's grading system also does not have any requirement or specification for NOACK volatility or Cold Crank Simulator ("CCS").[48]  Vertex has acknowledged that Group III base oils with a viscosity index from 120

---

[43] Day 2 (AM) Trans., B. Cowart Test. at 14:21-23, 55:23-56:21, 57:10-25.

[44] PTX004, SRMA at 9-10 § 3.4(c).

[45] PTX004, SRMA at 6, definition of "Product"; 22, Exhibit A.

[46] PTX138, API 1509, Appendix E at 1-2; Day 1 (AM) Trans., H. Henderson Test. at 116:10-23; Day 3 (AM) Trans., E. Snedegar Test. at 56:25-57:3, 58:11-59:12.

[47] Day 1 (AM) Trans., E. Henderson Test. at 124:18-125:6; Day 3 (AM) Trans., E. Snedegar Test. at 58:11-59:1.

[48] Day 1 (AM) Trans., H. Henderson Test. at 120:9-12; Day 3 (AM) Trans., E. Snedegar Test. at 57:23-58:5; Day 3 (PM) Trans., E. Snedegar Test. at 3-58:14-16; Day 4 (AM) Trans., D. Peel Test. at 141:3-15.

through 129 are "all the same."[49]  And that the designation of Group III base oils with a viscosity index of 130 or higher as "Group III+" is merely a marketing term, not an API classification.[50] All of this evidence shows that Group III base oils are Group III base oils,[51] regardless of Vertex's arguments to the contrary.

20.     Group III base oils may be substituted or interchanged with one another under the API's interchange rules and the so-called 10% and 30% rules.[52]  In fact, when VTX-6 met the API's specifications for a Group III base oil, it could be substituted for the Product in "a one-for-one exchange."[53]  Blenders purchasing VTX-6 received a certificate of analysis or COA with each truck or rail car of VTX-6, and that COA disclosed the characteristics of the entire VTX-6 batch in the truck or rail car.[54]  Blenders are sophisticated purchasers and understand the differences between Group II and Group III base oils.[55]  Because the base oil industry is a low-margin "game of pennies,"[56] blenders are incentivized to use the highest-quality base oil at the lowest price; they are thus incentivized to use Group III VTX-6 instead of the Product.[57]  That is why so-called "unethical" blenders sometimes "fudge" and substitute one base oil for another, even if substitution

---

[49] PTX112, Email re G-III Follow-Up at 1; Day 3 (AM) Trans., E. Snedegar Test. at 66:12-67:13; Day 1 (AM) Trans., H. Henderson Test. at 95:4-11, 95:25-96:3, 130:23-131:19; Day 4 (AM) Trans., D. Peel Test. at 144:15-21.

[50] Day 1 (AM) Trans., H. Henderson Test. at 131:6-12.

[51] Day 1 (AM) Trans., H. Henderson Test. at 95:25-96:3.

[52] PX112; Day 1 (AM) Trans., H. Henderson Test. at 114:22-115:23; Day 3 (AM) Trans., E. Snedegar Test. at 72:6-9, 72:16-73:6; Day 4 (AM) Trans., D. Peel Test. at 138:4-19, 139:4-140:9, 141:17-142:2.

[53] PTX202, Deposition Designations of W. Lyons at 90:19-91:11, 93:8-94:1, 94:24-95:15; PTX082 at 2; Day 1 (AM) Trans., H. Henderson Test. at 111:17-112:17.

[54] Day 3 (PM) Trans., E. Snedegar Test. at 47:5-10, 63:7-15, 134:9-11.

[55] Day 1 (PM) Trans., H. Erkoc Test. at 46:11-18.

[56] Day 3 (PM) Trans., E. Snedegar Test. at 133:16-22.

[57] Day 1 (AM) Trans., H. Henderson Test. at 114:22-115:23; Day 3 (PM) Trans., E. Snedegar Test. at 134:1-18.

is not consistent with the API's interchange rules.[58]  Thus, a blender that received a batch of Group III VTX-6 at Group II pricing would be incentivized to use the Group III VTX-6 instead of the Product.

21.     Further, customers, such as Valvoline, have formulations that list multiple API Group III base oils so they have formulation flexibility.[59]  This means that different base oils can be used in a formulation without doing additional testing, such as the testing required by the API.[60] Valvoline had specific formulations for certain of its lubricants that listed both the Product and VTX-6, which indicated that the lubricants could be made with 100% of the Product.[61]  By listing both the Product and VTX-6, the formulations also gave Valvoline the incentive to substitute Group III VTX-6 in place of the Product.  Pinnacle Oil had similar formulations listing both VTX-6 and the Product.[62]

22.     Industry or other approvals are not required to sell a Group III base oil.[63]  For example, Penthol sold the Product to blenders during the approximately one-year period before the Product received its first North American approval.[64]  And Vertex worked on producing and selling its own unapproved Group III base oil during the SRMA's term.[65]  Recognizing the ability

---

[58] PTX112, Email re G-III Follow-Up at 1; Day 3 (AM) Trans., E. Snedegar Test. at 75:2-16.

[59] Deposition Designations of W. Lyons (Valvoline) at 65:13-19.

[60] Deposition Designations of W. Lyons (Valvoline) at 68:9-14.

[61] Deposition Designations of W. Lyons (Valvoline) at 73:19-24.

[62] See, e.g., PTX082, API Formulation Information for 5W-20 Motor Oil; PTX083, API Formulation for 5W-30 Motor Oil.

[63] Day 2 (AM) Trans., B. Cowart Test. at 69:5-13; Day 3 (AM) Trans., E. Snedegar Test. at 69:15-70:2, 71:13-19; Day 4 (AM) Trans., D. Peel Test. at 111:5-7.

[64] Day 4 (AM) Trans., D. Peel Test. at 132:14-133:5.

[65] PTX108, Email re Discussion on HL Gr III options at 1; Day 4 (PM) Trans., D. Peel Test. at 6:19-7:5, 9:11-15, PTX112, Email re Gr-III Follow-up at 1.

to sell base oils without industry or other approvals, Vertex expected that its sales of unapproved Group III base oil would be profitable.[66]

23.     In fact, Vertex undertook several different paths or campaigns to produce and sell Group III base oil while the SRMA was in effect.[67]  Vertex's efforts began at least as early as 2017 and continued through 2018 and 2019.[68]  Vertex's efforts to produce and sell Group III base oil included (1) upgrading the Heartland Refinery to produce Group III VTX-6 consistently, (2) utilizing Vertex's patented processes, and (3) improving Vertex's feedstocks of used motor oil or UMO.[69]

24.     These efforts were important to Vertex.[70]  Vertex expected the Group III market to grow quickly and Vertex wanted to be a part of that market.[71]  Vertex felt that upgrading VTX-6 to a Group III product was "paramount to future success for maximizing profits"[72] and that Group III base oils would "dominate the market" during the next decade.[73]  Vertex even prepared models for Tensile Capital Management ("Tensile") showing how a Group III base oil would sell in the marketplace.[74]

---

[66] Day 4 (PM) Trans., D. Peel Test. at 16:14-24.

[67] Day 1 (PM) Trans., B. Cowart Test. at 153:12-18; Day 2 (AM) Trans., B. Cowart Test. at 86:4-15; Day 4 (AM) Trans., D. Peel Test. at 148:10-23; Day 4 (PM) Trans., D. Peel Test. at 4-21:4-13.

[68] Day 4 (AM) Trans., D. Peel Test. at 114:10-20, 117:2-6, 118:3-6, 124:13-15; Day 4 (PM) Trans., D. Peel Test. at 23:17-20.

[69] Day 1 (PM) Trans., B. Cowart Test. at 52:21-153:11; Day 4 (AM) Trans., D. Peel Test. at 148:10-23; PTX040, Vertex Patent; PTX061, Vertex Patent.

[70] Day 4 (PM) Trans., D. Peel Test. at 24:21-25.

[71] Day 1 (PM) Trans., B. Cowart Test. at 159:7-160:7; Day 2 (AM) Trans., B. Cowart Test. at 18:8-13; Day 4 (AM) Trans., D. Peel Test. at 149:23-150:7; Day 4 (PM) Trans., D. Peel Test. at 25:17-26:4.

[72] PTX013, Tensile Investor Presentation at 6; Day 4 (AM) Trans., C. Carlson Test. at 15:18-16:11.

[73] Day 4 (PM) Trans., D. Peel Test. at 4-26:11-4-27:11.

[74] PTX112, Email re GR-III Follow-up at 1; Day 3 (AM) Trans., E. Snedegar Test. at 81:16-19.

25.     Vertex breached Section 3.4(c) by selling a base oil which met the API's Group III industry specifications;[75] by marketing a base oil which met the API's Group III industry specifications;[76] and by promoting a base oil which met the API's Group III industry specifications.[77] Although Vertex agreed to stay in the Group II market and not enter the Group III market during the SRMA,[78] Vertex marketed and sold Group III VTX-6 during the SRMA.[79]

26.     When VTX-6 met the API's specifications for Group III base oil, it was a Group III base oil that competed with the Product.[80] And the percentage of Group III VTX-6 versus Group II VTX-6 produced by Vertex increased each year.[81] There were at least 151 times during the SRMA when Vertex marketed and sold Group III VTX-6.[82] By the time the SRMA terminated in late January 2021 and for the preceding six months, nearly 20% of the VTX-6 marketed and sold by Vertex was a Group III base oil under the API's specifications.[83]

27.     Vertex also breached Section 3.4(c) by advertising and promoting Group III VTX-6 to actual and potential customers via its VTX-6 specifications sheet or spec sheet.[84] Using the ASTM formula referenced in the spec sheet, VTX-6 had a typical viscosity index of 120 or above,

---

[75] *See e.g.*, DX66, Email re CC150 and Vertex 6 COAs at 6; PTX148, Group III VTX-6 Certificate of Analysis; Day 3 (PM) Trans., E. Snedegar Test. at 56:12-16, 56:22-25.

[76] PTX007, VTX-6 Spec Sheet; Day 1 (AM) Trans., H. Henderson Test. at 110:1-11.

[77] *See e.g.*, PTX005, Investor Presentation at 10, 19; PTX013, Tensile Capital Presentation at 8, 11.

[78] Day 2 (PM) Trans., F. Erkoc Test. at 18:16-20; Day 1 (PM) Trans., H. Erkoc Test. at 41:18-42:10.

[79] Day 1 (PM) Trans., B. Cowart Test. at 131:17-25.

[80] Day 1 (AM) Trans., H. Henderson Test. at 118:9-24; Day 1 (PM) Trans., H. Erkoc Test. at 115:6-18.

[81] PTX005, Investor Presentation at 7.

[82] Day 1 (AM) Trans., H. Henderson Test. at 118:25-119:7

[83] Day 1 (AM) Trans., H. Henderson Test. at 119:23-120:1.

[84] PTX007, VTX-6 Spec Sheet; Day 1 (AM) Trans., H. Henderson Test. at 125:7-126:5.

making it a Group III base oil.[85]  Spec sheets are how base oil suppliers represent the characteristics of their product to the marketplace.[86]  VTX-6 with a viscosity index of 125 would be "on-spec" and a batch of the Product with a viscosity index of 121 would be "on-spec."[87]

28.     Finally, Vertex breached Section 3.4(c) by marketing and promoting Group III VTX-6 to Tensile and other potential investors and by describing itself as the "[f]irst large scale re-refiner to produce Group III base oil in the US."[88]  When Vertex made this representation to Tensile and the other investors, Vertex had already produced and sold VTX-6 that was an "API spec" Group III base oil.[89]

29.     In a September 2017 presentation to potential investors, Vertex represented that it expected to be consistently producing Group III base oil by "3Q2019."[90]  Vertex discussed its production of a competing Group III base oil with Valvoline and told Tensile that Vertex intended (1) to "take advantage of possible changes in the market place ([Group II] price fall or [Group III] price increase)" and (2) to show potential investors that Vertex was "already producing and selling a ratable quantity" of Group III base oil.[91]  Vertex admitted that its investor presentations contained "general promotion language,"[92] and that the presentations were used to promote Vertex's Group III base oil investment thesis.[93]  Vertex's thesis caused Tensile to conclude that having Vertex

---

[85] Day 1 (AM) Trans., H. Henderson Test. at 125:7-126:5

[86] Day 1 (PM) Trans., H. Henderson Test. at 26:5-11.

[87] PTX202, Deposition Designations of W. Lyons (Valvoline) at 35:10-36:7

[88] *See e.g.*, PTX005, Investor Presentation at 11; PTX013, Tensile Capital Presentation at 11; Day 1 (PM) Trans., B. Cowart Test. at 1-133:2-5.

[89] Day 1 (PM) Trans., B. Cowart Test. at 135:5-10, 135:25-136:4.

[90] PTX162, September 2017 Investor Presentation at 5.

[91] PTX108, Email re Discussion on HL Gr III options at 1.

[92] *See e.g.*, PTX013, Tensile Investor Presentation at 11; Day 1 (PM) Trans., B. Cowart Test. at 141:15-23.

[93] Day 4 (AM) Trans., C. Carlson Test. at 14:5-20.

produce Group III VTX-6 would really "move the needle" and generate higher returns on Tensile's investment.[94]

30.     Tensile's investment in Vertex closed on July 26, 2019, and was publicly announced on July 31, 2019.[95]  The Tensile investment was designed to help Vertex "produce and sell more Group III VTX-6."[96]  Of the more than $20 million that Vertex received from Tensile, Vertex used about $7 million to upgrade the Heartland Refinery that produced and sold VTX-6.[97] Throughout 2019, Vertex was actively trying to produce more Group III base oils and discussing its efforts with Tensile.[98]

31.     Shortly after the joint venture was announced on July 31, 2019, Faruk Erkoc called Erica Snedegar and asked her questions about the transaction, including whether Vertex was going to produce Group III base oils.[99]  Despite her knowledge of and involvement in the Tensile joint venture, Ms. Snedegar withheld information from Mr. Erkoc about the transaction and Vertex's plans to produce and sell more Group III base oil.[100]  Just a few weeks before her call with Mr. Erkoc, Ms. Snedegar prepared a detailed analysis for Tensile addressing Vertex's ability to market

---

[94] PTX110, Email re Follow-up at 1; Day 1 (PM) Trans., B. Cowart Test. at 150:19-24.

[95] PTX014, July 31, 2019 Vertex Press Release.

[96] Day 1 (PM) Trans., B. Cowart Test. at 132:13-18, 146:12-14; Day 2 (AM) Trans., B. Cowart Test. at 25:11-13, 27:7-9, 27:24-25; 28:5-7

[97] Day 4 (AM) Trans., C. Carlson Test. at 17:9-18:14, 20:6-14.

[98] PTX107, Email re Making Gr III at Heartland; Day 1 (PM) Trans., B. Cowart Test. at 147:7-21, 149:7-15.

[99] PTX020, Email re Faruk.

[100] PTX112, Email re Gr-III Follow-up at 1; Day 3 (PM) Trans., E. Snedegar Test. at 15:15-16:3, 17:7-21; 19:9-17, 20:18-21:13.

and sell Group III base oil, but Ms. Snedegar did not disclose or even mention her analysis to Mr. Erkoc.[101]

32.     Then, two days after Ms. Snedegar's conversation with Mr. Erkoc, Vertex's CEO Ben Cowart emailed Tensile and told it to "steer clear" of the term Group III when speaking to a reporter who was writing an article about the transaction.[102]   At no time did Mr. Cowart tell Faruk Erkoc about the true nature of the Tensile investment.[103]  In fact, Mr. Cowart cannot recall a single conversation with anyone at Penthol about the Tensile transaction.[104]   Additionally, there was no internal discussion at Vertex about how it could sell its own Group III base oil and still comply with Section 3.4(c) of the SRMA.[105]   Vertex's argument that Penthol knew that Vertex breached the SRMA because Mr. Cowart sent an investor slide deck to Mr. Faruk Erkoc in 2018 is unavailing.[106]   The email transmitting the slide deck had no text, and Mr. Cowart never followed-up on the email.[107]   In fact, there is no trial exhibit showing Mr. Cowart ever discussed Vertex's production and sale of Group III base oil with Mr. Erkoc.  Because there is no evidence of any substantive discussion between Messrs. Cowart and Erkoc, and because Mr. Cowart's transmittal email contains no text whatsoever, Mr. Erkoc did not focus on and read the draft presentation attached to Mr. Cowart's email.[108]   As shown at trial, the draft presentation sent to

---

[101] PTX112, Email re Gr-III Follow-up at 1; Day 3 (PM) Trans., E. Snedegar Test. at 15:15-16:3, 17:7-21; 19:9-17, 20:18-21:13.

[102] PTX115, Email re Vertex-Tensile July 31 JV partnership announcement at 1; Day 2 (AM) Trans., B. Cowart Test. at 79:2-15.

[103] Day 2 (PM) Trans., F. Erkoc Test. at 32:4-25.

[104] Day 1 (PM) Trans., B. Cowart Test. at 164:10-13, 164:19-165:16.

[105] Day 4 (AM) Trans., D. Peel Test. at 145:15-146:8; Day 4 (PM) Trans., D. Peel Test. at 15:14-18, 18:23-19:9.

[106] DX024, Email re Heartland Investment Presentation FINAL.

[107] DX024, Email re Heartland Investment Presentation FINAL at 1; Day 2 (PM) Trans., F. Erkoc Test. at 2-29:4-9.

[108] Day 2 (PM) Trans., F. Erkoc Test. at 43:11-14.

Mr. Erkoc contained different language than what Vertex used in its presentations to Tensile and other potential investors.[109]

33.     Penthol first learned that Vertex was violating Section 3.4(c) of the SRMA by selling Group III VTX-6 when Pinnacle Oil sent several COAs to Penthol on November 16, 2020.[110]   One of the COAs showed that Vertex had sold Group III VTX-6 to Pinnacle with a viscosity index of 121.[111]   After receiving those COAs, Penthol sent a notice of default to Vertex on December 18, 2020, pursuant to Section 7.1(b) of the SRMA.[112]

**G.     Vertex engaged in deceptive and misleading practices regarding the Product.**

34.     The original Vertex party to the SRMA was Vertex Ohio.[113]   In October 2018, Vertex asked Penthol LLC to consent to the assignment of the SRMA from Vertex Refining OH, LLC to Vertex Energy Operating, LLC.[114]   Vertex told Penthol LLC that it needed to assign the SRMA because Vertex was "bringing a private capital partner to help us develop logistic infrastructure in Heartland (we are going to build a new tank farm and expand the rail) so we can be more efficient running the [Heartland] refinery."[115]   As explained above, Vertex had been looking for a private capital partner since 2017 to provide funding needed for Vertex to produce, market, promote, and sell more Group III VTX-6 in violation of the SRMA.[116]   But Vertex did not

---

[109] *Compare* DX024 *with* PX005, PX012, and PX060.

[110] PTX004, SRMA § 3.4(c); DX66, Email re CC150 and Vertex 6 COAs at 6; Day 1 (PM) Trans, H. Erkoc Test. at 50:8-18; Day 2 (PM) Trans., H. Gill Test. at 110:15-25.

[111] DX66, Email re CC150 and Vertex 6 COAs at 6.

[112] PTX026, December 18, 2020 Letter from Penthol to Vertex.

[113] PTX004, SRMA at 1.

[114] PTX017, Email re Vertex/Penthol; Assignment of JSMA at 2.

[115] PTX017, Email re Vertex/Penthol; Assignment of JSMA at 2.

[116] *See generally*, PTX162, September 2017 Investor Presentation.

disclose to Penthol that Vertex was competing with the Product in violation of Section 3.4(c) or that the outside funding would allow Vertex to expand its production, marketing, promotion, and sale of Group III VTX-6.[117]   Vertex's conduct violated Section 3.4(b) of the SRMA, which prohibited "unfair, anti-competitive, misleading or deceptive practices respecting the Product." SRMA § 3.4(b).

## H.   The SRMA was terminated unilaterally by Vertex or by the parties' mutual agreement.

35.   As noted above, once Penthol LLC learned that Vertex breached the SRMA by marketing, promoting, and selling a competing Group III base oil, Penthol LLC sent a December 18, 2020 letter to Vertex giving notice of alleged defaults pursuant to Section 7.1(b)(ii) of the SRMA.[118]   Vertex then had thirty (30) Business Days to cure the defaults,[119] and if it did not do so, Penthol LLC had the option to terminate the SRMA after the expiration of 30 Business Days.[120] Under the SRMA's definition of "Business Day," the 30-Business Day period ended on February 3, 2021, which meant that the first day that Penthol could have exercised its option to terminate the SRMA was February 4, 2021.[121]

36.   Vertex could have cured its default by denaturing or blending Group III VTX-6 to ensure that its viscosity index was always below 120, making it a Group II base oil, rather than a

---

[117] Day 2 (PM) Trans., F. Erkoc Test. at 32:19-25.

[118] PTX026, December 18, 2020 Letter from Penthol to Vertex.

[119] The SRMA defines "Business Day" as "any day except a Saturday or Sunday or any other day on which commercial banks in Houston, Texas are authorized or required by Applicable Law to be closed for business."  PTX004, SRMA at 2, definition of "Business Day"; Day 1 (PM) Trans., H. Erkoc Test. at 1-61:4-7.

[120] PTX004, SRMA at 16 § 7.1 ("Either party **shall have the right to** terminate this Agreement upon….") (emphasis added); Day 1 (PM) Trans., H. Erkoc Test. at 90:12-1-91:1.

[121]   Penthol LLC respectively requests that the Court take judicial notice pursuant to Federal Rule of Evidence 201(b)(2) that, excluding weekends and Harris County bank holidays, the 30th "Business Day" after December 18, 2020 is February 3, 2021.

Group III base oil with a viscosity index of 120 or higher.[122]  Because Vertex had several storage tanks and could create COAs in just forty-five minutes, Vertex could have added more VTX-6 to its storage tanks, generated another COA, and continued that process until it resulted in VTX-6 with a viscosity index below 120, rendering it a Group II base oil.[123]  Vertex could have also opted not to sell or offer to sell its Group III VTX-6 base oil.

37.     Vertex admitted that Penthol's December 18, 2020 letter did not terminate the SRMA.[124]  Indeed, the parties continued to perform under the SRMA even after Penthol sent the December 18, 2020 letter.[125]  This included receiving orders, arranging shipments, and continuing meetings and calls.[126]  In fact, neither Penthol nor Vertex considered the SRMA terminated because of Penthol's December 18, 2020 letter.[127]

38.     On January 19, 2021, Vertex responded to Penthol LLC's December 18, 2020 letter and denied the alleged defaults.[128]  Vertex's letter acknowledged that the SRMA remained in effect by stating that, "Penthol has no legitimate basis to terminate the Agreement under § 7.1(b).  *If Penthol does terminate the Agreement*, that will constitute a material breach of the Agreement, and Vertex will seek all available remedies under the law for that breach, including damages and attorneys' fees.  *In the event Penthol does follow through on its threat to terminate the Agreement*, I must remind Penthol about its obligations not to disparage or defame Vertex or any of its

---

[122] Day 1 (AM) Trans., H. Henderson Test. at 128:2-25.

[123] Day 3 (PM) Trans., E. Snedegar Test. at 41:24-42:16; 45:9-46:1.

[124] Day 1 (PM) Trans., B. Cowart Test. at 172:18-21; Day 2 (AM) Trans., B. Cowart Test. at 39:21-40:1, 40:11-13.

[125] Day 1 (PM) Trans., H. Erkoc Test. at 61:8-17; Day 2 (AM) Trans., B. Cowart Test. at 92:1-7; Day 2 (PM) Trans., H. Gill Test. at 111:5-18; Day 2 (PM) Trans., H. Gill Test. at 111:24-112:1; Day 3 (PM) Trans., E. Snedegar Test. at 30:16-31:15.

[126] Day 2 (PM) Trans., H. Gill Test. at 112:2-6; Day 3 (PM) Trans., E. Snedegar Test. at 32:9-16.

[127] Day 1 (PM) Trans., H. Erkoc Test. at 62:1-6, 92:20-25.

[128] PTX067, January 19, 2021 Letter from Vertex to Penthol.

employees."[129]  Vertex's admission that the SRMA had not terminated as of January 19, 2021, is consistent with the evidence showing that the parties continued to perform under the SRMA after Vertex sent its letter.[130]  Vertex even admitted that the SRMA was not terminated when it sent its January 19, 2021 letter.[131]

39.     Before Penthol LLC responded to Vertex's January 19 letter, Vertex sent another letter on the evening of January 27, 2021.[132]  Just that morning, Penthol had paid commissions to Vertex under the SRMA.[133]  Nevertheless, the transmittal email accompanying Vertex's January 27, 2021 letter indicated that Vertex was terminating the SRMA by stating: "Sales Representative and Marketing Agreement Termination."[134]  Although Section 7.1(b)(ii)'s thirty-Business-Day cure period had not yet expired, and although Penthol LLC was not in default under the SRMA and had not taken any steps to exercise its option to terminate the SRMA, Vertex's January 27 letter notified Penthol LLC that "Vertex considers the Agreement terminated."[135]  Before sending its January 27, 2021 letter, Vertex did not calculate when the 30-Business Day period under the SRMA would expire.[136] In fact, Mr. Cowart was not even aware that the SRMA defined the term "Business Day."[137]

---

[129] PTX067, January 19, 2021 Letter from Vertex to Penthol at 2 (emphasis added).

[130] Day 2 (PM) Trans., H. Gill Test. at 112:17-19; PTX188, Email re Penthol Payments at 1; PTX191, Penthol Payments at 2; Day 2 (PM) Trans., H. Gill Test. at 112:20-113:1, 113:14-114:17; Day 2 (PM) Trans., H. Gill Test. at 115:14-21; Day 3 (PM) Trans., E. Snedegar Test. at 32:17-25.

[131] Day 1 (PM) Trans., B. Cowart Test. at 169:5-14.

[132] PTX045, January 27, 2021 Termination Letter.

[133] PTX188, Email re Penthol Payments at 1; PTX191, Penthol Payments at 2.

[134] PTX233, Email re Sales Representative and Marketing Agreement Termination.

[135] PTX045, January 27, 2021 Termination Letter at 1; Day 1 (PM) Trans., H. Erkoc Test. at 1-98:3-22.

[136] Day 1 (PM) Trans., B. Cowart Test. at 167:22-168:2, 169:19-170:6.

[137] Day 1 (PM) Trans., B. Cowart Test. at 171:13-172:7.

40.     After sending its January 27, 2021 letter, Vertex cancelled the weekly meetings that had been held between Vertex and Penthol to discuss Product customers.[138]  Vertex also removed Penthol's access to the SharePoint WorkBook on or around January 27, 2021,[139] and stopped updating the SharePoint WorkBook on January 25, 2021.[140]

41.     On January 28, 2021, Vertex met with Lube-Tech, a Product customer, and told Lube-Tech that the SRMA had terminated as of January 27, 2021.[141]  Vertex had similar meetings with other Product customers around this same time.[142]

42.     On the morning of January 29, 2021, Vertex told Penthol that the SRMA was terminated and confirmed that the weekly calls had been cancelled and that Penthol's access to the SharePoint WorkBook had been cut off.[143]  Later in the day on January 29, 2021, Penthol sent a letter to Vertex confirming Penthol's agreement and understanding that the SRMA had terminated as of January 27, 2021.[144]

43.     Just days after the SRMA terminated, Vertex contacted ADNOC via email, with the subject line reading: "ADBase GIII Base Oil for North America."[145]  Vertex had wanted a

---

[138] Day 2 (PM) Trans., H. Gill Test. at 115:22-116:20, 117:2-14; Day 3 (PM) Trans., E. Snedegar Test. at 33:15-17.

[139] Day 3 (AM) Trans., B. Stewart Test. at 9:19-25; Day 3 (PM) Trans., E. Snedegar Test. at 34:11-15, 35:5-23

[140] DX118, Penthol SharePoint WorkBook; Day 3 (PM) Trans., E. Snedegar Test. at 10:8-16; Day 4 (AM) Trans., K. Theriot Test. at 84:1-19.

[141] DX097, Email re Vertex / Penthol (Adnoc Group III Base Oils) at 2; Day 2 (AM) Trans., B. Cowart Test. at 97:14-98:12, 98:19-23, 101:23-102:23; Day 2 (PM) Trans., H. Gill Test. at 120:11-121:1; Day 3 (PM) Trans., E. Snedegar Test. at 37:21-38:3.

[142] Day 3 (PM) Trans., E. Snedegar Test. at 37:14-25; 40:3-11.

[143] PTX044, Email re Reason for cancelation of customer calls; Day 2 (AM) Trans., B. Cowart Test. at 95:11-96:4.

[144] PTX233, Email re Sales Representative and Marketing Agreement Termination at 1; PTX051, January 29, 2021 Letter from Penthol to Vertex; Day 2 (PM) Trans., H. Gill Test. at 118:19-119:7; H. Erkoc Test. 62:11-:20, 63:18-64:4.

[145] PTX094, Email re ADBase GIII Base Oil for North America at 1-2.

contract with ADNOC since at least 2018.[146]  Even though the SRMA was terminated, Vertex wanted to continue selling the ADNOC Product.[147]  Although the email's subject line reads "ADBase GIII Base Oil for North America," Mr. Cowart denied that he was contacting ADNOC to discuss Vertex continuing the sell the Product in North America and instead claimed that he wanted to discuss international opportunities and to "congratulate" ADNOC based on its Group III+ designation.[148]  Mr. Cowart did not tell Penthol about these communications with ADNOC,[149] and Penthol did not give Vertex permission to contact ADNOC.[150]

## I.    Vertex breached its post-termination obligations under the SRMA.

44.    Section 7.2 of the SRMA required the parties to "settle and liquidate all transactions and obligations entered into pursuant to th[e] Agreement in an orderly and commercially reasonable manner."[151]  Vertex breached this provision in several ways.[152]  Instead of acting in "an orderly and commercially reasonable manner," Vertex intentionally cancelled meetings with Penthol LLC;[153] denied Penthol LLC access to information about Product customers;[154] misrepresented to Product customers and others the reason for the SRMA's termination;[155] failed to process and finalize contracts for Product purchases; failed to process Product orders and issue

---

[146] Day 1 (PM) Trans., B. Cowart Test. at 1-176:12-25; PTX147, Email re London Meeting Follow Up at 2.

[147] Day 2 (AM) Trans., B. Cowart Test. at 99:20-101:2.

[148] Day 1 (PM) Trans., B. Cowart Test. at 180:10-181:8, 183:8-13, 185:10-1-186:4; Day 3 (AM) Trans., D. Phillips Test. at 39:11-40:4, 40:11-41:16.

[149] Day 1 (PM) Trans., B. Cowart Test. at 182:7-14.

[150] Day 2 (PM) Trans., F. Erkoc Test. at 38:20-39:9.

[151] PTX004, SRMA at 17 § 7.2.

[152] Day 2 (PM) Trans., H. Gill Test. at 198:3-199:4.

[153] PTX044, Email re Reason for cancelation of customer call.

[154] Day 3 (AM) Trans., B. Stewart Test. at 9:19-25; Day 3 (PM) Trans., E. Snedegar Test. at 34:11-15, 35:5-23.

[155] See DX097, Email re Vertex / Penthol (Adnoc Group III Base Oils) at 2.

invoices to Product customers; failed to make shipments of the Product[156]; and prevented Penthol

LLC from communicating with Product customers.[157]

45.     Vertex continued to breach the SRMA after termination by failing to wind down its

operations.  Penthol LLC asked Vertex to help transition the business to Penthol LLC, but Vertex

refused to do so and stopped performing under the SRMA.[158]

46.     Vertex also breached Section 7.2 by removing Penthol's access to the SharePoint

WorkBook on or about January 27, 2021.[159]  Vertex and Penthol started using the SharePoint

WorkBook in 2019 because it was a safe way to share confidential information.[160]  The SharePoint

WorkBook contained confidential information about Product sales and logistics, including

purchase orders and shipping information, that needed to be regularly updated to remain useful.[161]

Vertex and Penthol could easily limit access to the SharePoint WorkBook only to those persons

who needed access to the confidential information it contained, making it more secure than just

exchanging emails.[162]

47.     While some information needed to run the business could be found on the

SharePoint WorkBook, it did not contain all information needed to run the business.[163]

---

[156] Day 3 (PM) Trans., E. Snedegar Test. at 33:15-17.

[157] PTX196, February 4, 2021 Letter from Penthol to Vertex; PTX197, February 8, 2021 Letter from Vertex to Penthol; PTX050, March 4, 2021 Order Dissolving Injunction.

[158] PTX044, Email re Reason for cancelation of customer call; Day 2 (PM) Trans., H. Gill Test. at 2-117:15-2-118:3; PTX196, Letter from Penthol to Vertex regarding Section 7.2; Day 3 (PM) Trans., E. Snedegar Test. at 33:15-17.

[159] Day 3 (AM) Trans., B. Stewart Test. at 9:19-25; Day 3 (PM) Trans., E. Snedegar Test. at 34:11-15, 35:5-23

[160] Day 3 (AM) Trans., B. Stewart Test. at 8:5-17.

[161] Day 3 (AM) Trans., B. Stewart Test. at 12:8-14; Day 3 (PM) Trans., E. Snedegar Test. at 126:19-24; *see* DX117, Penthol SharePoint WorkBook.

[162] Day 3 (AM) Trans., B. Stewart Test. at 9:2-10; Day 3 (PM) Trans., E. Snedegar Test. at 5:25-6:25; Day 3 (PM) Trans., E. Snedegar Test. at 127:21-23.

[163] Day 4 (AM) Trans., K. Theriot Test. at 87:19-23.

Information needed to run the business that was not on the SharePoint WorkBook included purchase orders and nomination documents,[164] contact information for customers and shipping companies, and the exact Product volume sold to Product customers.[165]   By failing to provide Penthol LLC access to this information and the information on the SharePoint WorkBook, Vertex failed to properly transition the Product business, operations, and logistics to Penthol LLC in violation of Section 7.2.[166]

48.     Vertex also breached Section 7.2 by (1) improperly conditioning its cooperation with Penthol LLC on the prior receipt of payments that were not even owed under the SRMA[167] and (2) demanding payment before the Parties had determined whether Section 7.2's set-off provision applied and what the new payment obligations would be (one way or the other).[168]   The commission amounts demanded by Vertex in its January 27, 2021 letter were not due and payable because Penthol LLC had not received cash payments from Product customers yet.[169]   Due to delays in Product customers paying Penthol LLC, Vertex typically did not receive commission payments until 50 or 60 days after Product customers received their invoice for the Product.[170]

---

[164] Day 3 (AM) Trans., E. Snedegar Test. at 114:18-25, 123:17-25; Day 4 (AM) Trans., K. Theriot Test. at 75:14-76:15.

[165] Day 4 (AM) Trans., K. Theriot Test. at 86:5-87:23, 88:13-17.

[166] PTX004, SRMA at 17 § 7.2.

[167] PTX045, January 27, 2021 Letter from Vertex to Penthol at 1.

[168] PTX045, January 27, 2021 Letter from Vertex to Penthol at 1.

[169] PTX004, SRMA § 5.2(b); PTX045, January 27, 2021 Vertex Termination Letter at Exhibit A; Day 4 (AM) Trans., C. Carlson Test. at 31:2-33:14, 33:25-34:2, 38:11-39:1.

[170] PTX188, Email re Penthol payments at 1; Day 4 (AM) Trans., C. Carlson Test. at 29:10-25

Vertex did not present any evidence at trial showing the specific customer payments received by Penthol LLC that would support corresponding commission payments to Vertex.[171]

49.     Vertex also breached Section 7.2 after the SRMA terminated by circumventing Penthol LLC in violation of Section 8.11 of the SRMA.[172]  Vertex did so by contacting ADNOC, Penthol LLC's supplier, just days after the SRMA terminated without Penthol LLC's permission.[173]  Vertex's communications with ADNOC indicated that Vertex wanted to distribute the Product in North America after the SRMA terminated, all in violation of Section 8.11.[174]

50.     Because Vertex breached Section 7.2, Vertex must reimburse Penthol LLC for "actual, reasonable, out-of-pocket expenses (with interest at the Interest Rate), including without limitation, reasonable legal fees and expenses."[175]  Penthol LLC is entitled to recover its expenses and fees because Vertex is the "defaulting Party" under Section 7.2 of the SRMA and Penthol LLC is the "non-defaulting Party."[176]

## J.     Vertex misappropriated Penthol LLC's trade secrets.

51.     While the SRMA was in effect, Vertex had access to Penthol LLC's trade secrets, including information about the Product, its customers, prices, costs, transportation information, technical information, and other financial information.[177]  Based on the nature of their relationship,

---

[171] Day 1 (PM) Trans., H. Erkoc Test. at 1-47:20-25; Day 4 (AM) Trans., C. Carlson Test. at 21:22-22:7; Day 4 (AM) Trans., C. Carlson Test. at 29:2-6.

[172] PTX004, SRMA at 17 §§ 7.2, 8.11.

[173] PTX094, Email re ADBase GIII Base Oil for North America at 1-2; Day 1 (PM) Trans., B. Cowart Test. at 176:12-25.

[174] PTX004, SRMA at 20 § 8.11; PTX094, Email re ADBase GIII Base Oil for North America at 1-2; Day 1 (PM) Trans., B. Cowart Test. at 176:12-25.

[175] PTX004, SRMA at 17 § 7.2.

[176] PTX004, SRMA at 17 § 7.2.

[177] Day 1 (PM) Trans, H. Erkoc Test. at 52:14-20 (procurement costs, freight costs, and selling price are trade secrets).

Vertex understood that it had a duty to keep Penthol LLC's trade secret information confidential.[178] Penthol LLC also took reasonable measures under the circumstances to keep its information confidential.[179]  Penthol LLC did so by, among other things, restricting access to sensitive information, using passwords and encryption, shredding documents, maintaining confidentiality agreements with customers and employees, and storing information on a protected server.[180]

52.   Vertex misappropriated and misused Penthol LLC's trade secrets while the SRMA was in effect and after its termination by using Penthol LLC's trade secrets for Vertex's own business purposes.[181]  Vertex first misappropriated Penthol LLC's trade secrets as early as September 2017 when Vertex disclosed Penthol LLC's confidential trade secret information to Tensile and others considering a potential investment in Vertex.[182]  The confidential trade secret information used and disclosed by Vertex included information about Penthol LLC's transportation costs[183] and Product sales volume.[184]  Vertex used Penthol LLC's trade secrets to help Vertex obtain funding to expand Vertex's production, marketing, promotion, and sale of VTX-6, including Group III VTX-6.[185]

---

[178] Day 1 (PM) Trans., H. Erkoc Test. at 53:24-54:6, 54:17-20, 78:12-79:5, 81:3-10.

[179] Day 1 (PM) Trans., H. Erkoc Test. at 53:15-23, 82:4-7; Day 2 (PM) Trans., H. Gill Test. at 145:25-146:12.

[180] Day 1 (PM) Trans., H. Erkoc Test. at 53:15-23, 82:4-7; Day 2 (PM) Trans., H. Gill Test. at 145:25-146:12.

[181] *See e.g.*, PTX112, Email re G-III Follow-Up at 1; DX098, Email re Valvoline pricing at 1; PTX005, Vertex Investor Presentation at 11, 15, 20; PTX013, Tensile Presentation at 11.

[182] PTX162, September 2017 Investor Presentation at 8, 11, 16; PTX013, Tensile Investor Presentation Day 2 (PM) Trans., H. Gill Test. at 146:24-147:14; PTX005, Investor Presentation at 11, 15, 20.

[183] PTX162, September 2017 Investor Presentation at 11; Day 2 (PM) Trans., H. Gill Test. at 143:8-21.

[184] PTX005, Investor Presentation at 5; Day 2 (PM) Trans., H. Gill Test. at 143:8-21.

[185] *See e.g.*, PTX013, Tensile Investor Presentation at 11.

53.     Vertex also misappropriated Penthol LLC's trade secrets in connection with the Tensile-Vertex joint venture.[186]  In a July 18, 2019 email to Tensile, Ms. Snedegar admitted that she used "real raw data from July 19 ADNOC Group III selling price" to prepare a comparative financial model for the sale of Group III VTX-6 against the sale of the Product.[187]  Ms. Snedegar did not ask Penthol's permission to use this information.[188]  Ms. Snedegar sent her July 18, 2019 email just over one week before Vertex's transaction with Tensile closed on July 26, 2019, and Tensile invested millions of dollars into Vertex.[189]

54.     The prices Ms. Snedegar used were actual, negotiated prices for Product sales during the month of July 2019, and Ms. Snedegar admitted that these prices were confidential.[190] Negotiated prices are the prices that customers actually pay, and they differ from posted prices published by industry groups like Argus.[191]  Customers know the difference between posted and negotiated prices,[192] and that negotiated prices are not public.[193] Pricing information is "important to any company,"[194] and Vertex has admitted that you could "win business" and "destroy someone in business" if you had access to their prices.[195]  Vertex had access to Penthol's actual, negotiated

---

[186] *See* PTX112, Email re G-III Follow-up at 1.

[187] PTX112, Email re G-III Follow-up at 1; Day 3 (AM) Trans., E. Snedegar Test. at 82:18-84:24, 90:8-22.

[188] Day 3 (AM) Trans., E. Snedegar Test. at 84:25-85:7.

[189] PTX014, July 31, 2019 Vertex Press Release.

[190] DX118, Penthol SharePoint WorkBook; Day 3 (PM) Trans., E. Snedegar Test. at 3-5:2-13.

[191] Day 1 (PM) Trans., H. Erkoc Test. at 1-53:2-9, 1-84:12-16, 1-85:2-9, 1-118:7-11; Day 2 (PM) Trans., H. Gill Test. at 151:18-22; Day 3 (AM) Trans., E. Snedegar Test. at 78:6-79:4; *see* DX154, Argus Historical Prices GRIII.

[192] Day 2 (PM) Trans., H. Gill Test. at 151:2-5.

[193] Day 3 (AM) Trans., E. Snedegar Test. at 117:1-10.

[194] Day 3 (AM) Trans., E. Snedegar Test. at 100:14-22.

[195] Day 3 (PM) Trans., E. Snedegar Test. at 21:25-22:25;  Day 1 (PM) Trans., H. Erkoc Test. at 54:21-55:6, 115:25-116:9-17.

prices for the Product ***only*** because Vertex was Penthol's sales representative and agent under the SRMA.[196]

55.     Vertex also misappropriated Penthol LLC's trade secrets after the SRMA terminated.[197]  At that time, Vertex had no right to access and use Penthol LLC's trade secrets because Vertex was no longer Penthol LLC's independent sales representative under the SRMA.[198] Nevertheless, Vertex had ongoing access to Penthol LLC's trade secrets post-termination that benefited Vertex's relationship with its VTX-6 customers.[199]  Vertex has never returned to Penthol LLC the confidential information that Vertex had access to only because it was Penthol LLC's sales representative and agent under the SRMA.[200]

56.     Vertex did not present evidence showing that Penthol LLC's confidential information could be readily ascertained through reverse engineering, independent development, or other means that are not improper.

**K.     Vertex's conduct damaged Penthol LLC.**

57.     As explained above in paragraphs 18 through 33, Vertex breached Section 3.4(c) by selling marketing, advertising, promoting, soliciting the sale of, and/or offering to sell Group III VTX-6 that competed with the Product.  Every gallon of Group III VTX-6 sold would allow customers to forego the purchase of a gallon of the Product.  This caused Penthol LLC to suffer $490,903 in damages because every sale of Group III VTX-6 should have been a sale or took away

---

[196] Day 2 (PM) Trans., H. Gill Test. at 144:5-17; Day 1 (PM) Trans., B. Cowart Test. at 121:19-25, 122:20-123:1.

[197] DX098, Email re Valvoline pricing at 1; Day 2 (PM) Trans., H. Gill Test. at 156:2-17, 156:25:2-157:11.; 157:22-158:3.

[198] PTX045, January 27, 2021 Termination Letter.

[199] *See e.g.*, DX098, Email re Valvoline pricing at 1.

[200] Day 2 (PM) Trans., H. Gill Test. at 161:22-162:3.

a subsequent sale of the Product and Penthol LLC is entitled to the profit it would have captured from those sales.[201]

58.     Penthol's damages of $490,903 can be calculated with the following formula:



Applying this formula, first divide the number of Group III VTX-6 COAs by the total number of COAs between January 2019 and January 27, 2021 (141/1295)[202] to get the relative proportion of Group III VTX-6 during the time period.  Multiply the relative proportion of Group III VTX-6 (141/1295) by the total number of gallons of VTX-6 sold during the same time period (30,057,659).[203]  Then multiply those 3,272,687 gallons by Penthol's per-gallon profit margin of $0.15[204] to get damages of $490,903.

59.     Alternatively, Penthol is entitled to a minimum of $109,980 in damages resulting from Vertex's breach of 3.4(c).  Ms. Snedegar testified that each COA reflects a full truck or a full

---

[201] Day 2 (PM) Trans., H. Gill Test. at 187:11-13.

[202] Day 1 (AM) Trans., H. Henderson Test. at 118:17-22; *see* PTX170, VTX-6 Consistency Data; DX148, VTX-6 Certificates of Analysis.

[203] Day 3 (PM) Trans., E. Snedegar Test. at 23:2-25, 26:15-23, 29:11-22; *see* PTX190, VTX-6 Sales Data.

[204] Day 2 (PM) Trans., H. Gill Test. at 123:21-124:125.

railcar of VTX-6.[205]  She then confirmed that the smallest number of gallons in a full truck or a full railcar would be 5,200 gallons.[206]  Accordingly, if each COA reflecting a sale of Group III VTX-6 was for only 5,200 gallons, Penthol's damages would be at least $109,980 using the following formula.  Multiply the minimum number of gallons (5,200) by the number of COAs reflecting Group III VTX-6 from January 2019 to January 27, 2021 (141) to get 733,200 gallons of Group III VTX-6.[207]  Then multiply those 733,200 gallons by Penthol's per-gallon profit margin of $0.15 to get damages of at least $109,980.[208]  At a minimum, Penthol is entitled to these damages from Vertex.

60.     Vertex's breached Section 3.3(a) by, among other things, failing to use "commercially reasonable sales efforts to maximize Product sales volume in the Territory."[209]  This includes failing to expand Product sales into new industries, such as industrial oils, which Vertex does not deny.[210]  Vertex instead focused on passenger car motor oils.[211]  Since the SRMA, Penthol has expanded into some of these more profitable segments like transmission fluid and process oils at higher margins.[212]  Penthol raised these additional uses with Vertex during the SRMA term, but Vertex did not attempt to enter these additional market segments.[213] This breach

---

[205] Day 3 (PM) Trans., E. Snedegar Test. at 47:5-10.

[206] Day 3 (PM) Trans., E. Snedegar Test. at 46:8-23.

[207] *See* Day 1 (AM) Trans., H. Henderson Test. at 118:17-22.

[208] Day 2 (PM) Trans., H. Gill Test. at 123:21-124:25.

[209] PTX004, SRMA § 3.3(a)

[210] Day 1 (PM) Trans., H. Erkoc Test. at 58:2-16; Day 3 (PM) Trans., E. Snedegar Test. at 128:18-22.

[211] Day 2 (PM) Trans., F. Erkoc Test. at 26:23-27:3.

[212] Day 2 (PM) Trans., H. Gill Test. at 126:11-127:6.

[213] Day 2 (PM) Trans., H. Gill Test. at 127:7-128:3.

caused Penthol LLC to suffer at least $1,050,000 of damages from lost business opportunities and lost profits.[214]

61.     Penthol's $1,050,000 in damages can be calculated using the following formula: multiply the amount of gallons of the Product Vertex could have sold for more profitable uses during the SRMA-term (7,000,000 gallons),[215] by the additional $0.15 per-gallon profit margin Penthol could have achieved on each of the 7,000,000 gallons.[216]

62.     As explained above in paragraphs 51 through 56, Vertex misappropriated Penthol LLC's trade secrets.  Penthol LLC is entitled to disgorge Vertex's Group III VTX-6 profits because of this misappropriation.  Vertex began misappropriating Penthol's trade secrets in September 2017 (the earliest date where Vertex's investor presentations showed Penthol trade secrets), and this continued after the SRMA terminated.[217]  From September 2017 until the SRMA terminated, Vertex made an estimated $518,286 in profit from the sale of Group III VTX-6.  Penthol is entitled to disgorge these profits.

---

[214] Day 2 (PM) Trans., H. Gill Test. at 129:25-130:2.

[215] Day 2 (PM) Trans., H. Gill Test. at 128:4-21; 129:18-130:2.

[216] Day 2 (PM) Trans., H. Gill Test. at 123:21-125:4.

[217] PTX162, September 2017 Investor Presentation at 8, 11, 16.

## Trade Secret Damages – Starting September 1, 2017 (PX162)

### September 1, 2017 to January 27, 2021

$$\left( \frac{\underline{\text{GIII VTX-6 COAs}}}{\text{Total VTX-6 COAs}} \times \text{Total VTX-6 Revenues} \right) \times \text{Vertex Profit Margin} = \textcolor{red}{\textbf{Damages}}$$

PTX170, DX148          PTX190

$$\left( \frac{144}{2060} \times \$98,858,370 \right) \times 7.5\% = \textcolor{red}{\$518,286}$$

63.     Vertex's $518,286 of profits (and Penthol's damages) can be calculated using the following formula: divide the number of Group III VTX-6 COAs by the total number of VTX-6 COAs during the time period (146/2,060) to get the relative proportion of Group III VTX-6 during the time period.[218]  Multiply the relative proportion of Group III VTX-6 by Vertex's gross VTX-6 revenue for the same time period ($98,858,370) to get $7,006,467.[219]  Then multiply $7,006,467 by Vertex's estimated profit margin for Vertex's sales of VTX-6 (7.5%).[220]  Because Vertex's investor presentations disclosed an 18.5% gross profit margin for its "black oil" division, which includes sales of VTX-6, a net profit margin of 7.5% for the sale of Group III VTX-6 is reasonable.[221]

---

[218] Day 1 (AM) Trans., H. Henderson Test. at 118:8-16; *see* PTX170, VTX-6 Consistency Data; DX148, VTX-6 Certificates of Analysis.

[219] Day 3 (PM) Trans., E. Snedegar Test. at 23:2-24:5, 26:15-27:18, 28:22-29:10; PTX190, VTX-6 Sales Data.

[220] C. CARLSON; PTX012, Investor Presentation at 8.

[221] Day 4 (AM) Trans., C. Carlson Test. at 8:2-16, 8:24-9:20; PTX012, Investor Presentation at 8.

64. Alternatively, Vertex admitted that it used Penthol's trade secrets in emails with Tensile to create a pricing model in July 2019.[222] Thus, Penthol entitled to disgorge $425,217 of Vertex's profits for Group III VTX-6 sales from July 18, 2019 until January 27, 2021.



65. Using the same formula as above: divide the number of Group III VTX-6 COAs by the total number of VTX-6 COAs during the time period (134/1,000) to get the relative proportion of Group III VTX-6 during the time period.[223] Multiply the relative proportion of Group III VTX-6 by Vertex's gross VTX-6 revenue for the same time period ($42,310,211) to get $5,669,568.[224] Then multiply $5,669,568 by Vertex's estimated profit margin for Vertex's sales of VTX-6 (7.5%).[225] Because Vertex's investor presentations disclosed an 18.5% gross profit margin for its "black oil" division, which includes sales of VTX-6, a net profit margin of 7.5% for the sale of Group III VTX-6 is reasonable.[226]

---

[222] PTX112, Email re G-III Follow-Up at 1.

[223] Day 1 (AM) Trans., H. Henderson Test. at 118:8-16; *see* PTX170, VTX-6 Consistency Data; DX148, VTX-6 Certificates of Analysis.

[224] Day 3 (PM) Trans., E. Snedegar Test. at 23:2-24:5, 26:15-27:18, 28:22-29:10; PTX190, VTX-6 Sales Data.

[225] PTX012, Investor Presentation at 8.

[226] Day 4 (AM) Trans., C. Carlson Test. at 8:2-16, 8:24-9:20; PTX012, Investor Presentation at 8.

66.     Penthol LLC was damaged by Vertex's breaches of Section 7.2.  Vertex's conduct made it difficult for Penthol LLC to timely satisfy customer orders.  Penthol LLC also had to hire a temporary employee and incur attorney's fees in connection with this lawsuit between Vertex and Penthol.[227]  This caused Penthol at least $40,000 in damages.[228]

**L.  Vertex's alleged damages are speculative and baseless.**

67.     Vertex seeks damages on its counterclaims from the SRMA's inception in June 2016 through December 31, 2021.[229]  But Vertex failed to present evidence or credible testimony supporting its alleged damages.

68.     Although the SRMA prohibits Vertex from receiving commissions or performance incentive payments until after Penthol actually receives payments from Product customers, Vertex did not present any evidence at trial of when Penthol LLC received any payments from Product customers.[230]  Vertex's damages expert, Sheila Enriquez, admittedly ignored the SRMA language preventing Vertex from receiving any commissions until after Penthol LLC was paid by Product customers.[231]

69.     Ms. Enriquez instead calculated Vertex's alleged damages on an annual basis,[232] without regard to when liabilities were incurred,[233] and did not perform any monthly calculations of cash receipts by Penthol LLC.[234]  Additionally, the financial statements that Ms. Enriquez relied

---

[227] *See* PTX155, Temporary Employee Invoices; Day 2 (PM) Trans., H. Gill Test. at 122:1-7, 122:11-20.

[228] *See* PTX155, Temporary Employee Invoices; Day 2 (PM) Trans., H. Gill Test. at 123:5-10.

[229] Day 4 (PM) Trans., S. Enriquez Test. at 37:14-16.

[230] PTX004, SRMA at 14 § 5.2(b).

[231] PTX004, SRMA at § 5.2(b); Day 4 (PM) Trans., S. Enriquez Test. at 86:8-12.

[232] Day 4 (PM) Trans., S. Enriquez Test. at 39:3-7.

[233] *See* Day 4 (PM) Trans., S. Enriquez Test. at 47:16-4-48:25.

[234] Day 4 (PM) Trans., S. Enriquez Test. at 102:10-13, 102:19-103:4.

upon do not show actual cash receipts for Penthol LLC.[235]  Ms. Enriquez also did not calculate Vertex's alleged damages based on either a December 18, 2020 or January 27, 2021 termination date, even though those are the two termination dates at issue based on the parties' competing positions.[236]  In fact, Ms. Enriquez could not say how much Vertex would be owed in alleged damages as of January 27, 2021, or thereafter, because she does not know what Penthol LLC's cash receipts were.[237]

70.    Ms. Enriquez did not consider a 2019 agreement in which Vertex agreed to an adjustment of the performance incentive owed under the SRMA and did not consider the possibility that Vertex waived its right to those funds.[238]  In 2019, PWA, Penthol LLC, and Vertex jointly established a framework to calculate the performance incentive and any adjustments to be made to the calculation.[239]  The joint framework arose from a detailed review of the parties' previous payments and receipts.[240]  Following discussions between Vertex, Penthol LLC, and PWA, Vertex agreed in 2019 to a roughly $380,000 adjustment to the performance incentive payments.[241]  This adjustment was made via Penthol LLC paying Vertex lower commission payments on a going forward basis, rather than Vertex repaying any funds that it had received from Penthol LLC.[242]

---

[235] Day 4 (PM) Trans., S. Enriquez Test. at 107:2-12.

[236] Day 4 (PM) Trans., S. Enriquez Test. at 79:14-21, 81:3-8, 102:19-103:4.

[237] Day 4 (PM) Trans., S. Enriquez Test. at 85:1-14, 85:1-4.

[238] Day 4 (PM) Trans., S. Enriquez Test. at 82:12-25; PTX131, Email re Incentive Performance Calculation at 1.

[239] Day 4 (AM) Trans., C. Carlson Test. at 22:15-25, 27:1-14; PTX127, Email re Incentive Calculation at 1.

[240] Day 4 (AM) Trans., C. Carlson Test. at 22:15-25, 27:1-14; PTX131, Email re Incentive Performance Calculation at 1.

[241] Day 4 (AM) Trans., C. Carlson Test. at 27:1-14; PTX129, Performance Incentive Adjustment Invoice.

[242] Day 4 (AM) Trans., C. Carlson Test. at 27:1-14.

71.     Ms. Enriquez also calculated a shortfall of $63,484 in commissions from June 2016 through December 2018,[243] even though Vertex never complained about these allegedly missing commissions.[244] PWA, which was hired by Vertex to perform these calculations, disagrees with Ms. Enriquez's calculations.[245]

72.     Ms. Enriquez also calculated an alleged overpayment by Penthol LLC to Vertex in 2020,[246] even though that alleged overpayment is inconsistent with the payments requested by Vertex in its January 27, 2021 letter.[247] Not surprisingly, Ms. Enriquez did not talk to Vertex about the payments requested in its January 27, 2021 letter.[248] Ms. Enriquez also alleges that certain expenses between Penthol C.V. and Penthol LLC were double-counted when PWA calculated the performance incentive payments, but she could not identify any specific instance of double counting.[249]

73.     Contrary to the SRMA, which does not mention or require Generally Accepted Accounting Principles ("GAAP") for the performance incentive calculation,[250] Ms. Enriquez relied on GAAP for her calculations.[251] Unlike Ms. Enriquez, PWA did not use GAAP when performing its calculations because the "spirit of the arrangement" reached between PWA, Vertex,

---

[243] Day 4 (PM) Trans., S. Enriquez Test. at 39:15-25.

[244] Day 4 (PM) Trans., S. Enriquez Test. at 83:20-84:20.

[245] PTX126, PWA Engagement Letter.

[246] Day 4 (PM) Trans., S. Enriquez Test. at 60:24-61:9.

[247] PTX045, January 27, 2021 Vertex Termination Letter at Exhibit A.

[248] Day 4 (PM) Trans., S. Enriquez Test. at 83:20-84:20; PTX045, January 27, 2021 Vertex Termination Letter at Exhibit A.

[249] Day 4 (PM) Trans., S. Enriquez Test. at 58:14-25, 98:19-25, 99:14-25.

[250] *See generally*, PTX004, SRMA.

[251] Day 4 (PM) Trans., S. Enriquez Test. At 59:5-9.

and Penthol LLC was for the performance incentive to be calculated on a cash basis, not on a GAAP or an accrual basis.[252]

74.     As explained above in paragraphs 35 through 43, the SRMA terminated as of January 27, 2021, either by Vertex's unilateral conduct or by the parties' mutual agreement. Nevertheless, Ms. Enriquez calculated estimated damages for Vertex for the duration of 2021 based on various assumptions about what might have happened if the SRMA did not terminate in January 2021.[253]  Because PWA did not calculate any performance incentive payments for 2021,[254] Ms. Enriquez created an estimate without any information other than Penthol LLC's financial statements,[255] even though the SRMA does not mention GAAP or say that the performance incentive should be calculated based on financial statements prepared according to GAAP.[256]  To the contrary, PWA, Vertex, and Penthol LLC agreed that the performance incentive calculations should be done on a cash basis, not an accrual or GAAP basis.[257]  But instead of focusing on actual cash receipts, invoices, purchase orders, or expenses, Ms. Enriquez based her estimated damages for 2021 only on Penthol's historical profits and made various assumptions based on those profits.[258]  Even Vertex's CEO had to admit that he did not know what would have happened to Product sales if the SRMA had continued beyond January 2021.[259]

---

[252] PTX230, Deposition Designations of S. Williams at 103:11-16.

[253] Day 4 (PM) Trans., S. Enriquez Test. at 65:14-19.

[254] Day 4 (PM) Trans., S. Enriquez Test. at 46:3-18.

[255] Day 4 (PM) Trans., S. Enriquez Test. at 65:14-19.

[256] *See generally*, PTX004, SRMA.

[257] PTX230, Deposition Designations of S. Williams at 103:11-16.

[258] Day 4 (PM) Trans., S. Enriquez Test. at 72:12-15, 89:19-24.

[259] Day 2 (AM) Trans., B. Cowart Test. at 91:1-4, 91:20-23.

## II.     Conclusions of Law

75.     For purposes of diversity jurisdiction, Penthol LLC is a citizen or subject of a foreign state.  *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) (holding that, "like limited partnerships and other unincorporated associations or entities, the citizenship of an LLC is determined by the citizenship of all of its members").

76.     For purposes of diversity jurisdiction, Vertex is a citizen of Nevada and Texas.  *See id.*

77.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive or interest and costs, and is between citizens of a state and a citizen or subject of a foreign state.

78.     The Court also has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because Penthol LLC's claims under the Sherman Act and the DTSA arise under federal law.

79.     To the extent necessary, the Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367 since those claims form part of the same case or controversy and derive from a common nucleus of operative facts.

80.     This Court has personal jurisdiction over Penthol LLC and Vertex because they each conduct substantial business in Texas.  Additionally, a substantial part of the events or omissions giving rise the claims occurred in Texas.  Finally, the Parties have contractually consented to jurisdiction in this Court in the SRMA.[260]

81.     Venue is proper in the Southern District of Texas pursuant to 29 U.S.C. § 1391 because Vertex resides in this judicial district; a substantial part of the events or omissions giving rise to Penthol LLC's claims occurred in this judicial district; and a substantial portion of the

---

[260] *See* Dkt. No. 1, Penthol's Original Complaint; Dkt. No. 55, Vertex's Answer and Affirmative Defenses.

affected interstate trade and commerce discussed below has been carried out in this judicial district. Additionally, the SRMA provides for venue in the Southern District of Texas.[261]

**A.    Vertex breached Section 3.4(c) of the SRMA.**

    *1.    The evidence shows that Vertex breached Section 3.4(c).*

    82.    The SRMA prohibited Vertex from directly or indirectly selling, marketing, advertising, promoting, soliciting the sale of, or offering to sell any product that competes with the Product, which is defined as a base oil meeting the specifications in Exhibit A to the SRMA.[262] Section 3.4(c)'s language is broad and extends to conduct beyond just selling a competing product.[263]   The parties further elevated Section 3.4(c)'s importance by using the phrase, "Notwithstanding anything to the contrary in this Agreement," to show that it trumped all other SRMA provisions.  *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing cases) ("When parties use the clause 'notwithstanding anything to the contrary contained herein' in a paragraph of their contract, they contemplate the possibility that other parts of their contract may conflict with that paragraph, and they agree that this paragraph must be given effect regardless of any contrary provisions of the contract.").  In short, Vertex wrongly argues that Section 3.4(c) is limited only to actual sales of a competing product, even though Vertex's witnesses admitted that Section 3.4(c) was broader than just actual sales.[264]

    83.    As explained in the above Findings of Fact, the evidence shows that Vertex directly or indirectly sold, marketed, advertised, promoted, solicited the sale of, or offered to sell Group III

---

[261] PTX004, SRMA at 15 § 8.3.

[262] PTX004, SRMA at 9-10 § 3.4(c).

[263] PTX004, SRMA at 9-10 § 3.4(c); Day 2 (AM) Test., B. Cowart Test. at 71:13-15, 71:22-72:3.

[264] Day 2 (AM) Trans., B. Cowart Test. at 71:13-15, 71:22-72:3.

VTX-6 that competes with the Product defined in the SRMA.  Thus, from a liability standpoint, it is clear that Vertex breached Section 3.4(c) of the SRMA

>2.   _Vertex has mischaracterized the SRMA's definition of "Product."_

84.     Vertex pretends the Group III VTX-6 it admittedly sold did not compete with the Product by focusing on the ADbase product sold in the marketplace at the time of the breach. According to Vertex, that ADbase product was a Group III+ base oil with which Group III VTX-6 did not compete.  This argument fails for at least three reasons.

85.     _First_, the SRMA does not define the "Product" in terms of any brand name, like ADbase. [265]  Reflecting Penthol LLC's desire for a totally independent sales representative, the SRMA defines "Product" broadly as _any_ "Group III Base Oil meeting the specifications set forth in Exhibit 'A'" to the SRMA. [266]  Vertex's argument that VTX-6 did not meet CCS (cold crank simulator) or NOACK volatility specifications is also unavailing because the API Group III specifications do not consider CCS (cold crank simulator) or NOACK volatility. [267]

86.     _Second_, Vertex's argument improperly focuses on the specifications of ADbase sold in the marketplace, rather than the specifications that the parties agreed to in Exhibit A to the SRMA.  Exhibit A to the SRMA lists the Product as a Group III base oil and came directly from ADNOC's "off-the-shelf specifications" for the Product. [268]  The SRMA's specifications reflect a Group III base oil with a viscosity index of 121. [269]  Vertex is thus wrong to argue that Section 3.4(c) focuses on so-called Group III+ base oils with viscosity indexes much higher than 121.

---

[265] PTX004, SRMA at 6, definition of "Product"; 22, Exhibit A.

[266] PTX004, SRMA at 6, definition of "Product."

[267] Day 1 (AM) Trans., H. Henderson Test. at 120:9-12; Day 3 (AM) Trans., E. Snedegar Test. at 57:23-58:5; Day 3 (PM) Trans., E. Snedegar Test. at 3-58:14-16; Day 4 (AM) Trans., D. Peel Test. at 141:3-15.

[268] Day 1 (PM) Trans., H. Erkoc Test. at 43:15-44:6, 88:17-22.

[269] PTX004, SRMA at 22, Exhibit A.

87.     A product that competes with the Product is one that meets the requirements of Exhibit A to the SRMA—meaning a product that meets Group III base oil classifications.[270] Penthol's President, Faruk Erkoc, negotiated the SRMA and confirmed that Penthol intended and understood that Section 3.4(c) required Vertex to stay in the Group II lane with its own VTX-6 product and not cross over into the Group III lane.[271]   Once a base oils meets the Group III classification, it is "all the same" until it reaches a viscosity index of 130 or higher.[272]

88.     Thus, although Vertex could not directly or indirectly compete with a base oil procured and sourced by Penthol LLC that met the specifications in Exhibit A, Vertex could (for example) sell, market, advertise, or promote the following base oils without violating Section 3.4(c):

   a)  A base oil that did not meet Exhibit A's specifications, but was procured and sourced by Penthol LLC—e.g., a Group II base oil sold by Penthol LLC; or

   b)  A base oil that did not meet Exhibit A's specifications and was not procured or sourced by Penthol LLC—e.g., a Group II base oil sold by another distributor or manufacturer, like ExxonMobil or Safety Kleen.

89.     Here, there is evidence that Vertex sold, marketed, advertised, and promoted a Group III base oil (Group III VTX-6) that competed with the Product, a Group III base oil meeting Exhibit A's specifications that was procured and sourced by Penthol LLC.

90.     Importantly, Exhibit A's specifications are *minimum* specifications, and the parties have never amended Exhibit A since the SRMA was signed in 2016.[273]   The specifications were

---

[270] PTX112, Email re G-III Follow-Up at 1; Day 3 (AM) Trans., E. Snedegar Test. at 66:12-67:13; Day 1 (AM) Trans., H. Henderson Test. at 95:4-11, 95:25-96:3, 130:23-131:19; Day 4 (AM) Trans., D. Peel Test. at 144:15-21.

[271] Day 2 (PM) Trans., F. Erkoc Test. at 18:16-20.

[272] PTX112, Email re G-III Follow-Up at 1; Day 3 (AM) Trans., E. Snedegar Test. at 66:12-67:13; Day 1 (AM) Trans., H. Henderson Test. at 95:4-11, 95:25-96:3, 130:23-131:19; Day 4 (AM) Trans., D. Peel Test. at 144:15-21.

[273] PTX004, SRMA at 22, Exhibit A; Day 1 (AM) Trans., H. Henderson Test. at 123:24-124:14.

not even changed when the SRMA was assigned to Vertex Energy Operating, LLC in December 2018.[274]   Accordingly, Vertex's evidence about ADbase's current specifications is completely irrelevant to the issue the Court must decide—i.e., how does the Group III VTX-6 sold by Vertex while the SRMA was in effect compare to Exhibit A's specifications.  Because the evidence shows that Vertex sold, marketed, advertised, and promoted Group III VTX-6 that competed with the Product procured and sourced by Penthol LLC, Vertex breached Section 3.4(c) of the SRMA.

      *3.*   *Penthol was damaged by Vertex's breach*.

91.     The parties' bargain reflected in the SRMA prevented Vertex from competing with the Product.  Because Vertex breached Section 3.4(c) by selling Group III VTX-6, Penthol did not receive the benefit of that bargain.  Accordingly, Penthol should be restored to the same position it would have been absent Vertex's breach—i.e., if Vertex had never sold Group III VTX-6.  *See Qaddura v. Indo-European Foods, Inc*., 141 S.W.3d 882, 888–89 (Tex. App.—Dallas 2004, pet. denied) (discussing benefit-of-the-bargain damages); *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) (finding that lost profits were the proper measure for benefit of the bargain damages because they were "the natural and probable consequences" of the breach).  To restore Penthol to that position, Penthol should receive the profits that it lost from Vertex selling Group III VTX-6, rather than the Product, in violation of Section 3.4(c).

92.     Contrary to Vertex's argument otherwise, Penthol's damages calculation is sufficient.  As explained in the Findings of Fact, the evidence established the potential range of gallons sold by Vertex in each shipment of Group III VTX-6, and the profits from those sales should have been realized by Penthol rather than Vertex.  Accordingly, the profits that Penthol would have received if Vertex had sold the Product instead of Group III VTX-6 should be awarded

---

[274] *Compare* PTX004, SRMA at 22, Exhibit A *with* PTX019, SRMA Assignment at 28, Exhibit A.

to Penthol as damages.  This is especially true because Section 3.4(c) is a non-compete provision that does not require mathematical precision for damages:

93.     The courts have recognized the problem of ascertaining damages in cases involving the breach of non-competition contracts.  Because of the very nature of these cases, ***it is seldom possible to establish with complete mathematical accuracy the damages resulting to plaintiff***. While courts do not permit an award of damages based upon mere speculation or conjecture, they do not go so far as to require that there be a mathematical exactness of the amount of damages. *Arabesque Studios, Inc. v. Acad. of Fine Arts, Intern., Inc*., 529 S.W.2d 564, 569 (Tex. App.— Dallas 1975, no writ) (emphasis added) (citing cases).  In this case, all that is required is that "the evidence … provide ***a basis for reasonable inference***." *Thomas*, 174 F.3d at 648.  Penthol has more than met this threshold for the damages caused by Vertex's breach of Section 3.4(c).

94.     As result of Vertex's breach of 3.4(c), Penthol is entitled to $490,903 in damages or, in the alternative, a minimum of $109,980 in damages.

**B.      Vertex breached its obligations under the SRMA.**

*1.      Vertex breached SRMA Section 3.3(a) by failing to maximize Product sales.*

95.     The SRMA required Vertex to use "commercially reasonable sales efforts to maximize Product sales volume in the Territory."[275]  Selling the Product into new industries while maintaining Product sales to current customers in current industries would have "maximize[d] Product sales volume in the Territory" under Section 3.3(a).  But Vertex did not do so.[276]  And the record shows that Penthol LLC could have obtained additional Product volume to sell into these

---

[275] PTX004, SRMA at 8 § 3.3(a).

[276] Day 1 (PM) Trans., H. Erkoc Test. at 58:2-16; Day 3 (PM) Trans., E. Snedegar Test. at 128:18-22.

new industries, if Vertex had complied with Section 3.3(a).[277]  Vertex's breach of Section 3.3(a) caused Penthol LLC to suffer at least $1,050,000 of damages from lost business opportunities and lost profits.[278]  Simply put, the evidence established that Vertex failed to maximize Product sales and therefore breached Section 3.3(a).

> *2.* *Vertex breached SRMA Section 3.1(a) by failing to act as an independent sales representative and having debilitating conflicts of interest.*

96.     As explained above, Vertex breached SRMA Section 3.4(c) as early as October 2016 by selling, marketing, advertising, promoting, soliciting the sale of, or offering to sell Group III VTX-6 that competed with the Product.[279]

97.     Vertex had debilitating conflicts of interest from selling Group III VTX-6 while it was required to be Penthol LLC's "***independent*** sales representative" under the SRMA.[280]  By selling Group III VTX-6 that competed with the Product, Vertex breached its "independent" status under the SRMA.  And Vertex's breaches damaged Penthol LLC because every sale of Group III VTX-6 could have been a sale of the Product, and a customer has confirmed that Group III VTX-6 and the Product may be used in a one-for-one exchange, which meets Vertex's definition of competition.[281]

> *3.* *Vertex breached SRMA Section 4.2(b) by failing to coordinate Product logistics, including railcars, and forcing Penthol LLC to incur damages.*

98.     The SRMA gave Vertex "sole responsibility for coordinating, arranging and procuring … logistics in respect of loading, transportation and/or freight (whether by rail car or

---

[277] Day 1 (PM) Trans., H. Erkoc Test. at 51:14-17; Day 2 (PM) Trans., F. Erkoc Test. at 27:4-14.

[278] Day 2 (PM) Trans., H. Gill Test. at 129:25-130:2.

[279] PTX148, October 2016 Group III VTX-6 Certificate of Analysis.

[280] PTX004, SRMA at 7 § 3.1(a) (emphasis added).

[281] PTX202, Deposition Designations of W. Lyons at 90:19-91:11, 93:8-94:1, 94:24-95:15; PTX082 at 2; Day 1 (AM) Trans., H. Henderson Test. at 111:17-112:17.

tank truck) of the Product to Customers."[282]  Vertex breached its logistics obligations by failing to ensure that leased railcars used to transport the Product were properly cleaned and returned.  To remedy Vertex's failure, Penthol had to hire a consultant to negotiate the railcar cleaning fee, causing Penthol $101,533.23 in damages.[283]

## C.   Vertex breached Section 7.2 of the SRMA.

### 1.   *The parties agreed to "an orderly and commercially reasonable" transition at termination.*

99.    Section 7.2 required the parties to "settle and liquidate all transactions and obligations entered into pursuant to th[e] Agreement in an orderly and commercially reasonable manner."[284]  Section 7.2 also entitled Penthol LLC, "in its sole discretion, to set-off any amount payable by [Vertex] to [Penthol LLC] under th[e] Agreement or otherwise, against any amounts payable by [Penthol LLC] to [Vertex] under th[e] Agreement or otherwise."[285]  Section 7.2 further required Vertex to "reimburse [Penthol LLC], on demand, for actual, reasonable out-of-pocket expenses (with interest at the Interest Rate), including, without limitation, reasonable legal fees and expenses incurred by [Penthol LLC] in connection with the enforcement of [Penthol LLC's] rights and remedies."[286]

### 2.   *Vertex breached Section 7.2.*

100.    Rather than act in "an orderly and commercially reasonable manner," Vertex unilaterally contacted customers to discuss the SRMA's termination[287] and removed Penthol

---

[282] PTX004, SRMA § 4.2(b).

[283] PTX229, Integrity Rail Partners Invoice; Day 2 (PM) Trans., H. Gill Test. at 143:3-6.

[284] PTX004, SRMA at 17 § 7.2.

[285] PTX004, SRMA at 17 § 7.2.

[286] PTX004, SRMA at 17 § 7.2.

[287] *See e.g.*, DX097, Email re Vertex / Penthol (Adnoc Group III Base oils) at 2.

LLC's access to the shared drive, which contained important customer information.[288]  Vertex also cancelled meetings with Penthol LLC[289]; misrepresented the reason for the SRMA's termination[290]; failed to process and finalize Product contracts; failed to process Product orders and issue invoices; failed to make shipments of the Product[291]; prevented Penthol LLC from communicating with Product customers[292]; and forced Penthol LLC to hire a temporary employee.[293]  All of this conduct breached Section 7.2.

101.    Vertex also breached Section 7.2's set-off and payment provisions by demanding payment ***within 48 hours*** of all amounts allegedly owed by Penthol LLC to Vertex.[294]  Vertex improperly conditioned its cooperation on the prior receipt of all amounts allegedly owed by Penthol LLC.[295]  Vertex's request for payment within 48 hours was an arbitrary deadline set before the parties had determined whether Section 7.2's set-off provision applied and whether Vertex must reimburse Penthol LLC for "actual, reasonable, out-of-pocket expenses (with interest at the Interest Rate)." The amounts demanded by Vertex for commissions were not due or payable because the invoice payments from customers had not been received by Penthol.[296]

---

[288]  Day 3 (PM) Trans., E. Snedegar Test. at 8:20-9:5; DX118, Penthol SharePoint WorkBook.

[289]  PTX044, Email re Reason for cancelation of customer call.

[290]  DX097, Email re Vertex / Penthol (Adnoc Group III Base oils) at 2.

[291]  Day 3 (PM) Trans., E. Snedegar Test. at 33:15-17.

[292]  PTX196, February 4, 2021 Letter from Penthol to Vertex; PTX197, February 8, 2021 Letter from Vertex to Penthol; PTX050, March 4, 2021 Order Dissolving Injunction.

[293]  PTX155, Temporary Employee Invoices.

[294]  PTX045, January 27, 2021 Letter from Vertex to Penthol at 1.

[295]  PTX045, January 27, 2021 Letter from Vertex to Penthol at 1.

[296]  PTX004, SRMA at 14 § 5.2(b).

3.        *Vertex cannot prevail by rewriting the SRMA.*

102.    Recognizing that Penthol LLC has a valid claim for breach of Section 7.2, Vertex argues that Section 7.2 should be limited to Penthol LLC's payment obligations to Vertex. Vertex's proposed edits to the SRMA fail for several reasons.

103.    *First*, Vertex argues that the words "settle" and "liquidate" in Section 7.2 focus only on Penthol LLC's payment obligations to Vertex.  Not so.  The parties used both "settle" and "liquidate" because they have different meanings—that is a basic contract-interpretation rule.  *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  And the Court must interpret Section 7.2 "so that none of the provisions will be rendered meaningless," which means that "settle" must be defined differently than "liquidate."  *See id.*  If Vertex were correct that "settle" means the same thing as "liquidate"—i.e., "to pay"—the parties would not have used both words in Section 7.2.

104.    Consistent with Penthol LLC's claim for breach of Section 7.2, Black's Law Dictionary defines "settle" to mean "***[t]o put in order … to deal with all the details of a business*** or of someone's money or property ***so that nothing remains to be done***."  *Settle*, Black's Law Dictionary (11th ed. 2019) (emphases added).  This definition gives "settle" a different meaning that "liquidate" and shows that Section 7.2 applies to customer conduct (as Penthol LLC alleges) and not just to Penthol LLC's payment obligations to Vertex (as Vertex alleges).  Indeed, case law supports defining "settle and liquidate" to mean the winding up of a business, not just a payment obligation.  *See e.g.*, *Dufour v. Lang*, 54 F. 913, 915 (5th Cir. 1892) (to "liquidate and settle" includes broad activities to wind up business, including "settl[ing] and liquidat[ing] the affairs" of a corporation); *Standard Warehouse & Compress Co. v. George H. McFadden Bros. Agency*, 272 F. 251, 254 (5th Cir. 1921) (to "liquidate and settle" includes "settl[ing] the business and affairs of the company").

105.    *Second*, Vertex's argument that Section 7.2 is limited to any outstanding debts owed to the other party so that each party could go on its way conflicts with other SRMA provisions.   For example, Section 5.3 already addresses Penthol LLC's payment obligations to Vertex.    SRMA § 5.3.    Accepting Vertex's argument would have two different SRMA provisions—Sections 5.3 and 7.2—addressing Penthol LLC's payment obligations to Vertex.

106.    Section 7.2 also uses the phrase "transactions and obligations," which Vertex argues to mean only "transactions and obligations" between Penthol LLC and Vertex.   But the SRMA elsewhere uses "transactions" to mean purchases of the Product by customers, which is consistent with Penthol LLC's claim that Section 7.2 applies to "transactions between Penthol [LLC] and customers entered into under, or pursuant to, Penthol [LLC]'s sales contracts with those customers."

107.    For example, Section 3.1(b) says that if Vertex purchases the Product for its own use, rather than helping Penthol LLC sell the Product to another customer, Vertex is not entitled to any payment under the SRMA.   In Section 3.1(b), "transaction" means Vertex's purchase of the Product as a customer for its own use.   Defining "transaction" to mean a customer's purchase of the Product for its own use also comports with SRMA Sections 5.1(a), 5.2(a)(1), and 5.2(b), which define "spot transaction" or "spot sale transaction" as Product purchases by customers who do not have long-term contracts.

108.    Because several SRMA provisions use the term "transaction" to mean a customer's purchase of the Product, the Court should reject Vertex's argument that "transactions" in Section 7.2 means "any outstanding debts owed to the other party"—i.e., Vertex or Penthol LLC—at termination.   Accepting Vertex's argument would create conflicts between Section 7.2 (one on hand) and Sections 3.1(b), 5.1(a), 5.2(a)(i), and 5.2(b) (on the other).

109.     *Finally*, Penthol LLC's ability to rely on Section 7.2's set-off rights does not conflict with the SRMA's express language.  Vertex improperly assumes that mutual termination of the SRMA by agreement means that no party can be in default at the time of termination.  Not so.  The facts here show that one party can be in default when both parties mutually agree to terminate the SRMA.  It is therefore possible to claim, as Penthol LLC has, that Section 7.2's set-off rights apply even when the SRMA was terminated by mutual agreement under Section 7.1(d).

110.     As explained above, Vertex was in default under the SRMA because it breached Section 3.4(c).  That is why Penthol LLC provided notice of default on December 18, 2020, and gave Vertex 30 Business Days to cure[297]—i.e., until February 4, 2021.

111.     Vertex responded to Penthol LLC's notice of default on January 19, 2021.[298] Vertex's response acknowledged that the SRMA remained in effect despite Vertex's alleged defaults: "Penthol has no legitimate basis to terminate the Agreement under § 7.1(b).  *If Penthol does terminate the Agreement*, that will constitute a material breach of the Agreement, and Vertex will seek all available remedies under the law for that breach, including damages and attorneys' fees. *In the event Penthol does follow through on its threat to terminate the Agreement*, I must remind Penthol about its obligations not to disparage or defame Vertex or any of its employees."[299] (emphases added).

112.     Before Penthol LLC could respond to Vertex's January 19 letter, Vertex sent another letter on January 27, 2021.[300]  Vertex's own lawyers referred to this letter as the "Sales

---

[297] PTX026, December 18, 2020 Letter from Penthol to Vertex.

[298] PTX067, January 19, 2021 Letter from Vertex to Penthol.

[299] PTX067, January 19, 2021 Letter from Vertex to Penthol at 2.

[300] PTX045, January 27, 2021 Letter from Vertex Terminating SRMA.

Representative and Marketing Agreement Termination."[301]   Thus, Vertex terminated the SRMA on January 27. 2021.  Vertex did not reach out to anyone at Penthol before sending the January 27, 2021 termination letter.[302]   Penthol accepted Vertex's termination on January 29, 2021, resulting in termination of the SRMA.[303]   Although it was eight days before the expiration of Section 7.1(b)(ii)'s thirty-Business-Day cure period and Penthol LLC had not taken any steps to terminate the SRMA.  Vertex's January 27 letter notified Penthol LLC that "Vertex considers the Agreement terminated."[304]   Vertex thus gave notice of its desire to "mutually agree to terminate th[e] Agreement."[305]   Penthol LLC responded by confirming its mutual agreement to terminate the SRMA as of January 27, 2021.  Vertex's assertion that it considered the SRMA terminated, "albeit wrongfully by Penthol," does not make it so.[306]

113.   Given the existence of multiple defaults by Vertex and the parties' termination of the SRMA by agreement before those defaults were cured or the cure period expired, Section 7.2 does not bar Penthol LLC from exercising its set-off rights.[307]   Vertex is trying to rewrite Section 7.2's set-off rights to apply only because of a legitimate uncured default under § 7.1(b).   But Section 7.2 contains no such limiting language.   Further, Vertex's argument that the SRMA's mutual termination provision precludes it from breaching Section 7.2 ignores the plain language of Section 7.2, which required Vertex to "settle and liquidate all transactions … in a commercially

---

[301] PTX233, Email re Sales Representative and Marketing Agreement Termination at 1.

[302] Day 2 (AM) Trans., B. Cowart Test. at 43:19-23.

[303] PTX051, January 29, 2021 Letter from Penthol to Vertex.

[304] PTX045, January 27, 2021 Letter from Vertex Terminating SRMA at 1.

[305] PTX004, SRMA at 17 § 7.1(d).

[306] PTX045, January 27, 2021 Letter from Vertex Terminating SRMA.

[307] PTX004, SRMA at 17 § 7.2.

reasonable manner" regardless of whether the SRMA was mutually terminated.  These obligations under Section 7.2 are post-termination obligations that survive termination.

> 4. *Penthol did not repudiate the SRMA.*[308]

114.   Anticipatory breach requires an "absolute repudiation of an obligation" and a "lack of a just excuse for the repudiation."  *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 239 (5th Cir. 2014).  Vertex argues that Penthol's December 18, 2020 letter was a repudiation of the SRMA.  As explained above, Penthol's December 18, 2020 letter served only as a notice asserting Penthol's rights under the SRMA.   Contrary to Vertex's argument that Penthol's letter was incorrect and resulted in repudiation, Penthol's assertion of its rights under the SRMA in the December 18, 2020 letter was not a repudiation.  *See In re Windmill Run Associates, Ltd.*, 566 B.R. 396, 447 (Bankr. S.D. Tex. 2017) (noting that "the assertion of such a right, whether done correctly or not, was not in itself an unequivocal repudiation of the contract").  In *In re Windmill Run Associates, Ltd.*, the court noted that repudiation occurred when the breaching party "took an action that was an unequivocal act that rendered impossible Debtor's continued performance under the contract."  *Id.*  Penthol took no such steps here.  In fact, all of the evidence is to the contrary because it showed that **both** Vertex **and** Penthol continued to perform under the SRMA until Penthol received Vertex's January 27, 2021 termination letter.  Indeed, as of December 18, 2020, Penthol had not decided whether it would terminate the SRMA at the conclusion of thirty Business Days,[309] and thus there could not have been any repudiation by Penthol at that time.

---

[308] Penthol LLC does not concede that repudiation was properly pled by Vertex as a claim or affirmative defense. The Court should grant Penthol LLC's Motion to Strike Vertex's unpled repudiation theory [Dkt. No. 202], which Vertex raised in its Proposed Findings of Fact and Conclusions of Law.

[309] Day 2 (PM) Trans., F. Erkoc Test. at 34:4-6.

115.     Moreover, even if Penthol had repudiated the contract, the evidence shows that Penthol had a just excuse to do so because Vertex had earlier materially breached Section 3.4(c) of the SRMA.[310]   Penthol's request that Vertex comply with the SRMA was not a repudiation of the contract, even if Vertex could not stop producing Group III VTX-6.   *See Basic Medical Care Plus, Inc. v. North Carolina Mut. Life Ins. Co.*, 2005 WL 2205016, at *7 (M.D.N.C. Sept. 6, 2005) (emphasis in original) ("If a party to the contract states that he cannot perform except on some condition *which goes outside the terms of his contract* then the statement will constitute a repudiation."); see also Restatement (Second) of Contracts § 250 (1981).   Regardless, the evidence shows that Vertex could have complied with the SRMA by denaturing or blending Group III VTX-6 to make it a Group II base oil.[311]

**D.     Vertex misappropriated Penthol LLC's trade secrets.**

116.     Vertex misappropriated Penthol LLC's trade secrets in at least two ways.   *First*, while the SRMA was in effect, Vertex had a limited right to access and use (and keep confidential) Penthol LLC's trade secrets related to the Product and its customers, but only while working as Penthol LLC's independent sales representative under the SRMA.   Vertex could not, for example, use Penthol LLC's trade secrets for any other purpose, including any purpose related to Vertex's VTX-6 business.   But that is exactly what Vertex did while looking for a private capital partner and during the Tensile joint venture to help Vertex compete with Penthol LLC and the Product.[312]

117.     *Second*, after the SRMA terminated, Vertex had no right to access and use Penthol LLC's trade secrets related because Vertex was no longer Penthol LLC's independent

---

[310] PTX004, SRMA at § 3.4(c).

[311] Day 1 (AM) Trans., H. Henderson Test. at 128:2-25; Day 3 (PM) Trans., E. Snedegar Test. at 41:24-42:16; 45:9-46:1.

[312] PTX162, Tensile Investor Presentation at 8, 11, 16; PTX112, Email re G-III Follow-Up at 1.

sales representative under the SRMA.  Nevertheless, Vertex had ongoing access to Penthol LLC's trade secrets post-termination that benefited Vertex's continued production, marketing, promotion, and sale of competing Group III VTX-6.[313]  This constitutes misappropriation of Penthol LLC's trade secrets.

### 1.   *Vertex's legal arguments fail.*

118.   *First*, the lack of a nondisclosure agreement between Penthol and Vertex is not a real reason to bar Penthol's recovery.  "Texas law makes it clear that an express confidentiality agreement is not required for liability in a trade secret misappropriation case … ." *Bianco v. Globus Med., Inc.*, No. 2:12-CV-00147-WCB, 2014 WL 5462388, at *10-11 (E.D. Tex. Oct. 27, 2014), *aff'd*, 618 Fed. Appx. 1032 (Fed. Cir. 2015); *see Zinco-Sherman, Inc. v. Adept* Food Sols., Inc., No. CIV. A. H-06-1081, 2006 WL 1061917, at *2 (S.D. Tex. Apr. 21, 2006) ("Although the parties did not execute a written confidentiality or noncompete agreement, Texas law does not require a formal written confidentiality agreement to establish a confidential or fiduciary relationship."); *Hyde Corp. v. Huffines*, 158 Tex. 566, 576, 314 S.W.2d 763, 770 (1958) ("In the area of confidential relationships between partners, employers and employees, licensors and licensees, and the like, the injured party is not required to rely upon an express agreement to hold the trade secret in confidence.").

119.   Section 4.8 of the SRMA confirmed that Vertex was Penthol's "exclusive agent for marketing and sale of the Product in the Territory," and as the Restatement of Agency makes clear:

> Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another … .

---

[313] DX098, Email re Valvoline pricing at 1.

120.    Restatement (First) of Agency § 395 (1933).   That is the exact situation here. Having obtained Penthol's confidential information because of the SRMA, Vertex could not use it without Penthol's permission, regardless of whether there was a nondisclosure agreement in place.

121.    *Second*, the trade secrets at issue belong to Penthol, not Vertex.[314]  To the extent Vertex had any role in generating or developing those prices, it did so at Penthol's direction as Penthol's agent, which renders the prices Penthol's property. 13 Dorsaneo, Texas Litigation Guide § 200B.04 ("If an employee is hired or employed specifically to invent, develop, or devise improvements for the employer, any inventions and work product resulting from the employee's work in the scope of employment belongs to the employer." (citing cases)).   Finally, even if the Court determines that the trade secrets at issue were jointly owned or developed by Penthol and Vertex, Penthol still can sue Vertex for misappropriation: "[A] joint owner can bring a claim for trade secret misappropriation against the other owner." *StrikePoint Trading, LLC v. Sabolyk*, 2008 WL 11334084, at *6 (C.D. Cal. Dec. 22, 2008); *see Curtiembre Becas, S.A. v. Arpel Leather Corp.*, No. 1:05CV622, 2007 WL 9751828, at *8 (M.D.N.C. May 2, 2007) ("[C]ourts that have addressed [the issue] have held that a joint owner of a trade secret is protected from unlawful disclosure by the other owners of the trade secret, absent some clear waiver of that protection." (citing cases)).

122.    *Third*, Vertex's argument that Penthol LLC's trade secrets are not secret is meritless.   Indeed, the evidence establishes that Vertex would not want its competitors to know the same information that Penthol LLC alleges to be its trade secrets.   Vertex's argument is also

---

[314] *See e.g.*, Day 1 (PM) Trans., H. Erkoc Test. at 52:14-20 (H. Erkoc testifying that the price sold to the customer is Penthol's most important trade secret); *id.* 77:8-19 (H. Erkoc testifying that Penthol created the prices and Vertex would record them in the workbook).

undercut by its own conduct in this lawsuit.  Vertex has designated as "Attorneys' Eyes Only" ("AEO") documents that contain the same type of information that Penthol LLC claims to be its trade secrets, including documents that contain customer names, product pricing, cost information,[315] product specifications,[316] and other technical and financial information.[317]  For Vertex to make its AEO designations, the information at issue must be "(1) of a competitively sensitive, proprietary, or technical nature that it may harm the competitive position of the producing party if disclosed and (2) is believed to be unknown to the opposing party or parties," including "pricing information [and] customer identification data."  Dkt. No. 57 at 4.  Given Vertex's AEO designations for similar information, Vertex cannot credibly argue that Penthol LLC's trade secrets are not secret.

123.    Additionally, Penthol LLC has standing to assert a DTSA claim.  As an initial matter, this argument has no bearing on Penthol LLC's state-law claim under TUTSA.  Under the SRMA, Vertex was nothing more than an independent sales representative or agent.[318]  In contrast, Penthol LLC was the principal that entered into customer contracts for Product sales and purchases.[319]  Penthol LLC was therefore an "owner" of the information in those contracts. Penthol LLC was also the signatory for all storage and transportation contracts for the Product.[320] Penthol LLC was thus an "owner" of the information in those contracts.  Further, Penthol LLC was responsible for identifying "opportunities to source and purchase the Product outside the

---

[315] PTX190, VTX-6 Sales Data.

[316] PTX007, VTX-6 Spec Sheet; PTX186, Email re Specs.

[317] PTX190, VTX-6 Sales Data.

[318] PTX004, SRMA at 7, 12 §§ 3.1, 4.8.

[319] PTX004, SRMA at 11 § 4.4; *see e.g.*, PTX141, Pennstar Contract at 10; PTX142 Plouton Contract at 7; PTX143 Pinnacle Oil Contract at 9.

[320] PTX004, SRMA at 10-11 § 4.2.

Territory for ultimate delivery to and sale in the Territory.[321]  As such, Penthol LLC had access to "the main economic terms" of those opportunities, including "price, volumes, delivery terms and other material commercial terms."  This again shows that Penthol LLC is an "owner" of that information.  Finally, Penthol LLC had to keep "accurate records of all sales and expenses of the Product," which again shows that Penthol LLC owned that information.

2. *Penthol LLC's damages are measured by disgorgement of Vertex's profits.*

124.     Disgorgement "is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs."  *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993).  "A defendant who misappropriates a trade secret … not only faces the potential for liability calculated as a reasonable royalty, but also faces the risk of a judgment requiring disgorgement of up to all the profits gained as a result of that misappropriation."  *Bianco v. Globus Med., Inc*., 53 F. Supp. 3d 929, 938 (E.D. Tex. 2014); *see* 18 U.S.C. § 1836(b)(3)(B).

125.     Mathematical precision is not required for Penthol's damages, which are measured from either September 2017 or July 2019 through the end of the SRMA in January 2021 using the formula in the Findings of Fact.  The evidence showed that Vertex's "black oil" gross profit margin (which included VTX-6 sales) was 18.5%, and thus a net profit margin of 7.5% is reasonable.[322]

**E.     Vertex's affirmative defenses fail.**

126.     Vertex asserts the following affirmative defenses: waiver; unclean hands; failure to mitigate damages; and estoppel, equitable estoppel, and quasi-estoppel.  The Court has already entered summary judgment in Penthol LLC's favor as to Vertex's unclean-hands defense (as it

---

[321] PTX004, SRMA at 10 4.1.

[322] Day 4 (AM) Trans., C. Carlson Test. at 8:2-16, 8:24-9:20; PTX012, Investor Presentation at 8.

applies to Penthol LLC's breach-of-contract claims) and estoppel that requires a finding of misrepresentation or concealment.  Dkt 176 at 4-5.

127.    As an initial matter, Vertex's equitable defenses of waiver, unclean hands, and estoppel apply only to a claim for equitable relief.  *See, e.g.*, *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 994 (5th Cir. 2019) (noting that, as an equitable defense, unclean hands applies only to a request for equitable relief).

128.    Turning first to Vertex's affirmative defense of **waiver**: "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008)).  "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Id.*

129.    Vertex alleges that Penthol LLC waived its claims "because it wrongfully terminated the SRMA without reasonable notice to Vertex and without reasonable cooperation with Vertex, and because Penthol violated the non-circumvention provision in the SRMA."  But, as previously explained, Penthol LLC did not wrongfully terminate the SRMA.  And, even if Penthol LLC had, that conduct would not show waiver as a matter of law.  Finally, Vertex is no longer prosecuting its claim that Penthol violated the non-circumvention provision in Section 8.11 of the SRMA.

130.    Vertex likewise cannot maintain a waiver defense based on Penthol LLC knowing that Vertex was selling VTX-6 when the SRMA was signed.  The evidence showed that VTX-6 was sometimes a Group II base oil and sometimes a Group III base oil.  Penthol LLC did not discover that Vertex was selling Group III VTX-6 until November 2020.  Shortly thereafter,

Penthol LLC sent its December 18, 2020 letter notifying Vertex of an alleged default under Section 3.4(c) of the SRMA, which prohibited Vertex from selling, marketing, advertising, promoting, offering to sell, or soliciting to sell any product that competed with the Product.  Penthol LLC's conduct is totally consistent with exercising its rights under the SRMA.  Further, the evidence shows that Vertex did not disclose to Penthol LLC Vertex's failure to comply with Section 3.4(c).

131.    Vertex's argument that Penthol knew that Vertex breached the SRMA because Mr. Cowart sent an investor slide deck to Mr. Faruk Erkoc in 2018 is unavailing.[323]   The email transmitting the slide deck had no text, and Mr. Cowart never followed-up on the email.[324]   In fact, Mr. Faruk Erkoc did not even read the attachment.[325]

132.    As to **<u>unclean hands</u>**, Vertex "must show that [Penthol LLC] conducted itself as to shock the moral sensibilities of the judge, or stated otherwise, that [Penthol LLC]'s conduct was offensive to the dictates of natural justice."  *iFLY Holdings LLC v. Indoor Skydiving Germany Gmbh*, 2:14-CV-1080-JRG-RSP, 2016 WL 3675136, at *1 (E.D. Tex. Mar. 25, 2016).  "The unclean hands doctrine requires a finding of both inequitable conduct and a finding that the conduct relates to the requested relief."  *Petro Franchise Sys., LLC v. All Am. Properties, Inc.*, 607 F. Supp. 2d 781, 799 (W.D. Tex. 2009).

133.    Vertex alleges that "Penthol has unclean hands because it wrongfully terminated the SRMA without reasonable notice to Vertex and without reasonable cooperation with Vertex, and because Penthol violated the non-circumvention provisions in the SRMA."  Even if these allegations were true, they would not support Vertex's unclean-hands defense as a matter of law.

---

[323] DX024, Email re Heartland Investment Presentation FINAL.

[324] DX024, Email re Heartland Investment Presentation FINAL at 1; Day 2 (PM) Trans., F. Erkoc Test. at 2-29:4-9.

[325] Day 2 (PM) Trans., F. Erkoc Test. at 43:11-14.

These allegations are nothing more than a purported breach-of-contract and are legally insufficient to invoke the unclean-hands doctrine. *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Investments, LLC*, 481 S.W.3d 336, 351 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Admitted breach of a contract is not necessarily sufficient to invoke the doctrine of unclean hands." (citing cases)).

134.    Additionally, the unclean-hands defense "requires a finding of *both* inequitable conduct *and a finding that the conduct relates to the requested relief.*" *Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F. Supp. 2d 781, 799 (W.D. Tex. 2009) (emphases added). To meet this standard, the relationship between the allegedly inequitable conduct and the requested relief must be "immediate, necessary, or direct." *Id.* But the allegedly inequitable conduct identified by Vertex has nothing to do with unjust enrichment for trade-secret misappropriation. Because Vertex does not tie its unclean-hands defense to Penthol LLC's claim for unjust enrichment for Vertex's trade-secret misappropriation, that defense fails.

135.    For **estoppel**, Vertex "would have to demonstrate at least intentional deception through concealment or inaction, or gross negligence amounting to constructive fraud." *Wilson v. Tessmer Law Firm, PLLC*, 483 F. Supp. 3d 416, 429 (W.D. Tex. 2020). Vertex has not identified any evidence showing that Penthol LLC engaged in this type of intentional deception or gross negligence. Indeed, the evidence is to the contrary and shows that Penthol LLC complied with the SRMA.

136.    As to **failure to mitigate damages**, Vertex must show that Penthol LLC failed "to exercise reasonable care in minimizing damages." *Moreland v. United States*, No. 3:11-CV-358-L, 2013 WL 3283700, at *2 (N.D. Tex. June 28, 2013). Vertex "must also show the amount by which the damages were increased by failure to mitigate." *Id.* Vertex has adduced no proof that

Penthol LLC has failed to minimize its damages and certainly no evidence of the amount by which Penthol LLC's damages increased from any alleged failure to mitigate.  To the contrary, Penthol LLC acted promptly to mitigate its damages after Vertex's misconduct by, inter alia, attempting to fill orders, and incurring additional costs to do so.

137.     Vertex's failure to mitigate defense fails for the additional reason that it rests on the incorrect assumption that Penthol LLC terminated the contract.  As explained above, the parties mutually terminated the contract.  Accordingly, there is no factual basis for Vertex's mitigation defense.

## F.     Penthol LLC is entitled to attorneys' fees, exemplary and punitive damages, and disgorgement of Vertex's profits.

138.     Penthol LLC is entitled to an award of attorneys' fees under the DTSA and the TUTSA.[326]  Penthol is also entitled to an award of attorneys' fees under Section 7.2 of the SRMA.[327]  Vertex admits it never invoked Section 7.1 of the SRMA by sending a default notice to Penthol LLC.[328]  Penthol LLC's December 18, 2020 letter renders it the "non-defaulting Party" and renders Vertex the "defaulting Party" under SRMA Section 7.2.  Thus, Penthol LLC is entitled to recover from Vertex its "actual, reasonable out-of-pocket expenses (with interest at the Interest Rate), including without limitation, reasonable legal fees and expenses…."  Vertex cannot be the "non-defaulting Party" because it did not send a letter under Section 7.1.

---

[326] Section 7.2 of the SRMA provides that "[t]he defaulting Party shall reimburse the non-defaulting Party, on demand, for actual, reasonable out-of-pocket expenses (with interest at the Interest Rate), including, without limitation reasonable legal fees and expenses incurred by the non-defaulting Party in connection with the enforcement of the non-defaulting Party's rights and remedies."  The TUTSA provides that the Court "may award reasonable attorney's fees to the prevailing party if: (3) willful and malicious appropriation exists."  Tex. Civ. Prac. & Rem. Code Sec. 134A.005(3).

[327] PTX026, December 18, 2020 Letter from Penthol to Vertex.

[328] Day 2 (AM) Trans., B. Cowart Test. at 41:13-19.

139.    The parties have agreed to resolve attorneys' fees following trial via Federal Rule of Civil Procedure 54(d)(2).  Penthol LLC shall file its request for attorneys' fees and costs within 45 days of the date of these findings of facts and conclusions of law.  Vertex shall have 21 days to respond to the request, and Penthol LLC shall have 14 days to reply.

**G.    Vertex terminated the SRMA or mutually agreed to do so with Penthol LLC.**

140.    Penthol LLC gave Vertex notice of alleged defaults under the SRMA on December 18, 2020.  Vertex responded by denying that any defaults had occurred and acknowledging that the SRMA remained in effect as of January 19, 2021.  Vertex then changed its position on January 27, 2021, stating that it now "considers the [SRMA] terminated, albeit wrongfully by Penthol LLC."

141.    Penthol LLC did not terminate the SRMA.  *First*, Vertex is incorrect that, once Penthol LLC sent its December 18, 2020 notice of default, termination was automatic if Vertex did not cure its breach within 30 Business Days.  Section 7.1 of the SRMA set forth the various ways the SRMA was "***subject to*** termination."[329]   This language did not make termination automatic.  "Subject to' … implies a contingency."  *Titan Tire Corp. of Bryan v. Local 890l, United Steelworkers of Am.*, 673 F. Supp. 2d 582, 586 (N.D. Ohio 2009), *aff'd sub nom*, 656 F.3d 368 (6th Cir. 2011).  "Subject to termination" means that termination "is an option … but it is not automatic."  *Id.*

142.    Section 7.1(b) of the SRMA confirmed that termination was not automatic with the transmission of a default notice like Penthol LLC's December 18, 2020 letter:

> Either Party shall have the ***right to terminate*** this Agreement upon … the failure of a Party to perform any material covenant or obligation set forth in this Agreement if such failure is not remedied within thirty (30) Business Days after receipt of a Notice specifically describing the nature of the default; provided, however, that in

---

[329] PTX004, SRMA § 7.1 (emphasis added).

the event the alleged default is cured within such thirty (30) day period, this Agreement shall remain in full force and effect and not be terminated as a result of such default.[330]

143.     Under this language, Penthol LLC had only a "right to terminate" that was not exercisable until at least February 4, 2021, the first day following the expiration of 30 Business Days after sending its December 18, 2020 default notice.  Penthol LLC's option to terminate could be eliminated based on the "provided" language relied on by Vertex—i.e., if the alleged default was cured within 30 Business Days, Penthol LLC's option to terminate was no longer exercisable and the SRMA would "remain in full force and effect."  Even Vertex's January 19, 2023 letter recognized that Penthol LLC had only an option to terminate after sending its December 18, 2020 letter, because Vertex's January 19 letter acknowledged that Penthol LLC had to take additional steps to "follow through on its threat to terminate."[331]  In sum, Penthol had only an option to terminate after sending its December 18, 2020 letter; that letter neither terminated the SRMA nor required its termination.

144.     *Second*, the evidence shows that the SRMA did not terminate when Penthol LLC sent its December 18, 2020 letter.  To the contrary, the parties continued to perform under the SRMA until late January 2021.[332]  Penthol LLC also paid commissions to Vertex on December 23, 2020 and the morning of January 27, 2021.[333]  It was only later on January 27, 2021, that **Vertex** terminated the SRMA by sending an email with the subject line: "Sales Representative and

---

[330] PTX0004, SRMA § 7.1(b) (emphasis added).

[331] PTX067, January 19, 2021, Letter from Vertex to Penthol at 2.

[332] Day 4 (PM) Trans., E. Snedegar Test. at 33:15-17; *see* DX097, Email re Vertex / Penthol (Adnoc Group III Base Oils at 2.

[333] PTX188, Email re Penthol payments at 1; PTX191, Penthol Payments at 2.

Marketing Agreement ***Termination***."[334]   That email transmitted Vertex's January 27, 2021 letter stating that "Vertex considers the Agreement terminated."[335]

145.   *Third*, Penthol LLC's option to terminate under Section 7.1(b) was not exercisable until at least February 4, 2021.  But before then, on January 28, 2021, Vertex was already telling customers like Lube-Tech that the SRMA terminated as of January 27, 2021.[336]

146.   Vertex's claim that Penthol LLC unilaterally terminated or wrongfully terminated the SRMA therefore fails.

147.   Vertex's claim that Penthol LLC wrongfully terminated the SRMA fails for the additional reason that Vertex materially breached the SRMA, including Section 3.4(c).

148.   Vertex is no longer asserting claims under, and is not entitled to any relief based on, SRMA Sections 4.1 or 8.1.

**H.      Vertex is not entitled to damages.**

149.   Vertex is not entitled to any commissions beyond what it has already received from Penthol LLC because Penthol LLC had paid all commissions due when the SRMA terminated on January 27, 2021.[337]   Vertex is only entitled to commissions once customers pay Penthol LLC.[338] Vertex has presented no evidence of monies actually paid by customers to Penthol LLC after January 27, 2021.

---

[334] PTX233, Email re Sales Representative and Marketing Agreement Termination at 1 (emphasis added).

[335] PTX045, January 27, 2021 Vertex Termination Letter.

[336] DX097, Email re Vertex / Penthol (Adnoc Group III Base Oils) at 2.

[337] PTX188, Email re Penthol Payments; PTX192, Penthol Payments.

[338] PTX004, SRMA at 14 § 5.2(b).

150.     Penthol LLC did not wrongfully terminate or repudiate the SRMA, so Vertex is not entitled to any performance incentive payments for 2021 or any commissions for cash payments received by Penthol LLC after January 27, 2021.

151.     Because Vertex's damages are speculative, based on estimates and assumptions, and conflict with the SRMA's language, Vertex is not entitled to any performance incentive payments for 2021 or any commissions for cash payments received by Penthol LLC after January 27, 2021.

## I.     Vertex is not entitled to attorneys' fees and costs.

152.     Even if Vertex had prevailed on its breach-of-contract claim, it is not entitled to attorneys' fees and costs.  Under the version of Section 38.001 of the Texas Civil Practice and Remedies Code in effect at the time this lawsuit was filed, attorneys' fees were not recoverable by or against a limited liability company.  *See*, *Varel Int'l Indus., L.P. v. PetroDrillbits Int'l, Inc.,* 05-14-01556-CV, 2016 WL 4535779, at *7 (Tex. App.—Dallas Aug. 30, 2016, pet. denied) ("Under the plain language of section 38.001, a trial court cannot order limited liability partnerships, limited liability companies, or limited partnerships to pay attorney's fees.")  Penthol LLC is a limited liability company.  Accordingly, Vertex would not be entitled to attorneys' fees against Penthol LLC.

153.     Penthol LLC sent a letter under Section 7.1 of the SRMA because Vertex breached Section 3.4(c) of the SRMA.[339]  Vertex admits it never invoked Section 7.1 by sending a notice letter to Penthol LLC.[340]  Penthol LLC's December 18, 2020 letter renders it the "non-defaulting Party" and renders Vertex the "defaulting Party" under SRMA Section 7.2.  Thus, Penthol LLC is

---

[339] PTX026, December 18, 2020 Letter from Penthol to Vertex.

[340] Day 2 (AM) Trans., B. Cowart Test. at 41:13-19.

entitled to recover from Vertex its "actual, reasonable out-of-pocket expenses (with interest at the Interest Rate), including without limitation, reasonable legal fees and expenses…."  Vertex cannot be the "non-defaulting Party" because it did not send a letter under Section 7.1.

**J.    Penthol LLC prevails on its affirmative defenses.**

154.    Even if Vertex could prevail establish a basis for its breach-of-contract claim, Penthol LLC prevails on its affirmative defenses.

155.    Vertex's claims are barred by waiver.

156.    Vertex's claims are barred by estoppel by contract, quasi-estoppel, and/or equitable estoppel.

157.    Vertex's claims are barred by the doctrine of ratification.

158.    Vertex's claims are barred based on Vertex's prior material breach.

159.    Vertex's claims are barred because Penthol LLC's conduct was reasonable and justified.

160.    Vertex's claims are barred by the doctrines of *in pari delicto* and unclean hands.

161.    Vertex is not entitled to exemplary or consequential damages under the SRMA.

162.    Vertex's claims are barred by set-off.

Date: November 22, 2023

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By:    */s/ William M. Katz, Jr.*
William M. Katz, Jr.
Attorney-in-Charge
Texas Bar No. 00791003
S.D. Tex. Bar No. 21581
William.Katz@hklaw.com

Dina W. McKenney
Texas Bar No. 24092809
S.D. Tex. Bar No. 3501700
Dina.McKenney@hklaw.com

Jordan T. Koenig
Texas Bar No. 24121702
S.D. Tex. Bar No. 24121702
Jordan.Koenig@hklaw.com

One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
214-969-1700 (Telephone)
214-969-1751 (Facsimile)

J. Michael Bell
Texas Bar No. 02079200
S.D. Tex. Bar No. 5574
michael.bell@hklaw.com

811 Main Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

**MORGAN, LEWIS & BOCKIUS LLP**

David J. Levy
Texas State Bar No. 12264850
S.D. Tex. Bar No. 13725
david.levy@morganlewis.com

William R. Peterson
Texas State Bar No. 24065901
S.D. Tex. Bar. No. 1035932
william.peterson@morganlewis.com

Heidi Rasmussen
Texas State Bar No. 24090345
S.D. Tex. Bar. No. 3027157
heidi.rasmussen@morganlewis.com

1000 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001

**ATTORNEYS FOR PENTHOL LLC**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered to all counsel of record

on November 22, 2023 via email in accordance with the Federal Rules of Civil Procedure.

*/s/ Jordan T. Koenig*
Jordan T. Koenig