United States District Court
Southern District of Texas
**ENTERED**
March 07, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PENTHOL, LLC | § |
| | § |
| *Plaintiff/Counter-Defendant,* | § |
| | § |
| v. | § CIVIL ACTION NO. 4:21-cv-416 |
| | § |
| | § |
| VERTEX ENERGY OPERATING, LLC | § |
| | § |
| *Defendant/Counter-Plaintiff.* | § |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After considering the evidence presented at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law. Except where otherwise noted, the facts set out in the following recitation should be considered as findings of fact and the application of the law to the facts conclusions of law.

### I.     Introduction

Penthol C.V. is a Dutch trading company active around the world, but with a number of contacts in the Middle East. It is principally operated by a Turkish family. Penthol C.V. was headed up by Zeynap Cizmeci, with Cizmeci's father, Faruk Erkoc, acting as honorary chairman to the company.  As chairman of Penthol C.V., Faruk also became the President of Penthol, LLC at its inception in 2016. Hakan Erkoc, Cizmeci's brother and Faruk's son, became the Vice President of Penthol LLC. Penthol LLC is the plaintiff herein.

Faruk had business ties in the Middle-East and gradually convinced the Abu Dhabi National Oil Company ("ADNOC") to make Penthol C.V. its exclusive marketing agent for base oil in North America. This relationship began first on a "spot sale" basis that subsequently

evolved into a formal contractual relationship between Penthol C.V. and ADNOC once Penthol proved it was able to establish a foothold in the market. Penthol had no experience selling base oil in the United States market and eventually decided it needed a company more well-versed in the marketplace to help it gain its foothold. To that end it contacted Vertex, an American based base oil company.

In June of 2016, Plaintiff/Cross-Defendant Penthol, LLC ("Penthol") and Defendant/Cross-Plaintiff Vertex Energy Operating, LLC ("Vertex") entered into a Sales Representative and Marketing Agreement ("SRMA"). Under the SRMA, Vertex was to be Penthol's exclusive sales representative in North America for the product "ADBase" (a Group III base oil produced by ADNOC). Vertex was well-established in the North American base oil industry. It had been producing and selling VTX-6, a Group II base oil made from Used Motor Oil ("UMO") for years. Thus, Vertex already had logistics expertise and a ready-made customer base that it could tap in order to sell the ADBase that Penthol was going to import. At the same time, Vertex did not pose a commercial threat since Group III base oil is a much higher quality oil than Group II and sells for a higher price.[1] Moreover, the SRMA generally prevented Vertex from selling a product that would compete with ADBase. For its services, Vertex was to receive $0.05 per gallon commission (provided that Penthol received the customer's payment) and a performance incentive equal to 25% of the Net Sales Proceeds in excess of $50,000. The SRMA was set to have a term of approximately five and a half years, terminating on December 31, 2021.

---

[1] Group II and Group III are different groupings of base oil according to the American Petroleum Institute ("API"). The API uses three main specifications ("specs") to classify base oils: viscosity index ("VI"), saturates, and sulfur. Group II and Group III share the same requirements for saturates and sulfur, but to be grouped and approved as Group III, the base oil must have a VI of 120 or higher, while the VI for Group II generally falls between 80 and 120.

The SRMA is the document around which this controversy swirls, and the most relevant terms of the SRMA are outlined below.

SRMA 3.4 Prohibited Acts. Notwithstanding anything to the contrary in this Agreement, neither Vertex nor its Personnel shall directly or indirectly:

> (c) sell, market, advertise, promote, solicit the sale of or offer to sell any product that competes with the Product procured or sourced by Penthol, except to the extent this restriction is prohibited by Applicable Law.

SRMA 3.3 Vertex Sales Obligations. Vertex shall at its own expense:

> (a) market, promote, and solicit the sale of the Product to prospective and existing Customers consistent with good business practice, in each case using its commercially reasonable efforts to maximize Product sales volume in the Territory.

SRMA 4.2 Storage and Logistics. Vertex will have the sole responsibility for coordinating, arranging and procuring (a) facilities for storage of the Product in the Territory and (b) logistics in respect of loading, transportation and/or freight (whether by rail car or tank truck) of the Product to Customers. The agreements that are commercially necessary to support storage and/or transportation of the Product (collectively, the "Logistics Agreements") shall be entered into solely by Penthol. Vertex shall not execute, amend or modify any Logistics Agreements without Penthol's prior consent.

SRMA 7.1 Early Termination Events. This Agreement is subject to termination as follows:

> (a) Either Party shall have the right to immediately terminate this Agreement upon Notice to the other Party at any time in the event (i) any representation or warranty made by such Party herein is false or misleading in any material respect when made or when deemed made or repealed; (ii) such other Party becomes Bankrupt; or (iii) such other Party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its asserts to, another entity and, at the time of such consolidation, amalgamation, merger or transfer, the resulting, surviving or transferee entity fails to assume all the obligations of such Party under this Agreement to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the non-transferring Party; or

3

(b) Either Party shall have the right to terminate this Agreement upon (i) the failure of a Party to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within ten (10) Business Days after receipt of a Notice; or (ii) the failure of a Party to perform any  material covenant or obligation set forth in this Agreement if such failure is not remedied within thirty (30) Business Days after receipt of a Notice specifically describing the nature  of the default; provided, however, that in the event the alleged default is cured within such  thirty (30) day period, this Agreement shall remain in full force and effect and not be terminated as a result of such default; or

(c) Penthol gives a Notice as provided in Section 4.7(a) [regarding Penthol discontinuing the sale of the Product]; or

(d) The Parties mutually agree to terminate this Agreement

SRMA 7.2 Termination Rights. The Parties agree that within a commercially reasonable time after termination of this Agreement as provided in Section 7.1, the Parties will settle and liquidate all transactions and obligations entered into pursuant to this Agreement in an orderly and commercially reasonable manner. The non-defaulting Party shall be entitled, in its sole discretion, to set-off any amount payable by the non-defaulting Party to the defaulting Party under this Agreement or otherwise, against any amounts payable by the non-defaulting Party to the defaulting Party under this Agreement or otherwise. The defaulting Party shall reimburse the non-defaulting Party, on demand, for actual, reasonable, out-of-pocket expenses (with interest at the Interest Rate), including, without limitation, reasonable legal fees and expenses incurred by the non-defaulting Party in connection with the enforcement of the non-defaulting Party's rights and remedies. The non-defaulting Party's rights under this Section 7.2 shall be in addition to any and all rights and remedies such Party may have under Applicable Law or in equity, except as such rights may be limited by the express terms hereof, including, without limitation, Section 8.4.

As the years progressed, the relationship appeared to be going well. Vertex leveraged its relationships with customers and began selling ADBase in the very first year. Additionally, it used its contacts with certain additive companies to obtain approvals for ADBase, and ADBase's North American customer base grew. Within four years, Vertex sold 150 million gallons of

4

ADBase on behalf of Penthol. Yet in 2018/2019, the first cracks in the relationship started to appear. Penthol was upset to learn that Vertex had been seeking outside investors and that the search had culminated in a new partnership with investment company Tensile Capital Management ("Tensile").

Vertex had been seeking a capital infusion for a number of reasons/projects. In a presentation for Tensile, one of the projects that Vertex mentioned involved investigating the possibility of Vertex upgrading its facilities and/or instituting a new process by which it could begin producing its own Group III oil. While this eventuality never occurred, Vertex did get far enough along to actually run a number of different trials—none of which were commercially successful. Penthol denied being informed of this project, but the evidence clearly demonstrates that an email was sent to Faruk Erkoc that plainly set this out.[2] This email could have been the first seed planted in Penthol's mind that Vertex was planning to compete with Penthol in the sale of Group III base oil.

As the relationship progressed, the sales of ADBase increased—it was a highly rated Group III product. As sales increased, the products' reputation increased and so did the commissions and performance incentives that Penthol was required to pay Vertex. Then, in the fall of 2020, Penthol hired a new North American CEO, Harji Gill. Gill was Penthol's first American based CEO. Whether spurred by the fact that Vertex was flirting with making its own Group III product or because the SRMA was soon to enter its final year (or for some other unknown reason), Gill began to contact customers outside of Vertex's presence. These contacts concerned Vertex greatly and were also arguably a violation of § 8.11 of the SRMA (an issue this Court need not address). Whether a violation or not, many of the ADBase customers were

---

[2] Faruk admitted that he never read that email or the attachment. The email attachment explains that Vertex was exploring avenues to manufacture its own Group III base oil. (DX-24).

also Vertex's customers for VTX-6. This made Vertex so uneasy that it actually sued Penthol and sought injunctive relief in state court. On November 11, 2020, a Texas state court issued a Temporary Injunction that, among other things, prevented Penthol from reaching out directly to customers sourced by Vertex, despite the fact that they were also Penthol customers. Not surprisingly, this state court action displeased Penthol immensely.

After the injunction issued, an employee of Pinnacle, which was a purchaser of both ADBase and VTX-6 (and who, perhaps coincidentally, was an old acquaintance of Gill), sent a few VTX-6 COAs to Gill. In this context, a Certificate of Analysis, or "COA," is an analysis of a load of base oil that breaks down and grades/describes its primary components. These COAs usually accompany the product when it is delivered to the customer. In this instance, the COAs had been for shipments of VTX-6 that Vertex sent to Pinnacle. Gill testified that these particular COAs were sent to him unprompted, although this testimony is somewhat questionable as Gill would have no obvious use for VTX-6 COAs. More likely, as Faruk Erkoc admitted, Gill solicited these COAs after Vertex had filed its state court action. Regardless of the reason, at least one of those COAs demonstrated that a shipment of VTX-6 had a VI of over 120. On that basis, Penthol sent Vertex a notice letter on December 18, 2020, accusing Vertex of improperly competing by selling VTX-6 with a viscosity index above 120 and demanding that Vertex stop doing so. The wording of this notice and Vertex's response is one of the critical parts of this dispute. On January 19, 2021, Vertex sent a response letter denying that it was in breach because VTX-6 was sold as a Group II oil. It pointed out that it sold VTX-6 long before the SRMA was entered into, and it refused to stop selling VTX-6. The relationship continued to devolve, until it was clear that the SRMA was terminated (in late January of 2021). This lawsuit ensued.

6

Before proceeding, the Court understands that the term "Group III VTX-6" as it is referred to in some briefing is a source of contention for the parties. On one hand, Penthol believes it accurately describes the batches of VTX-6 that had a VI of 120 or higher as a Group III oil. Meanwhile, Vertex believes it is an oxymoron since VTX-6 has always been a Group II product. In order to use a more neutral term, the Court will use the phrase "'High VI VTX-6" to describe the instances where a shipment of VTX-6 had a VI of 120 or above and was sold by Vertex in the relevant time period.

## II.      Penthol's Claim for Breach of § 3.4(c): Competition

Penthol's first breach of contract theory—the focus of much of the evidence at trial—is that Vertex breached § 3.4(c) of the SRMA by selling a competing product to the ADBase product. This alleged breach was also Penthol's basis for sending its December 18th notice letter to Vertex. Specifically, Penthol argues that a portion of Vertex's own VTX-6, despite having been marketed, sold, and priced as Group II, was in reality Group III because certain batches had a VI of 120 or above. According to Penthol, selling High VI VTX-6 constituted competition because those sales could have been sales of its ADBase product. According to Penthol, this constitutes a breach of the SRMA.

Before addressing the competition theories, the Court finds it necessary to discuss the evidence as to base oil pricing because it sets the framework for the competition discussion. While the evidence varies, it is clear (and undisputed) that Group III oil sells for a significantly higher price than Group II oil. The evidence demonstrates that the differential can be as much as $0.85 to $1.00 per gallon. As such, the preponderance of the evidence demonstrates that no supplier would sell a Group III oil for Group II prices and no buyer would pay a Group III price when a lower priced Group II oil would suffice. In fact, the only two customers that testified

stated that they would not substitute ADBase for the VTX-6 they were buying for economic reasons.

Section 3.4(c) of the SRMA states that "neither Vertex nor its Personnel shall directly or indirectly . . . *sell, market, advertise, promote, solicit the sale of or offer to sell any product that competes with the Product* **[ADBase]**, except to the extent this restriction is prohibited by Applicable Law." (emphasis added). The SRMA defines the "Product" as "Group III Base Oil meeting the specifications set forth in Exhibit 'A.'"

Penthol presented essentially three theories of how it claims Vertex breached § 3.4(c). Each theory is articulated in Penthol's Proposed Findings of Fact and Conclusions of Law (Doc. No. 183-2).

### 1. *Literal Competition*

Penthol's first argument is a literal one—that Vertex competed by "marketing and selling Group III VTX-6 that meets the specifications in Exhibit A to the SRMA." (Doc. No. 183-2 at 29). This claim was clearly not supported by the evidence. In fact, the preponderance of the evidence demonstrates that there was no literal competition. As an initial matter, Penthol mischaracterizes the SRMA. The fallacy in Penthol's reasoning is demonstrated in what it proposes to the Court. In its Proposed Findings of Fact and Conclusions of Law, paragraph number 28, Penthol proposes that this Court finds that the "Product" is "defined as **any base oil** meeting the specifications in Exhibit A." (emphasis added). This is not completely accurate. As noted above, the Product is defined as a "**Group III Base Oil** meeting the specifications in Exhibit A." Thus, under a literal-competition theory, VTX-6 could not have competed with the Product because it was not priced, approved, marketed, sold, or purchased as a Group III base oil, regardless of the VI level.

8

Even if one sets the contract definition aside, the Court's finding is reinforced by the fact that the High VI VTX-6 did not meet the specifications in Exhibit A. The first two lines of Exhibit A to the SRMA are telling. They read:

**"Product Specification**

**Grade: ADBase 4cSt (Group III)"[3]**

Thus, the contract requires a Group III oil not only in the text (§1.1 Definition of Product), but it also requires a Group III oil in the specifications. It does not prohibit a Group II oil *sold with some Group III characteristics*. Consequently, a Group II oil with a VI over 120 and similar sulfur and saturate numbers would still not meet the contract's definition. Moreover, Exhibit A does not solely list the three API specifications (or "specs") for Group III oil; it also lists other specs like appearance, Noack (measure of volatility), and CCS (cold crank simulator). There is no evidence to support a claim that any VTX-6 ever achieved the appearance, Noack, and CCS listed in Exhibit A. Several witnesses, including David Peel, testified that appearance, Noack, and CCS were all critical base oil specs that affect the specs of the ultimate formulation. This evidence clearly demonstrates that VTX-6, even High VI VTX-6, did not meet the contractual requirements of a competing product. Therefore, the Court finds Penthol's literal theory of competition fails.

   2.  *R&D for Future Group III Product and Relationship with Tensile*

Penthol's second theory of competition that violates the SRMA involves Vertex's three pilot attempts at developing a Group III base oil and its relationship with investor Tensile. Penthol argues and provides some credible evidence that Vertex was actively trying to research and develop its own Group III product and that Vertex perhaps hid that research and

---

[3] The "4cSt" represents another metric of grouping within base oils. Evidence at trial indicated that base oils could be 4cSt, 6cSt, 8cSt, etc.

development ("R&D") from Penthol.[4] For example, Vertex obtained a $23 million loan from Tensile in 2019, $7 million of which was to go towards R&D into the production of an economically viable Group III base oil. Penthol quotes documents in the record in an attempt to argue that during the SRMA Vertex was already holding itself out as a Group III manufacturer. These "quotes," however, are taken out of context and are seriously misleading. The preponderance of the evidence demonstrates that the quoted documents were all aspirational, and that Vertex communicated to Tensile goals for what *could* happen in the future, should the investment be made and the R&D prove to be successful. Thus, there was no evidence that Vertex ever held itself out as a *current* Group III manufacturer.

To Penthol's credit, the evidence does establish that Vertex *was* actively experimenting as to whether it could develop an economically viable Group III base oil. No one from Vertex testified how it planned to market such a product without violating the SRMA, assuming it was still in effect. Researching and developing a competing product, however, is different than selling, marketing, promoting, or offering to sell a competing product that the SRMA prohibits. The preponderance of the evidence establishes that Vertex never conducted itself in a manner to breach this clause of the SRMA. The Court does not find that Vertex's failed attempts to determine if it could produce a Group III product competed with ADBase. The evidence conclusively demonstrates that Vertex never made an economically viable or consistent Group III base oil. It certainly never tried to sell one. Moreover, the preponderance of the evidence shows that the only reason Vertex was able to create VTX-6 with a consistent VI approaching

---

[4] As noted earlier, the evidence is controverted as to whether Vertex "hid" the extent of its relationship with Tensile from Penthol. Penthol provided an internal email from Vertex CEO Ben Cowart to Tensile saying to "steer clear" of discussing a potential Group III base oil. Meanwhile Vertex provided another email from Cowart to Penthol President Faruk Erkoc as early as January 2018 that includes a slide deck used for the Tensile investment that clearly discusses Vertex's Group III plans (Erkoc testified that he did not read this email). Regardless of whether Vertex concealed its conduct with Tensile, the Court finds the conduct did not breach the SRMA, as discussed in the text.

the 117–120 range was more by happenstance than by design. The VI of the VTX-6 output depended, largely, on the quality of the input. As American cars started using more full synthetic oil, the UMO that they produced became higher quality. It was this UMO that was the primary feedstock for Vertex's product. If that feedstock had an elevated VI level, so would the end product. It was not a planned result, and whatever the VI level, VTX-6 was sold as a Group II oil. Therefore, Penthol's second breach of contract theory fails as well.

    3. *Interchangeability and Substitutability*

This brings the Court to Penthol's third theory of breach—that Vertex marketed, promoted, and sold a High VI VTX-6 that, practically speaking, customers could use interchangeably with ADBase or substitute into their formulations in lieu of ADBase. According to this theory, every gallon of "Group III" VTX-6 sold should have been a gallon of ADBase sold.

To support this allegation, Penthol presented the following evidence. Penthol points to COAs indicating that some of the VTX-6 leaving Vertex's Hartland facility had a VI of 120 or higher. Penthol presented evidence that, for the year of 2020, almost 20% of the COAs leaving Heartland indicated a VI of 120 or higher. Additionally, Penthol points to Vertex's customer-facing spec sheet. (PTX 007). While this marketing sheet lists the VI as 118, it also lists typical properties of VTX-6 at 40℃ and 100℃. Penthol postulates that if a customer were to calculate the VI using these two numbers and using the accepted VI formula, the customer would get a typical VI of 120 for VTX-6. Thus, Penthol argues that Vertex advertised to customers that VTX-6 was technically a Group III base oil.

Despite this evidence, the Court finds that Penthol has not met its burden of proof in showing that Vertex's "Group III" VTX-6 competed with ADBase in any meaningful way or in

any way contemplated by the SRMA.  First of all, there is no evidence that anyone other than Penthol, especially customers, ever did this calculation. What the preponderance of the evidence demonstrates is that VTX-6 was always sold as a Group II base oil. No evidence demonstrates that Vertex ever held VTX-6 out as a Group III product, nor does the evidence suggest that any customer ever did the VI calculation using the 40°C and 100°C specs instead of relying on the listed VI. There was testimony that Vertex in places referred to VTX-6 as a "Group II plus" product because it had a comparably high VI as opposed to other Group II products. The "plus" description is not one recognized by the API but is merely a marketing term. Penthol similarly referred to ADBase as a "Group III plus" due to its comparably high VI. While it appears that the term "plus" is gaining some traction in the industry, neither party attributed it to the API nor used it in a misleading manner. To paraphrase an analogy counsel used at trial: does Barefoot Prosecco *really* compete with Dom Perignon? Barefoot customers may be pleasantly surprised to find out the wine they purchased in fact tastes like Dom Perignon, but Dom Perignon customers certainly would not take the risk of ordering Barefoot and "hoping for the best."

Moreover, Penthol's expert admitted that he did not have any formulations from customers illustrating that they could use either ADBase or VTX-6 interchangeably. Additionally, David Peel testified that, even with a VI over 120, VTX-6 could not be substituted for a formulation requiring ADBase and still yield the same final product for the end user. Finally, even though customers from Valvoline and Pinnacle testified that, technically, both ADBase and VTX-6 could be used for dilution, both stated that they had never done it and that, economically, it would not make sense to purchase ADBase instead of VTX-6 when they sought a Group II oil.  The Court finds by a preponderance of the evidence that the products were not practically or commercially interchangeable, nor did they compete.

The Court was presented with some evidence that Vertex's experimental attempts to change VTX-6 into a Group III product made some Penthol personnel uneasy. This feeling is understandable, but Vertex's research did not breach the SRMA. It could not have been a surprise to Penthol, however, that Vertex was selling high quality Group II oil. The reason Penthol approached Vertex in the first place was that it had, by virtue of selling a good quality product, numerous, beneficial contacts through which Penthol could also sell ADBase.

Even if the Court had been persuaded that Vertex competed and thus breached the SRMA, Penthol has not proven any damages flowing from the alleged breach. ADBase sales steadily increased over the course of the SRMA, and profits skyrocketed in 2021. There is no evidence that even one customer bought High VI VTX-6 because it knew it had a VI index of over 120 or that it bought High VI VTX-6 instead of ADBase. Specifically, there is no evidence that customers received the COAs before placing an order. In fact, the evidence established just the opposite. The COA (which is the only document that would demonstrate that the Vertex product had a VI of 120 or above) was sent at the time the product was shipped—well after the time it was purchased. The evidence also shows that during the period from January, 2019 and January 27, 2021, there were 1,295 VTX-6 COAs issued, and only 141 of those showed a VI above 119.  Thus, a potential customer betting that its purchase of VTX-6 would have a higher (Group III) VI would be taking a considerable risk. Finally, even if a customer received the COA before the purchase, there was no evidence that these customers would have paid the higher price for ADBase, and there is abundant evidence they would not. In short, there is no evidence that Penthol ever lost a sale. Moreover, evidence at trial showed that Vertex sold all of the ADBase that was available to sell and, on occasion, even had to cancel sales for lack of product. Penthol has not proven by a preponderance of the evidence that it was damaged in 2021 after the contract

was terminated. It had record sales and it paid no commission on those sales. Penthol, therefore, has not proven that it actually suffered any damage from this alleged breach.

Finally, Penthol's estimated damages calculation of $490,903 due to the alleged breach is also problematic. Penthol arrived at this number by taking the number of COAs indicating a VI over 120 (141) divided by the total number of VTX-6 COAs (1,295) for the period of January 1, 2019 to January 27, 2021. Penthol then multiplied this COA fraction $\left(\frac{141}{1,295}\right)$ by the total gallons of VTX-6 sold over the period (30,057,659) to, supposedly, get the total gallons of High VI VTX-6 sold. Lastly, Penthol multiplied the gallons of High VI VTX-6 by a profit margin of $0.15/gallon.

The Court sees multiple problems with this calculation of alleged damages. First and foremost, it assumes that the ratio of COAs to gallons is uniform. In reality, however, every COA does not represent the same number of gallons; some represent railcars (~25,000 gallons), while others represent truck loads (~6,000 gallons). Thus, multiplying the COA fraction by total gallons sold does not yield a reliable estimate of how many gallons of High VI VTX-6 were sold.

Second, the $0.15/gallon profit margin is *Penthol*'s typical profit margin for Group III ADBase (albeit unverified). This profit margin improperly assumes that customers who bought High VI VTX-6 from Vertex at a Group II price would have, instead, paid the Group III ADBase price for the same product. There was no testimony that Group II base oil consumers would do that. In fact, the evidence proves the opposite. The evidence demonstrates that the difference between the two prices was approximately $0.85-$1.00. Had Penthol *really* wanted these sales, it would have had to compete with VTX-6 and other Group II oils pricewise. The customers that did testify stated they would not buy ADBase instead of VTX-6, even if they were interchangeable, for economic reasons. No company would sell its premium product for a lower

14

price when it is already selling all of the product it could get at the higher price. Certainly no one testified Penthol would.  In short, there was no evidence that Penthol was willing to discount ADBase in order to get these sales, or, alternatively, that VTX-6 customers were willing to pay ADBase's typical price for a Vertex product. Therefore, the $0.15 profit margin is wholly speculative and not based in reality.

For all the above reasons, the Court finds Vertex did not violate § 3.4 of the SRMA. The Court hereby finds for Vertex on Penthol's competition claim for breach of the SRMA.

### III.   Penthol's Claim for Breach of § 3.3(a): Failure to Maximize Sales

The Court now considers Penthol's second theory of breach of the SRMA. Penthol argued that Vertex breached SRMA § 3.3(a) by failing to maximize sales of ADBase in markets more profitable than the Passenger Car Motor Oils ("PCMO") market. The Court finds that Penthol fails to meet its burden of proof on this cause of action as well.

Section 3.3(a) of the SRMA requires that Vertex "market, promote and solicit the sale of the Product to prospective and existing Customers consistent with good business practice, in each case using its commercially reasonable efforts to maximize Product sales *volume* in the territory." (emphasis added). The first step of any contract interpretation is to look at the plain language of the contract. The plain language of the contract clearly dictates that Vertex was to maximize the volume of ADBase sold, not the profits. The testimony demonstrates that two goals of the SRMA were (1) to enable Penthol to get a foothold in the United States marketplace and (2) to prove to ADNOC that Penthol was a reliable partner. Both goals were achieved. The evidence shows that Vertex did maximize volume. Every gallon of ADBase acquired by Penthol and shipped to North America was ultimately sold by Vertex during the relevant time period.

Even putting aside the volume/profit distinction, Penthol still fails to demonstrate that other markets would have, in fact, been more profitable than the PCMO market or that any act or omission by Vertex constituted a breach. Aside from Gill's testimony that other markets (windmills, lubricants, metalworking, plastics, etc.) would have been more profitable, there has been no evidence presented that pursuing the PCMO market was anything but commercially reasonable. When the parties first entered the SRMA, Vertex was working in the PCMO space. Penthol knew this. Vertex's experience in the PCMO market was the reason why Penthol engaged Vertex in the first place. By all indications, Penthol benefited from Vertex's pre-existing client base in the PCMO market. Moreover, if Vertex was selling all the ADBase it could get, there was no proof that Penthol could actually deliver a product to this speculative new customer base.

Other portions of Gill's testimony further support the conclusion that pursuing the PCMO market, as opposed to other allegedly more profitable markets, was commercially reasonable under the SRMA. Gill admitted that Penthol only added one or two more customers after the SRMA terminated and Penthol took over operations. Had other markets been so much more accessible and profitable, one would think Gill would have reached out and promoted ADBase to those markets as soon as Penthol got out of the SRMA and took over its own projects. Instead, Penthol continued selling primarily in the PCMO space. Hence, Penthol's own business decisions and post-SRMA sales support the conclusion that promoting ADBase in the PCMO market complied with the SRMA.

Moreover, even assuming that other markets would have been more profitable, and that Vertex had a contractual obligation to pursue those markets, Penthol's damages calculations on this issue are again riddled with problems. Gill's testimony is once again instructive. Gill

16

testified that, had Vertex diversified the business portfolio to increase profit margins, Penthol would have seen about $1,050,000 increase in profits. This testimony was not credible.

He arrived at this number by multiplying seven million gallons by a profit margin of $0.30/gallon. He testified that the seven million gallons represents the number of gallons of ADBase that Vertex allegedly could have, and should have, sold in other markets. This number was reached by merely finding 10% of roughly 70 million, which is the total number of ADBase gallons sold by Vertex during the SRMA.  The 10% figure is arbitrary and speculative; it is the very kind of *ipse dixit* prohibited by *Daubert. See Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993). The record is devoid of evidence that 10% of sales is a commercially reasonable percentage, or that the SRMA requires this proportion of diversification.

The thirty-cent profit margin is similarly speculative. This number purportedly represents Penthol's "realized" profit margin (albeit unverified) of $0.15/gallon in the PCMO market plus an additional $0.15/gallon for the hypothetically higher profits in other markets. There is, however, no credible evidence that prices in other markets were, on average, fifteen cents higher. There is similarly no credible evidence that customers in other markets were willing and able to purchase ADBase, specifically, for an additional $0.15/gallon or that there was ADBase to be delivered. This "evidence" is not grounded in the real world and is so speculative and inconclusive that it cannot be categorized as more than guesswork.

The Court concludes that Vertex did not breach § 3.3(a) of the SRMA by concentrating sales efforts of ADBase in the PCMO market. Doing so complied with the SRMA and was commercially reasonable. The evidence shows that Vertex maximized the volume of ADBase sales as was required by the contract. For the above reasons, the Court finds for Vertex on this theory of breach.

IV.     **Penthol's Claim for Breach of § 4.2(b): Failure to Coordinate Railcar Logistics**

Penthol's next theory of breach of the SRMA involves the cleaning of certain railcars under lease between August 1, 2020, and January 22, 2021. Penthol argues that Vertex breached SRMA § 4.2(b) by failing to coordinate railcar logistics, which resulted in Penthol (1) getting invoiced roughly $400,000 from The International Rail Transport Committee ("CIT") for railcar cleaning, (2) spending about $100,000 to hire a rail consultant to negotiate this number down, and (3) having to re-sign railcar leases as a result of this negotiation.

Section 4.2(b) of the SRMA states that "Vertex will have sole responsibility for coordinating, arranging and procuring (a) facilities for storage of the Product in the Territory and (b) logistics in respect of loading, transportation and/or freight (whether by rail car or tank truck) of the Product to Customers. The agreements that are commercially necessary to support storage and/or transportation of the Product . . . shall be entered into solely by Penthol."

In sum, Vertex was to arrange logistics for storing and transporting ADBase, and Penthol was to sign the checks. Penthol argues that Vertex failed to ensure that the leased railcars were properly cleaned and returned, which resulted in damages. As the Court understands Penthol's argument, leasing railcars from CIT is analogous to renting a car. Just as a car renter would independently refuel the vehicle before returning it to the rental agent to prevent a fuel upcharge, so too would a rail car lessee independently clean the railcar before returning the cars to CIT to prevent it from levying a cleaning upcharge. Penthol was the entity already contractually bound to pay for the cleaning. Penthol initially claimed the amount of damages for Vertex's failure to return the railcars cleaned was around $400,000 in its Proposed Findings of Fact and Conclusions of Law, paragraph 73. Testimony at trial, however, suggested that Penthol never actually paid the $400,000 figure to CIT; instead, it paid roughly $100,000 to a railcar consultant

who negotiated with CIT on Penthol's behalf. As a result of the negotiation, instead of paying the $400,000 cleaning fee, Penthol had to re-sign the railcar leases with CIT.

After reviewing the evidence, the Court finds that Penthol's railcar theory of breach fails for two reasons. First, the evidence produced at trial failed to prove by a preponderance of the evidence that Vertex erred or breached any contractual provision. The rail consultant did not testify, and the invoices that Vertex allegedly delivered late were never produced at trial. In fact, to the contrary, Vertex produced evidence that Robin Snyder, who oversaw rail logistics for Vertex, sent an email giving Penthol a heads-up about the leases expiring and sent a second email laying out three options for cleaning the railcars, the cheapest of which was returning them directly to CIT. This second email predicted that the CIT cleaning would cost Penthol $100,000-$150,000, which matches the amount Penthol actually paid and is seeking here.

This estimate leads to the second reason Penthol's claim fails. Penthol has failed to prove by a preponderance of the evidence that it sustained any resulting damages. As Snyder's email noted, the expected cleaning cost was between $100,000 and $150,000. Indeed, the evidence shows that Penthol ultimately paid $100,000 for cleaning (by hiring the consultant and re-signing the leases). There is no evidence that but-for Vertex's alleged breach, Penthol would not have re-signed the leases anyway, nor was there evidence that the renewed leases were more expensive or otherwise damaging to Penthol. By all indications, Penthol used the leased cars in 2021 and would have needed them regardless of when the SRMA terminated. Therefore, even if there was evidence of breach by Vertex, there are no resulting damages to Penthol that were proven by a preponderance of the evidence. Penthol knew it was going to have to pay $100,000-$150,000, and it did pay $100,000.

The Court finds that Vertex did not breach its contract in this regard and that Penthol has not proven damages even if it had proven a Vertex breach. For the above reasons, the Court finds for Vertex on this cause of action.

### V.      Misappropriation of Trade Secrets

Penthol also brings a claim for misappropriation of trade secrets. To succeed on a claim for misappropriation of trade secrets under the DTSA and/or TUTSA, a plaintiff must prove "(1) a trade secret existed, (2) the trade secret was acquired through breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." *M-I L.L.C. v. Q'Max Sols., Inc.*, 2019 WL 3565104, at *3 (S.D. Tex. Aug. 6, 2019). "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means. Tex. Civ. Prac. & Rem. Code § 134A.002(2) ("TUTSA"); 18 U.S.C. § 1839(6) ("DTSA"). Improper means does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." *Id.*

Under both TUTSA and DTSA, trade secret is defined as "information . . . that (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts reasonable under the circumstances to maintain its secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002(6)(A)&(B); 18 U.S.C. § 1839(3). "[M]atters of general knowledge in an industry are not trade secrets." *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 705 (W.D. Tex. 2019). There is no competitive advantage if something is equally available to all competitors in the market. *See In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

Here, Vertex allegedly misappropriated Penthol's trade secrets when seeking an investment from Tensile.[5] As discussed above, Vertex sought an investment from Tensile for a multitude of reasons, including for research and development of a Group III base oil made from UMO. In various presentations and emails to Tensile, Vertex included profit projections and some predicted costs associated with selling a domestically produced Group III base oil. Penthol argues that these profit and freight cost projections used data derived from ADBase sales, that the pricing of ADBase sales was confidential business information, and that Vertex only had access to this information because of the SRMA.

Penthol claims Vertex used Penthol trade secrets regarding pricing in an email dated July 18, 2019, which listed an "average" selling price for ADBase approved formulations. This average selling price included mostly non-confidential spot sale prices. Penthol also claims that Vertex used its trade secrets in its pitch presentations to Tensile. Penthol claims the following statements (made by Vertex to Tensile) contain its trade secrets:

1. "Domestic capacity will be freight advantaged over foreign supply by $0.25 per gallon" and "Majority of Group III supplied to US are imported from the Middle East and Asia representing an $0.25/gal transportation disadvantage." (PTX-5 at 11, 15).

2. "Vertex-Penthol sold 16 million gallons imported in the first 12 months." (Appx. at 576:5-12).

---

[5] Penthol also argued that Vertex misappropriated trade secrets by sending customer Valvoline a post-termination email. The email contained expected February 2021 pricing information for ADBase. The Court easily finds for Vertex on this claim of misappropriation. Penthol cannot fault Vertex for failing to help them wind up the SRMA while simultaneously accusing Vertex of misappropriation of a trade secret for answering an important customer's request on Penthol's behalf when it was trying to help it wind up. The email in question was sent as the Penthol-Vertex relationship disintegrated. It gave Valvoline a pricing estimate for the upcoming month based on the prior pricing schedule between the parties; as a customer, Valvoline already had access to its own previous pricing schedule, which is the bulk of the alleged trade secrets. Finally, passing along requested information to an existing customer is arguably a requirement of the SRMA and Penthol did not prove any resulting damages. Therefore, to the extent that Penthol's claim is based on this alleged misappropriation, the Court finds for Vertex.

3. "Group III priced at Group II+ posting minus $0.42 per gallon." (Appx. at 577:3-7).

Penthol did not ask Vertex to sign an NDA regarding any of this information. (Appx. at 210:14-21, 839:22-840:8).

Regarding the second alleged trade secret—that 16 million gallons were imported in the first 12 months—the Court finds that Penthol failed to show that this information was not generally known or readily ascertainable, as it can be found on publicly available platforms like ImportGenius. Therefore, this import information is not a trade secret under the DTSA or TUTSA. The Court's remaining analysis will therefore concern only the first and third alleged trade secrets—the averaged pricing information.

The evidence is mixed on the first element as to whether a trade secret existed. A trade secret must be not generally known or readily ascertainable, and the trade secret owner must have taken reasonable steps to keep the information secret. Evidence shows that the pricing information was maintained on an online database, kept by Vertex, requiring log-in credentials. Erica Snedegar testified that, when making a sale to potential customers, she will often ask the potential customer how much they are currently paying for their base oil. She testified that customers almost always tell her as it is in their best interest to get a good deal. This testimony suggests that how much a customer pays for their base oil is not always kept confidential. Nevertheless, when being questioned about a spreadsheet containing pricing information, Snedegar admitted that the information was of the sort which would normally be confidential and kept away from competitors. Furthermore, it is unclear whether averaging the profits/pricing, as Snedegar did here, affects the information's confidentiality (given that many of the individual figures were non-confidential spot prices and an average would disguise the actual prices).

The evidence on the second element of trade secret misappropriation is also a mixed bag. The second element requires that Penthol show that the trade secrets were acquired through breach of a confidential relationship or discovered through improper means. There was no evidence that the pricing information was discovered through improper means, considering that Vertex developed and maintained the spreadsheets in accordance with its contractual obligations. Thus, the question is whether the trade secret was acquired through breach of a confidential relationship. The parties did not sign an NDA regarding the pricing information, there was no evidence that Penthol asked Vertex to keep the information confidential, and Penthol did not ask Vertex to return or delete the pricing data after the SRMA terminated. Still, Vertex only had access to Penthol's pricing because of its role as sales representative under the SRMA.

The third element requires that Penthol show Vertex used the information without Penthol's authorization. This element is more straightforward because Vertex clearly did not seek or have permission or authorization from Penthol. Snedegar admitted that she did not ask Penthol if she could use their pricing information before sending the email to Tensile.

While Penthol may have met its burden for these three requirements, it also must prove by a preponderance of the evidence that it *owned* the alleged trade secrets. Under the DTSA, the term "owner," with respect to a trade secret, "means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. 1839(4). Vertex contends that Penthol is not the owner of the trade numbers Vertex maintained.

The Court finds that Penthol has not proven it is the owner of the above trade secrets, or, rather, that it is the *exclusive* owner as compared to Vertex. The SRMA is silent as to which party has rightful legal or equitable title to, or license in, the averaged pricing information. While the ultimate product sales and prices were approved by Penthol, all pricing information was

created or obtained, compiled, stored, and maintained by Vertex. Evidence shows that Vertex negotiated the prices with customers, recorded that pricing data into the online database, and then provided the information to Penthol. Thus, evidence shows that creating, maintaining, and using ADBase pricing information was a joint effort by Vertex and Penthol.

Thus, by a preponderance of the evidence, Vertex and Penthol shared joint ownership and license in the alleged trade secrets.[6] Accordingly, Penthol has not proven that it created or maintained the information it claims as trade secrets. *See, e.g., Focused Impressions, Inc. v. Sourcing Group, LLC, 2020 WL 1892062*, *4 (D. Mass 2020) (in dispute over ownership of a trade secret, who "created" and "maintained" the information is relevant to ownership question); *NJ Coed Sports LLC v. ISP Sports, LLC*, 2023 WL 3993772, *4 (D.NJ. June 14, 2023) (creation, maintenance, and efforts to keep secret are relevant to ownership).

Even if Penthol had established each element of trade secret misappropriation, including ownership, the Court would still find that the evidence, or lack thereof, compels a finding for Vertex on the issue of damages. As an initial matter, the Court finds that there is no evidence of actual damage from the disclosures discussed above. In addition to authorizing recovery of actual damages, however, the DTSA and TUTSA also authorize recovery of unjust enrichment or disgorgement. Any unjust enrichment awarded must be "caused by the misappropriation of the trade secret." 18 U.S.C. 1836(b)(3)(B)(i)(II).

That being the case, Penthol argues that Vertex misappropriated its trade secrets to obtain the Tensile investment. Penthol then concludes that it is entitled to disgorgement of Vertex's

---

[6] This is certainly not to say that in a typical agency relationship, the agent is an "owner" of any of the principal's trade secrets that the agent uses, maintains, or creates. Rather, the specific facts and circumstances of *this* relationship with regard to *these* trade secrets indicate that Vertex was so intertwined and exercised such control over the pricing information such that it was a joint owner. Furthermore, there appear to be no restrictions for Vertex's use of this data. For instance, nothing in the SRMA prevented Vertex from factoring in ADBase pricing into its own pricing for VTX-6.

profits from the sales of High VI VTX 6. If those two premises seem unrelated, it is because they are (at least, Penthol failed to prove any causal relationship). The conduct forming the basis for Vertex's alleged *liability* is communication to an investor; by contrast, the conduct forming the basis for Penthol's alleged *damages* is sales of a different product to customers. Penthol made clear at trial that it is not seeking disgorgement of Vertex's investment from Tensile. Furthermore, Penthol failed to prove that Vertex's VTX-6 sales or profits increased because of the misappropriation in connection with the Tensile presentation. Given that award of unjust enrichment must be *caused by* the misappropriation, and given the failure to prove by a preponderance of the evidence any causal nexus between the Tensile investment and VTX-6 sales, the Court finds that Penthol is not entitled to any damages. As such, Penthol cannot recover on this cause of action.

## VI.    Competing Claims for Breach of § 7.2: Termination

Finally, both parties have presented competing claims for breach under § 7.2 of the SRMA. On one hand, Penthol believes that Vertex terminated the SRMA in its January 27, 2021 letter, and consequently, Penthol is entitled to approximately $40,000 in damages related to hiring additional employees related to the termination. On the other hand, Vertex believes that Penthol wrongfully repudiated[7] the SRMA in its December 18th letter, or, alternatively, that the

---

[7] This repudiation theory is the subject of the parties' briefing filed on the eve of trial. Considering the briefing, case law, and evidence adduced at trial, the Court denies Penthol's Motion to Strike Vertex's unpled Claim of Repudiation. To the extent repudiation requires a party to use the magic word "repudiation" in its pleadings, Penthol is correct that Vertex did not plead the word in its pleadings. A distinction must be made, however, between repudiation as a theory of breach of contract, and repudiation as an affirmative defense to a breach of contract action. As an affirmative defense to a breach of contract claim, repudiation would presumably have to be pled as any other affirmative defense. As an offensive theory/basis for breach of contract, repudiation appears to not need to be pled separately. *See, e.g., ExxonMobil Global Servs. Co. v. Gensym Corp. & Versata Enterprises, Inc.*, 54 F.Supp.3d 707, 710-711 (W.D. Tex. 2014) (granting Exxon's motion for summary judgment on its breach of contract claim, reasoning that the defendant's "repeated failures to provide the license codes amounted to repudiation," though neither Exxon's motion nor complaint mentions the word "repudiation"). Even if repudiation, as a theory for breach, must be supported by the pleadings, the Court finds that Vertex has pled facts supporting a theory of repudiation. "Under Rule 8 of the Federal Rules of Civil Procedure, it is enough that the plaintiff plead sufficient facts to put the defense on notice of the theories on which the complaint is based." *TIG Ins. Co. v. Aon Re,*

letter "lit the fuse" of termination once Vertex refused to cure the alleged defect.  Consequently,

Vertex believes it is entitled to unpaid and future commissions and performance incentives.

Obviously, Vertex bears the burden of proof on these counterclaims.

Since the parties dispute how § 7.1 and § 7.2 of the SRMA apply to these facts, the Court

will look first to the language of the contract. The evidence established that the SRMA was not

set to expire until December 31, 2021. Thus, this dispute involves activities with 11-12 months

remaining on the SRMA. That being the case, one must look to the contractual terms governing

early termination.

Section 7.1 outlines early termination events. Subsection (b) states that:

> Either Party shall have the **right to terminate** this Agreement upon . . . the failure of a Party to perform any material covenant or obligation set forth in this Agreement if <u>such failure is not remedied within thirty (30) Business Days</u> after receipt of a Notice specifically describing the nature of the default; **provided, however, that** in the event the alleged default is cured within such thirty (30) day period, this Agreement shall remain in full force and effect and not be terminated as a result of such default.

SRMA § 7.1(b) (emphasis added). The contract defines Business Days as days, other than

Saturday and Sunday, in which commercial banks in Houston, Texas operate. *See* SRMA § 1.1,

Definitions. Additionally, § 7.2 outlines the parties' rights upon termination. It states that:

> [T]he Parties agree that within a commercially reasonable time after termination of this Agreement as provided in Section 7.1, the Parties will settle and liquidate all transactions and obligations entered into pursuant to this Agreement in an orderly and commercially reasonable manner. The non-defaulting party shall be entitled, in its sole discretion, to set-off any amount payable by the non-defaulting party to the defaulting party under this Agreement or otherwise, against any amounts payable by the non-defaulting party to the defaulting party . . .

---

*Inc.*, 521 F.3d 351, 357 (5th Cir. 2008) (quoting *Simpson v. James*, 903 F.2d 372, 375 (5th Cir. 1990)). Vertex's position has been consistent throughout the case: that Penthol's December 18th letter wrongfully terminated the contract. Moreover, as explained in the text, the Court does not find the contract to have been repudiated on December 18, 2020; thus, there is no harm to Penthol in addressing Vertex's repudiation theory.

The primary evidence pertaining to this situation is a short series of letters. Therefore, the Court must closely examine the pertinent letters exchanged between the parties and the relevant timeline.

- On December 18, 2020, Penthol sent a letter to Vertex that Penthol described as a "Notice of Certain Early Termination Events" pursuant to § 7.1(b). The letter states that "if Vertex does not cure the defaults described below within thirty (30) business days after receipt of this Notice, **Penthol will terminate** the Agreement pursuant to Section 7.1(b)." (PTX 26) (emphasis added). The alleged "defaults" described was Penthol's belief that Vertex breached § 3.4 by selling a competing product (High VI VTX-6).   December 19th would be Day One (1) of the thirty Business Day countdown.

- On January 19, 2021, Vertex responded to Penthol's December 18th letter stating that it believed Penthol had no legitimate basis to terminate the agreement under § 7.1(b). It states that "**if Penthol does terminate the Agreement, that will constitute a material breach of the Agreement**, and Vertex will seek all available remedies under the law for that breach, including damages and attorneys' fees. In the event Penthol does follow through on its threat to terminate the Agreement, I must remind Penthol about its obligations not to disparage or defame Vertex or any of its employees." (PTX 67) (emphasis added).

- On January 27, 2021, having received no response to its January 19th letter, Vertex sent another letter to Penthol. This letter stated "This letter pertains to your December 18, 2020, correspondence. As we detailed in our January 19, 2021 letter back to you, Penthol's default allegations are false. Nevertheless, Penthol has not withdrawn its December 18, 2020 termination notice. **So, pursuant to Section 7.1, Vertex considers the Agreement terminated**, albeit wrongfully by Penthol." (PTX 45) (emphasis added).

- On January 29, 2021, Penthol sent a response letter confirming that the SRMA had been terminated. It states that "In your letter of January 27, **you acknowledge and confirm the termination of the Agreement**. . . Rather than cure its material breaches of the Agreement, **Vertex has elected to 'consider []the Agreement terminated'** as stated in your January 27 letter. Thus Vertex has acknowledged and consented to the termination. **To be clear, Penthol agrees with Vertex that the Agreement has been terminated under section 7.1 of the Agreement**." (PTX 233) (emphasis added).

- Pursuant to the SRMA's definition of "Business Days," 30 days after Penthol's first letter would have been February 3, 2021. This date is reached by setting December 18, 2020 as "day zero." Under the SRMA, weekends and bank holidays, including December 25, 2020, January 1, 2021, and January 18, 2021,

are not counted. Days 1–8 end on December 31, 2020. Days 9–27 end on January 29, 2021, and Day 28 is February 1, 2021. Day 30, therefore, falls on February 3, 2021, making February 4, 2021 the earliest date that Penthol could terminate.

Penthol argues that the December 18th letter was a warning, or threat, to terminate. It argues that the letter gave Vertex 30 days to cure its alleged breach (producing and selling High VI VTX-6). The 30th day after the letter, according to the contract's definition of "Business Days," would be February 3, 2021. Thus, under Penthol's interpretation, the December 18th letter *itself* could not have terminated the contract; it was, instead, Vertex's January 27th letter, sent before the close of the 30-day window, that actually terminated the contract. Penthol supports this argument by pointing to evidence in which both parties continued performing the contract until January 27th. For example, it was not until after January 27th that Vertex cut off Penthol's access to the shared workbook and told customers that Vertex was no longer selling ADBase on behalf of Penthol. These actions indicate that up until January 27th, Vertex considered the SRMA to be operative, but on the 27th, Vertex considered the contract to have been terminated.

By contrast, Vertex presents two arguments for why the December 18th letter terminated the SRMA. Vertex's first argument is that the December 18th letter "lit the fuse" of termination and set into motion an inevitable termination, which could only be stopped by Vertex "curing" the alleged defect (producing and selling High VI VTX-6). To support this interpretation, Vertex points to the clause in § 7.1 beginning with "provided, however, that . . . ." Vertex argues that the word "provided" introduces the *only* event that could stop termination after the receipt of a defect notice—cure.  Given that Vertex refused to cure  the alleged defect in its January 19th letter, Vertex argues that the December 18th letter terminated the SRMA.

The Court disagrees with Vertex's "lit the fuse" interpretation of § 7.1(b). The first line of § 7.1(b) reads "Either Party shall have the **right to terminate** this Agreement upon," and the

following lines describe the events that trigger the *right to terminate*, not termination itself. Therefore, the clause beginning with "provided" is not modifying *termination*. It is modifying the *right to terminate*. Contrary to Vertex's interpretation, curing the defect identified in a notice letter does not stop termination from occurring; rather, curing such defect means that the party who sent the letter no longer has a right to terminate. Conversely, "not curing" within thirty days only gives the notifying party the right to terminate.[8] As such, the Court concludes, based on the language of the SRMA, the language of the actual letter, the remainder of the evidence, and the applicable law that the contract was not, by its terms, terminated by Penthol's December 18th letter. This is reinforced by the evidence that the December 18th letter is clearly addressing an event in the future, and that Vertex's January 19th response makes it clear that Vertex did not consider the SRMA to have been terminated. While denying that Penthol had a right to terminate based on High VI VTX-6, the response clearly recognizes that Penthol had not yet terminated and that it would be a breach if it did so on this ground. That letter closes as follows:

> Penthol has no legitimate basis to terminate the Agreement under § 7.1(b). **If Penthol does terminate the Agreement,** that will constitute a material breach of the Agreement, and Vertex will seek all available remedies under the law for that breach, including damages and attorneys' fees. **In the event Penthol does follow through on its threat to terminate the Agreement,** I must remind Penthol about its obligations not to disparage or defame Vertex or any of its employees.

> Despite the ongoing litigation between the parties, Vertex believes that both parties, and most importantly, the customers of the ADNOC Group III base oil, **are best served if Penthol maintains the Agreement until the previously agreed termination date**. We are therefore available to discuss your letter at your convenience.

(PTX 67) (emphasis added).

---

[8] Since it is the notifying party's right to terminate after 30 days, the fact that Vertex did not wait until the expiration of the 30-day period to send its January 27th letter does not control this aspect. Under the language of the contract, it was never Vertex's right to terminate after 30 days—if anyone had the right to terminate, it was Penthol. Of course, a complicating factor is that there was no breach for Vertex to cure within those 30 days. Since Vertex exercised a preemptive strike on January 27, 2021, what Penthol would have done on February 4, 2021 is mere speculation.

Clearly, at this stage, the preponderance of the evidence proves that neither side considered the agreement terminated.

Nevertheless, Vertex presented a second theory for why Penthol's December 18th letter terminated the contract—the doctrine of repudiation. Vertex argues that, under the SRMA, it was not required to stop selling VTX-6, even VTX-6 with a VI over 120. The Court agrees. Selling Group II VTX-6 that occasionally had a VI over 120 was *not* a breach of the SRMA for the reasons set out above. Given this finding, Vertex believes that Penthol's December 18th letter repudiated the SRMA by unequivocally conditioning its continued performance on Vertex doing something it was not contractually obligated to do.

In Texas, in order to prevail on a claim for anticipatory repudiation, a plaintiff must establish each of the following elements: (1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party. *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004). Texas case law holds that a repudiation has been committed "when one party to the contract [1] demands of the other a performance to which he has no right to under the contract and [2] states definitively that unless his demand is complied with, he will not render his promised performance." *In re Windmill Run Assocs., Ltd.*, 566 B.R. 396, 445–46 (S.D. Tex. 2017) (citing *Humphrey v. Placid Oil Co.*, 142 F. Supp. 246 (E.D. Tex. 1956), *aff'd* 244 F.2d 184)). The non-repudiating party may then "accept the agreement as being terminated or consider the repudiation as a breach of contract and bring suit for damages." *Windmill*, 566 B.R. at 445 (citing *Hauglum v. Durst*, 769 S.W.2d 646 (Tex. App.–Corpus Christi 1989, no writ)). The non-repudiating party is entitled to maintain his action for damages at once for the entire breach, and is entitled in one suit to receive in damages the present value of the future payments payable to him by virtue of the contract. *Taylor Pub. Co. v. Sys. Mktg. Inc.*, 686

S.W.2d 213 (Tex. App. 1984), *writ ref'd* (May 8, 1985). It is important to note that under Texas common law, for contracts not governed by the Uniform Commercial Code, a party faced with anticipatory repudiation cannot claim damages for the anticipatory breach and at the same time treat the contract as in force. *Lumbermens Mutual Casualty Company v. Klotz*, 251 F.2d 499, 506 (5th Cir. 1958). It is also important to note that the wording of the actual contract in question sets out each parties' rights.

Here, Vertex's theory of repudiation fails for multiple reasons. First, Penthol's December 18th letter follows the prescribed language of the contract and was not an absolute repudiation. Second, Vertex's January 19th letter did not treat the December 18th letter as a repudiation, instead electing to keep the SRMA in effect. Third, both parties performed under the contract and behaved consistently with the SRMA until January 27, 2021. Finally, as far as Vertex was aware, its January 19th letter may have had its desired effect and convinced Penthol that its beliefs were misplaced.

The preponderance of the evidence shows that Penthol's December 18th letter was not a repudiation, even though it was a demand to stop selling High VI VTX-6 (something that Vertex was not otherwise obligated to do). Anticipatory breach requires an "absolute repudiation of an obligation" and a "lack of a just excuse for the repudiation." *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 239 (5th Cir. 2014). The evidence demonstrates that Penthol believed, albeit based upon an incorrect premise, that its December 18th letter served only as a notice asserting Penthol's position under the SRMA. *See In re Windmill Run Associates, Ltd.*, 566 B.R. 396, 447 (S.D. Tex. 2017) (noting that "the assertion of such a right, whether done correctly or not, was not in itself an unequivocal repudiation of the contract"). In *Windmill*, the court noted that repudiation occurred when the breaching party "took an action that was an unequivocal act that

rendered impossible Debtor's continued performance under the contract." *Id*. Here, no such act is present. Though Penthol stated that it would terminate the SRMA if Vertex did not comply, Penthol acknowledged that it would not have a right to do so until 30 days had passed. Given these factors, the Court finds that Penthol's mistaken understanding as to High VI VTX-6 was not a repudiation.

Vertex's January 19th letter clearly demonstrates that Vertex believed the contract to be in place and it elected *not* to treat the repudiation as a breach. Under Texas law, repudiation gives the non-repudiating party the option to treat the repudiation as a breach or ignore it and await the agreed upon time of performance. *Ingersoll–Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 211 (Tex. 1999). The non-repudiating party must do one or the other; it cannot do both. *Bumb v. InterComp Techs., L.L.C.*, 64 S.W.3d 123, 125 (Tex. App.—Houston [14th Dist.] 2001, no pet.). Vertex's January 19th letter clearly talks about the SRMA in the present tense and states that the parties and their customers would be best served if the SRMA remained in effect. Vertex even attempted to correct Penthol's mistaken belief about High VI VTX-6 being a default under the SRMA. It was clearly awaiting the agreed time of performance. Therefore, the preponderance of the evidence (including the January 19th letter) demonstrates that, at the time, Vertex did *not* consider the SRMA to have been terminated and did *not* consider the December 18th letter to have been a repudiation. Even if Vertex could have considered the December 18th letter to be a repudiation, Vertex made its decision to ignore the repudiation and continue operating business as usual under the SRMA.

Further, a preponderance of the evidence shows that both Vertex and Penthol continued to perform under the SRMA until Penthol received Vertex's January 27, 2021 termination letter. Thus, as of January 26, 2021, the parties continued to perform their obligations under the SRMA.

Finally, Penthol could have opted not to terminate after receiving Vertex's January 19th letter. It was Penthol's impression that it sent a notice of default under the SRMA, which, had it not been cured, would give Penthol the *right* to terminate. Upon receiving the January 19th letter, Penthol could have realized that it was mistaken about the High VI VTX-6 or, even if it did not, it could have opted not to exercise its supposed right to terminate.

For these reasons, Vertex has failed to prove, by a preponderance of the evidence, that it is entitled to recover for breach of contract due to Penthol's alleged repudiation. The Court finds by a preponderance of the evidence that as of January 19, 2021—the date of Vertex's response to the December 18th letter—the contract was in effect and both sides were performing at least to some degree.

While both sides presented testimony at trial that, at the time of the January 19th letter (and even as late as January 26, 2021), they wanted to continue the SRMA and were performing under the SRMA, there is little evidence that either party made a meaningful attempt at reconciliation. On the whole, the evidence proves that the relationship between the parties permanently changed in late 2020. Vertex blames the hiring of Gill and his subsequent actions as the pivotal turning point. Vertex became suspicious that Penthol's new CEO, Gill, was circumventing them by talking to shared clients (and he probably was) and ultimately filed suit. Meanwhile, Penthol became suspicious that Vertex was trying to develop a Group III base oil or that it would try to supplant Penthol as ADNOC's marketeer (the former of which was certainly true at one point in time). The temporary injunction issued by a Texas state court only exacerbated tensions. By the time Penthol sent its December 18th letter, both sides harbored concerns about continuing their relationship. Moreover, the price of Group III base oil was

expected to skyrocket in 2021 and Vertex saw this as a motivating factor. Thus, Penthol had the incentive to manage its own logistics and stop giving a cut of their profits to Vertex.

The parties' status changed on January 27, 2021, when Vertex wrote Penthol the following:

> This letter pertains to your December 18, 2020, correspondence. As we detailed in our January 19, 2021 letter back to you, Penthol's default allegations are false. Nevertheless, Penthol has not withdrawn its December 18, 2020 termination notice. So, pursuant to Section 7.1, **Vertex considers the Agreement terminated**, albeit wrongfully by Penthol.

(PTX-45) (emphasis added).

The evidence demonstrates that this is the first time one of the parties, in the present tense, actually considered the contract terminated. Vertex also cut off Penthol's access to the shared database on January 27, 2021. The evidence also demonstrates that while this termination may not have complied with the requirements in the SRMA, those requirements became irrelevant and were waived when two days later Penthol accepted the termination, by stating the following in its January 29, 2021 correspondence:

> **The Agreement has been terminated**
>
> Rather than cure its material breaches of the Agreement, Vertex has elected to "consider[] the Agreement terminated," as stated in your January 27 letter. Thus Vertex has acknowledged and consented to the termination. **To be clear, Penthol agrees with Vertex that the Agreement has been terminated under section 7.1 of the Agreement**.

(PTX-233) (emphasis added).

Section § 7.1 of the SRMA is entitled "Early Termination" and includes termination by mutual agreement.

Thus, the evidence proves that both sides agreed to a termination, perhaps with each side motivated by incorrect assumptions or suspicions. Penthol made inaccurate assertions in both of

its December 18th and January 29th letters by suggesting that Vertex's production of High VI VTX-6 was a breach. As the evidence at trial clearly demonstrated, this assertion was not accurate. Vertex on the other hand, wrongfully claimed that as of January 27, 2021, if not a month earlier, Penthol had wrongly terminated the contract. It is clear that Penthol had not, at that point, terminated the contract nor did it have the right to terminate, as the 30-business day period to cure had not passed. Penthol could have easily and justifiably considered the arguments set out by Vertex in its January 19th letter (to the effect that Vertex was not in breach) to be meritorious and either withdrawn its December 18th letter or, at the expiration of the cure time period, merely opted to leave the contract intact.

Having found that the December 18th letter did *not* terminate the SRMA, the Court finds that the SRMA was mutually terminated in accordance with SRMA § 7.1(d).[9] The Court hereby rules that the contract was mutually terminated on January 29, 2021. The evidence proves that an agreement existed between the parties that the SRMA had been terminated on this date. Given that the SRMA was mutually terminated, neither Penthol nor Vertex is deemed the defaulting or non-defaulting party under the SRMA. Thus, neither party is entitled to future damages for full performance of the contract, nor is either party entitled to attorney's fees under § 7.2. Though neither party is entitled to future damages, the Court must still resolve where such a finding leaves the parties' respective claims for damages relating to the time periods surrounding the termination itself.

### 1. *Penthol's Damages relating to termination*

Penthol argues, despite the mutual termination, that it is nonetheless entitled to approximately $40,000 in damages related to hiring additional employees following termination.

---

[9] The Court notes that Penthol has admitted, both at trial and in pretrial motions, that it "mutually terminated" the SRMA in the letters it sent following the January 27th letter.

35

It argues that Vertex failed to wind up the contract in a commercially reasonable and orderly manner by, for example, cutting off access to the shared workbook.[10] The Court finds for Vertex on this issue. Evidence at trial showed that, with a few exceptions, these additional employees are still employed by Penthol and would have been hired following either an early termination by Penthol or the natural termination of the SRMA. Also, Penthol employee Bryan Stewart testified that he was not made aware of the December 18th letter sent by Penthol and was not told by anyone at the company that the SRMA might terminate. Had he been given a proper notice by his superior, he could have begun the process of taking over sales logistics over a month earlier. Thus, despite its December 18th letter, Penthol did nothing to mitigate any potential damages it may have incurred. Finally, no credible evidence (such as accounting or employee records) was presented to support the $40,000 figure. Rather, the $40,000 appears wholly speculative by Gill.

Additionally, Penthol argues that it is the "non-defaulting party" under § 7.2 and is therefore entitled to set-off amounts owed to Vertex (namely the unpaid 2020 performance incentive). This fails for two reasons. First, as held above, Penthol has failed to prove any damages with which to off-set its amount owed. Second, the Court does not agree that Vertex is a "defaulting" party within the meaning of § 7.2, considering that Penthol has admitted that the SRMA was mutually terminated regardless of how the mutual termination was effectuated. As such, Penthol is not entitled to offset any amounts owed to Vertex at the time of termination.

### 2. *Vertex's Damages relating to the SRMA*

Vertex argues that Penthol wrongfully terminated the SRMA by breaching or repudiating the contract in its December 18th letter. As such, Vertex believes it is entitled to (1) commissions

---

[10] Section 7.2 of the SRMA requires both sides after a termination to settle and liquidate all transactions and obligations in a "commercially reasonable manner."

and performance incentives that were due at the time of termination and (2) prospective commissions and performance incentives for 2021.

The Court agrees that, regardless of whether it was a mutual termination or not, Vertex is entitled to a "true-up," unpaid commission and unpaid performance incentives through 2020. Before setting out the numbers, the Court finds that Vertex's damages expert witness, Sheila Enriquez, was credible and that the breakdown of amounts owed in the time periods are convincing. (DX-137, 001-003). The Court agrees with her testimony that the performance incentives were improperly reduced because Penthol included bank fees and interest expenses allegedly borne by Penthol C.V., which were duplicative of the same amounts already listed under the expense column for Penthol LLC. The evidence at trial showed these values, and this Court hereby finds as damages the following.

**Unpaid Commission**[11]

| | |
|---|---|
| June 2016—Dec. 31, 2018: | $63,484.00 |
| 2019: | $11,945.00 |
| 2020: | $410,479.00 |
| Total: | $485,908.00 |

---

[11] Penthol argues that, based on the language of the contract, commission is only payable to Vertex once a customer has paid Penthol for the ADBase. It claims that there was no evidence that the customers, whose orders form the basis of these unpaid commissions, ever paid, or failed to pay Penthol. Accordingly, Penthol argues that Vertex has not met its burden showing that it is entitled to these commission amounts. Evidence at trial showed that every gallon of ADBase was sold by Vertex, and that in 2021, Penthol continued to sell its ADBase product successfully to the customer base built by Vertex. Moreover, Vertex's expert, Enriquez, testified that she calculated these unpaid commissions amounts using the amounts Penthol's accountants had recorded were actually due to Vertex in Penthol's own accounting records. Even under Penthol's argument, if these commissions were due according to Penthol's records, the customers must have paid. As such, notwithstanding the absence of evidence concerning specific, individual customer payments, the Court finds that Vertex proved by a preponderance of the evidence that it was owed unpaid commissions for the above time frame.

**Unpaid Performance Incentives**

| | |
|---|---|
| 2016—2018: | $218,790.00 |
| 2019: | $162,031.00 |
| 2020: | $529,984.00 |
| Total: | $910,805.00 |

Vertex, believing that it is the non-defaulting party, also seeks prospective commission and performance incentives for 2021 to compensate them for the full term of the SRMA. Vertex also seeks attorneys' fees under the contract. As explained above, the Court does not find either party to be the non-defaulting party and instead finds that, by a preponderance of the evidence, the termination process was initiated by Vertex's January 27th letter and was mutually terminated on January 29, 2021, when Penthol accepted. Therefore, as Vertex is not the non-defaulting party, it is not entitled to prospective commission and performance incentives for the entirety of 2021, nor is it entitled to attorneys' fees and costs under § 7.2. The Court does find that Vertex is entitled to commission and performance incentives through January 27, 2021, as Vertex continued working under the SRMA through that date. Vertex, however, only provided one lump sum for *all* of 2021 damages. That is, it did not separate out earnings for January of 2021. Given that the Court does not have evidence supporting a damages figure for *only* the month of January 2021, it cannot award Vertex damages for its work performed in early 2021.

## VII.   Conclusion

All factual findings above constitute the Court's findings of fact. All legal conclusions above constitute the Court's conclusions of law. It is hereby ORDERED that Penthol, LLC, shall pay all unpaid commissions in the amount of $485,908.00 and shall additionally pay the unpaid performance incentives in the amount of $910,805.00. Neither party is entitled to attorneys' fees or costs under the SRMA because the termination is mutual, and therefore neither party is the defaulting or non-defaulting party under § 7.2. The Court will enter a final judgment in a separate document as contemplated by Rule 58(a) of the Federal Rules of Civil Procedure.

Signed at Houston, Texas, this 7th day of March, 2024.

Andrew S. Hanen
United States District Judge